1 | Robert E. Boone III (132780)
2 | Nafiz Cekirge (255710)
  | Andrea N. Winternitz (275221)
3 | BRYAN CAVE LLP
  | 120 Broadway, Suite 300
4 | Santa Monica, CA 90401-2386
  | Telephone: (310) 576-2100
5 | Facsimile: (310) 576-2200
  | E-Mail: reboone@bryancave.com
6 |           nafiz.cekirge@bryancave.com
  |           andrea.winternitz@bryancave.com
7 | Attorneys for Defendant
8 | BANK OF AMERICA, N.A.

FILED
CLERK, U.S. DISTRICT COURT

SEP 15 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

9

10

11

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

12 | CV14  07188 -JAK(JCx)

13 | STEVIE BRADFORD, an individual;
   | JEFFERY WHITE, an individual;
14 | LETICIA MERCADO, an individual;
   | REFUGIO MERCADO, an individual;
15 | GLORIA FERREL, an individual;
   | ROBERT FERREL, an individual;
16 | KAREN GILMORE, an Individual;
   | LARRY MOORE, an individual;
17 | STEPHEN CHILDS, an individual;
   | FRANCISCO RAMIREZ, an individual;
18 | MARIA RAMIREZ, an individual;
   | MARIA PEREZ, an individual;
19 | WAYNE FONTZ, an Individual;
   | LOURDES FONTZ, an individual;
20 | JOHN LIPONI, an individual; DUNG
   | HO, an Individual, JOAN TUCKER, an
21 | individual; HAROLD TUCKER, an
   | individual; 20 WALTER LUSK, an
22 | individual; JAMES WILLIAMS, an
   | individual; HASSAN ABDALLAH, an
23 | individual; MARIA ABDALLAH, an
   | individual; LUIS SOTO, an Individual;
24 | ARMINE AKCHEIAN, an individual;
   | PETER BAIA T A, an individual;
25 | AGUSTIN (JOHN) LATOSQUIN, an
   | individual; CRAIG FREIS, an
26 | individual; CARLA ORTIZ, an
   | individual; MANUEL AMAYA, an
27 | individual; ANA JULIA AMAYA, an
   | individual; TERRY STRAW, an
28 | individual; STACY STRAW, an
   | individual; OSCAR BOBADILLA, an

Case No.

**BANK OF AMERICA, N.A.'S NOTICE OF REMOVAL**

Date Action Filed: September 8, 2014
Trial Date: None

[Filed concurrently with Declaration of Edward Cherkezian]

COPY

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

individual; JOSE ALVARENGA, an individual; JOSEPH MOORE, an individual; ADELA MOORE, an individual; GEORGE LUCAS, an individual; MARIA ODELL, an individual; ALEJANDRO BASURTO, an individual; CHOR CHUN NGAN, an individual; CARLOS CASTILLO, an individual; ISABEL ARREOLA, an individual; AMAR MALHI, an individual; KULWANT KAUR MALHI, an individual; JULIO SANTA CRUZ, an individual; DANIEL PERAZZO, an individual; DELJEAN STARKS, an individual; EDWARD GONZALES, an individual; BERNICE GONZALES, an individual; BARMWOOD COX, an individual; RUBEN GARCIA, an individual; AMBER KRAUS, an individual; GREG KRAUS, an individual; RAYMOND LUNA, an individual; PAUL RUSCONI, an individual; LARRY BLUFORD, an individual; MICHELLE HARBOUR, an individual; MARY DAVIDSON, an individual; KERALD MITCHELL, an individual; MERCY UMEOKAFOR, an individual; MARTIN LOZANO, an individual; DONALD MILLER, an individual; ALIS NAZIKYAN, an individual; EVA FLOWERS, an individual; CAL BELL, an individual; JAIME SEVILLA, an individual; WILMER YABAR, an individual; SALVADOR MARTINEZ, an individual; STEVEN THORNE, an individual; PETE FLORES, an individual; CYNTHIA FLORES, an individual; REYNALDO JAOJOCO, an individual; CORAZON JAOJOCO, an individual; PAT HENNEMANN, an individual; JOHN HENNEMANN, an individual; ROGER GOWRINATHAN, an individual; CARLOS HURTADO, an individual; NORMA NAVARRO, an individual; SCOTT STREISEL, an individual; TRACI JOHNSON, an individual; EMETERIO RODRIGUEZ, an individual; PEDRO PEREZ, an individual; GRISELDA PEREZ, an individual; HERMILO ROBLES GOMEZ, an individual; JOAQUIN REYES, an individual; MONICA GONZALEZ, an individual; MARCELINO ROMAN, an individual;

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  VICTOR MUNOZ, an individual;
INGRID MUNOZ, an individual;
2  ALFREDO JIMENEZ, an individual;
LARRY RIMER, an Individual; TONY
3  KEUSSEYAN, an individual; EILEEN
KEUSSEYAN, an individual; EMMIT
4  COLLIER, an individual; MARIA
CUARA, an individual; ALAN
5  HUNTER, an individual; RUDESINDO
FERNANDEZ, an individual;
6  CORNELIO BOSQUES an individual;
EDDIE EBRAHIMI, an individual;
7  ROXANA MARROQUIN, an
individual; PEDRO MARROQUIN, an
8  individual; ROCIO LOPEZ, an
individual; JUAN DE DIOS
9  LANDAVERDE, an individual;
REBECCA ARTMORE, an individual;
10  MICHEAL ARTMORE, an individual;
SHARON WILSON, an individual;
11  STANLEY GRAHAM, an individual;
ISIDRO DUARTE, an individual;
12  JESUS JUAREZ, an individual; LILIA
JUAREZ, an individual; HECTOR
13  RODRIGUEZ, an individual; FRED
LEY, an Individual; BETTY LEY, an
14  individual; LORENZO SELVA, an
individual; RITA SELVA, an individual;
15  MICHAEL DAVIDSON, an individual;
KIM DAVIDSON, an individual;
16  RAJAH NALLIAH, an individual;
NOELINE SHANMUGAN, an
17  individual; LINDA PAUL, an
individual; DENNIS ROSS, an
18  Individual; TIFFANY WONG, an
individual; LINDA K. HUNEKE, an
19  individual; REFUGIO ALARCON, an
individual; LEONARDO ALARCÓN,
20  an individual; MARGARITA
CONTRERAS, an individual; GEMMA
21  JIMENA, an individual; GLADYS
BOCANEGRA, an individual; JOSEPH
22  CEDILLO, an individual; KEITH KIM,
an Individual; KENT VAAGEN, an
23  individual; ARGEO GALLASTEGUI,
an individual; ISABEL
24  GALLASTEGUI, an individual; JOSE
VELADO, an individual, MARIA
25  VELADO, an individual; HECTOR
NIETO, an individual; BRENT BON, an
26  individual; MATTHEW HOFER, an
individual; ANA LARA, an individual;
27  JESUS GUEVARA, an Individual;
FERNANDO MORALES, an individual;
28  ELIA HERNANDEZ, an individual;

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  ARTURO CALDERON, an individual;
   JESUS GONZALEZ, an individual;
2  BRADLEY SMITH, an individual;
   RANNAH SMITH, an individual;
3  CHERYL WELCH, an individual;
   THOMAS POLITZ, an individual;
4  DAVID RICKARD, an individual;
   GUSTAVO GONZÁLEZ, an individual;
5  RODOLFO CAGAMPAN, an
   individual; REFUGIO DIAZ, an
6  individual; ROSARIO DIAZ, as
   individual; RUBEN ESPINOZA, an
7  individual; RENE ESPINOZA, an
   individual; LYNNE MARIE
8  RASMUSSEN, an individual; RONALD
   KOLODZIEJ, an individual;
9  MARJEANNE TENDLER, an
   individual; ARTHUR TENDLER, an
10 individual; MICHELE VESPIER, an
   individual; ANALILIA WADE, an
11 individual; LORRAINE JOHNSON, an
   individual; MEHRAN ABAZARY, an
12 individual; SOHEILA FERDOWSI, an
   individual; JULIE ASPIRAS M.D., an
13 individual; MARIA CIBRIAN, an
   individual; ERNIE ANZURES, an
14 individual; SHERI TOURTELLOTTE-
   JOHNSON, an individual; MANUEL
15 QUIROZ, an individual; SERGIO
   FAURRIETA, an individual; GARY
16 BROOKSHIER, an individual; MARIA
   GOMEZ, an individual; CHARLES
17 BATTLE, an individual; JON
   MARQUEZ, an individual; SHIRLEY
18 MARQUEZ, an individual; LOLITA
   MANAOAT, an individual; BENITO
19 GONZALEZ, an individual; CARLOS
   LEMUS, an individual; LINDA V. DEL
20 ANGEL, an individual; CHARLIE
   HARRIS, an individual ; SHELLEY
21 CALDWELL, an individual; DEBRA
   DEMAGNUS, an individual;
22 LAWRENCE BELL, an individual;
   YOLANDA TUMANENG, an
23 individual; VIRGINIA WESTON, an
   individual; FRANCIS FUNIESTAS, an
24 individual; MARISSA FUNIESTAS, an
   individual; GUILLERMO FLORES, an
25 individual; KENNETH SKAIFE, an
   individual; BALDEV SINGH, an
26 individual, DAVID MANAOAT, an
   individual; LEAH MANAOAT, an
27 individual; ALFONSO BORJA, an
   individual; AVELINA BORJA., an
28 individual; RICARDO FAJARDO, an

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1  individual; GRACE HONG, an
   individual; STEPHEN HARRIS, an
2  individual; ROBERTA BURTON, an
   individual; OTHELLO ABATA, an
3  individual; ERLINDA ABATA, an
   individual; YOUNG J. PARK, an
4  individual; CHRISTOPHER
   FLORENDO, an individual; DELICIA
5  FLORENDO, an individual; TEIRA
   DOOM, an individual; CIRILO
6  GOMEZ, an individual; YOLANDA
   SMITH, an individual; LEVITA
7  TAYLOR, an individual; WILLIAM
   TAYLOR, an individual; JANET
8  HAGEN, an individual; JAMES
   HAGEN, an Individual; LOLITA
9  CUNANAN, an individual; JOHNNY
   VISTA, an individual; OLGA VISTA,
10 an individual; ANDRES IBARRA, an
   individual; ANABELLA IBARRA, an
11 individual; ESTELLA DOMINGUEZ,
   an individual; MARIA LAZARO, an
12 individual; JESUS LAZARO, an
   individual; ALLEN WILSON, an
13 individual; THOMAS LUKE, an
   individual; DEBORAH LUKE, an
14 individual; JUAN MOYA, an individual;
   VERONICA MOYA, an individual,
15 ROBERT RODEN, an individual;
   MANUEL BRITO, an individual;
16 DAVE MAFFIE, an individual; LINDA
   HUBBARD, an individual; EDUARDO
17 MUNOZ, EDDIE MUNOZ, an
   individual; ROLANDO MARTINEZ, an
18 individual; RONALD RUIZ, SANDRA
   RUIZ, an individual; HOPERT
19 MADISON, an individual; MARIA DE
   LA CRUZ, TERI O'ROURKE, an
20 individual; SANDRA MORAN, an
   individual; JUAN MUNOZ, an
21 individual; JAMES WALKER, an
   individual; WILLIAM COSTA, an
22 individual; TONY CASTADINI, an
   individual; BARBARA HARADA, an
23 individual; BARBARA HENRY, PAUL
   HENRY, an individual; DAWN
24 MAHURIN, an individual; MARK
   MORGAN, RICH JOHNSON, an
25 individual; MICHELLE JOHNSON, an
   individual; AURELIO RUIZ, an
26 individual; YASMIN KABUYA, an
   individual; GRACE ZARAZOGA, an
27 individual; CARLOS MEGALLONA,
   an individual; MARIO DIAZ,
28 MAGDALENA DIAZ, an individual;

CLIFTON KINGSTON, an individual;
VICTORIA ARCADI, an individual;
SCOTT COFFEY, STEPHEN JONES,
an individual; CHARLES AHUMADA,
an individual; JUAN SALCEDO, an
individual; RODOLFO JIMENEZ, an
individual; ROSA GARAICOA, an
individual; CHRISTINE PETERSEN, an
individual; EMILLE DECUIR, an
individual; COYE DECUIR, an
individual; KARL BURCH, an
individual; AARON SEBAH, an
individual; HANNELORE SEBAGH, an
individual; JOHN CHICA, an
individual; ROSEMARIE GONZALEZ,
an individual; DAWN CALLOWAY, an
individual; CARLOS NAVA, an
individual; GUADALUPE
CERVANTES, an individual;
JANEATTE GANTER, an individual;
GREGORY GANTER, an individual;
ALVARO PARADA, an individual;
LINO CAMBALIZA, an individual;
TERESA CAMBALIZA, an individual;
CINDY STENBECK, an individual;
KEN GALSTER, an individual;
JEROME GRANT, an individual;
AMPARO LIWANAG, an individual;
TINA TRUONG, an individual; NOEL
EZEKIEL, an individual; WANDA
ROGERS, an individual; JUDITH
CALDWELL, an individual; JAMES
DIGIOVANNI, an individual; JUDITH
PERKINS, an individual; ANNA
CALLIRGOS, an individual; MARIO
CALLIRGOS, an individual;
GUSTAVO MIRANDA, an individual;
JUSTIN SLEDGE, an individual;
RICARDO GARDOCE, an individual;
JOSEPHINE GARDOCE, an individual;
SCOTT LEE, an individual; TERESA
IRANNEJAD, an individual; MICHAEL
MCDONALD, an individual; GARY
SAGE, an individual; JUDY SAGE, an
individual; JUAN PAN, an individual;
LUISA VARGAS, an individual;
SERGIO VARGAS, an individual;
JESSE CHAPMAN, an individual;
LONNY PACE, an individual;
SAVIOUR AZZOPARDI, an individual;
KATHRYN AZZOPARDI, an
individual; BEATRIZ GARCIA, an
individual; GILBERTO SANABRIA, an
individual; PABLO JIMENEZ, an
individual; BERTHA GARCIA, an

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

BANK OF AMERICA, N.A.'S NOTICE OF REMOVAL

individual; MARTIN LOZANO, an
individual; ADRIAN AGUILAR, an
individual; JOSE GUTIERREZ, an
individual; WILLIAM DEBNAM, an
individual; SONIA CANAS, an
individual; VICTOR RIVERA, an
individual; ARTURO GALLEGOS, an
individual; and DENNIS ROSS

             Plaintiffs,

      vs.

BANK OF AMERICA
CORPORATION, a Delaware
corporation, authorized to do business in
California; BANK OF AMERICA,
N.A.; BANC OF AMERICA
MORTGAGE SECURITIES, INC., not
authorized to do business in California;
RECONTRUST COMPANY, N.A., and
DOES 1 through 100, inclusive

            Defendants.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA  90401-2386

1    **TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO ALL**

2    **PARTIES AND THEIR ATTORNEYS OF RECORD:**

3        **PLEASE TAKE NOTICE** that Defendant Bank of America, N.A.

4    ("BANA") removes the action styled *Bradford, et al. v. Bank of America, N.A., et al.*

5    (L.A. Co. Super. Ct. Case No. BC556820) (the "*Bradford* Action") from the

6    Superior Court of the State of California for the County of Los Angeles to the

7    United States District Court for the Central District of California based on diversity

8    jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d)

9    ("CAFA").

10   I.    **BACKGROUND**

11       1.    On September 8, 2014, 315 separately named Plaintiffs filed the

12   Complaint in the *Bradford* Action in Los Angeles County Superior Court. (Compl.,

13   Caption, pp. 1-6.)

14       2.    BANA was served with the Summons and Complaint on September 10,

15   2014.

16       3.    In the Prayer for Relief in the Complaint, Plaintiffs seek: (1)

17   "compensatory, special and general damages in an amount according to proof at

18   trial, but not less than $50,000,000, against all Defendants"; (2) an injunction

19   preventing "Defendants from proceeding with any foreclosure sale"; and (3)

20   cancellation of their foreclosure sales. (Compl., Prayer for Relief ¶¶ 1, 3-4.)

21   II.   **CAFA PROVIDES THE BASIS FOR REMOVAL**

22       4.    CAFA grants federal courts with original jurisdiction over certain class

23   actions and "mass actions." *See* 28 U.S.C. §§ 1332(d)(2), (11); *see also Miss. ex rel.*

24   *Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 739 (2014) (hereinafter, "*Hood*");

25   *United Steel v. Shell Oil Co.*, 602 F.3d 1087, 1091 (9th Cir. 2010).

26       5.    For purposes of jurisdiction and removal under CAFA, "mass actions"

27   are treated like class actions. *See* 28 U.S.C. § 1332(d)(11)(A).

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

6.    Accordingly, a civil action may be removed under CAFA as a "mass action" if: (1) it meets CAFA's statutory definition of "mass action"; (2) any plaintiff is a citizen of a state different from any defendant (*i.e.*, minimal diversity exists); and (3) the amount in controversy exceeds CAFA's jurisdictional threshold of $5 million exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2), (d)(11); *see also Hood*, 134 S. Ct. at 739-40.

7.    In addition, for a mass action to be removable under CAFA, at least one plaintiff must exceed the $75,000 amount in controversy threshold set in 28 U.S.C. section 1332(a). *See Abrego v. Dow Chem. Co*, 443 F.3d 676, 689 (9th Cir. 2006).

**A.    The *Bradford* Action Is a "Mass Action" within the Meaning of CAFA**

8.    CAFA defines a "mass action" as "any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact . . . ."[1] 28 U.S.C. § 1332(d)(11)(B).

9.    In the *Bradford* Action, all 315 individually named Plaintiffs propose to try their monetary relief claims jointly on the ground that their claims involve common questions of law and fact. Indeed, the Complaint expressly states that "Plaintiffs, and each of them, hereby demand a jury trial," and alleges that Plaintiffs were victims of a "common practice/scheme implemented by Defendants on a company-wide level scheme." (Compl., p. 1, ¶ 2.)

10.    Accordingly, the *Bradford* Action is a "mass action" within the meaning of CAFA. *See Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 868 (9th Cir.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

---

[1]    A civil action falling within this definition may not qualify as a "mass action" if it falls within certain exceptions defined by CAFA. *See* 28 U.S.C. §§ 1332(d)(11)(B)(ii)(I)-(IV). The *Bradford* Action does not fall within these exceptions.

1    2013); *see also Bullard v. Burlington N. Santa Fe Ry. Co.*, 535 F.3d 759, 762 (7th

2    Cir. 2008).

3        **B.**     **The *Bradford* Action Meets CAFA's "Minimal Diversity"**

4            **Requirement**

5       11.    CAFA's minimal diversity requirement is satisfied when "any member

6    of the class of plaintiffs is a citizen of a State different from any defendant." 28

7    U.S.C. § 1332(d)(2)(A); *see also Hood*, 134 S. Ct. at 740.

8       12.    BANA is a national bank with its main office, as set forth in its articles

9    of association, in North Carolina. (Decl. of Edward Cherkezian ("Cherkezian

10    Decl.") ¶ 7.) As such, BANA is a citizen of North Carolina. *See Wachovia Bank,*

11    *N.A. v. Schmidt*, 546 U.S. 303, 307 (2006); *Rouse v. Wachovia Mort., FSB*, 747 F.3d

12    707, 708 (9th Cir. 2014). BANA's principal place of business is also in North

13    Carolina. (Cherkezian Decl. ¶ 8.)

14       13.    As alleged in the Complaint, all Plaintiffs are citizens of California.

15    (Comp. ¶ 1.)

16       14.    Accordingly, minimal diversity exists.

17        **C.**     **The *Bradford* Action Meets CAFA's $5 Million Aggregate Amount**

18            **in Controversy Requirement**

19       15.    To remove an action to federal court under CAFA, the amount in

20    controversy must exceed "the sum or value of $5,000,000, exclusive of interest and

21    costs." 28 U.S.C. § 1332(d)(2).

22       16.    In determining the amount in controversy, the sum claimed by the

23    plaintiff in the complaint typically "controls." *Lewis v. Verizon Communs., Inc.*,

24    627 F.3d 395, 399 (9th Cir. 2010).

25       17.    Here, CAFA's amount in controversy threshold is met because

26    Plaintiffs expressly seek at least $50 million in the Complaint. (Compl., Prayer for

27    Relief ¶ 1.)

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

18. Moreover, "simple arithmetic" demonstrates that least one plaintiff must have in excess of $75,000 in controversy. *Carvalho v. Equifax Info. Servs.*, Case Number C 08-1317 JF (HRL), LLC, 2008 U.S. Dist. LEXIS 116687, at *6 (N.D. Cal. Jul. 7, 2008). If each of the 315 Plaintiffs sought $75,000 an no more, the aggregate amount in controversy would equal $23,625,000, which is less than the $50,000,000 sought by the Complaint.

19. In addition, Plaintiff Barmwood Cox, like all Plaintiffs, seeks an injunction against foreclosure and the cancellation of his foreclosure sale. (Compl., Prayer for Relief ¶¶ 3-4.) When a plaintiff seeks to enjoin a foreclosure sale, the amount in controversy is either "the fair market value of the property or the amount of indebtedness." *Sokoloski v. PNC Mortg.*, Civ. No. 2:14-1374 WBS CKD, 2014 U.S. Dist. LEXIS 108626, at *3 (E.D. Cal. Aug. 6, 2013). Under either approach, Cox meets the $75,000 amount in controversy threshold—his original loan balance was $1,119,770, his current loan balance is $1,064,673, and his property appraised at $1,500,000. (Cherkezian Decl. ¶ 9.)

## III.  OTHER REMOVAL REQUIREMENTS FOR REMOVAL BASED ON FEDERAL QUESTION JURISDICTION AND CAFA ARE SATISFIED

20. **This Removal Is Timely.** Under CAFA, a notice of removal must be "filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of a pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b); *see also* 28 U.S.C. §§ 1332(d)(11) & 1453(b). Because this Notice of Removal is filed within 30 days of the service of the Summons and Complaint on BANA on September 10, 2014, the Notice of Removal is timely.

21. **The Rule Of Unanimity Is Inapplicable, But In Any Event Is Satisfied.** Removal under CAFA does not require the consent of the non-removing defendants. *See* 28 U.S.C. § 1453(b).

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

1    22.    **Notice To Parties And State Court.**  In compliance with 28 U.S.C.

2    section 1446(d), a copy of this Notice of Removal is being served on all parties of

3    record, including all adverse parties, and will be filed with the Clerk of the Superior

4    Court of the State of California for the County of Los Angeles promptly after the

5    filing of this Notice of Removal.

6    23.    **This Court Is The Proper Venue For This Action.**  The proper venue

7    for removal is "to the district court of the United States for the district and division

8    embracing the place where such action is pending."  28 U.S.C. § 1441(a).  As the

9    Western Division of the United States District Court for the Central District of

10   California embraces the County of Los Angeles, removal to this Court is proper.  28

11   U.S.C. § 84(c)(2).

12   24.    **Attachment Of All Process, Pleadings, and Orders.**  In compliance

13   with 28 U.S.C. §1446(a), "all process, pleadings, and orders served upon" Bank of

14   America is attached hereto as Exhibit A.  28 U.S.C. §1446(a).

15   **IV.    CONCLUSION**

16   25.    For the foregoing reasons, BANA removes the *Bradford* Action to this

17   Court and requests that this Court exercise jurisdiction over the *Bradford* Action.

18

19   Dated:  September 15, 2014

Respectfully submitted,

20   **BRYAN CAVE LLP**

21   By:

22   Nafiz Cekirge
     Attorneys for Defendant

23   BANK OF AMERICA, N.A.

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CA 90401-2386

# EXHIBIT A

COPY    12-45    9/10/14

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 08 2014

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

See Attachment    BANK OF AMERICA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

See Attachment    STEVE BRADFORD
AN INDIVIDUAL

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:    CASE NUMBER:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court    (Número de Caso):

Stanley Mosk Courthouse    BC 556 820
111 N. Hill Street Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Brookstone Law, P.C 18831 Von Karman Ave., Irvine, CA 92612

SHERRIR.CARTER

DATE:    Clerk, by    CRISTINA GRIJALVA    , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

[SEAL]

SEP 08 2014

3. ☒ on behalf of *(specify):* Bank of America, n.A.

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☒ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

--EXHIBIT A-- PAGE 6

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRADFORD vs. BANK OF AMERICA, N.A. | |

_____INSTRUCTIONS FOR USE_____

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[✓] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

STEVIE BRADFORD, an individual; JEFFERY WHITE, an individual; LETICIA MERCADO, an individual; REFUGIO MERCADO, an individual; GLORIA FERREL, an individual; ROBERT FERREL, an individual; KAREN GILMORE, an individual; LARRY MOORE, an individual; STEPHEN CHILDS, an individual; FRANCISCO RAMIREZ, an individual; MARIA RAMIREZ, an individual; MARIA PEREZ, an individual; WAYNE FONTZ, an individual; LOURDES FONTZ, an individual; JOHN LIPONI, an individual; DUNG HO, an individual; JOAN TUCKER, an individual; HAROLD TUCKER, an individual; 20 WALTER LUSK, an individual; JAMES WILLIAMS, an individual; HASSAN ABDALLAH, an individual; MARIA ABDALLAH, an individual; LUIS SOTO, an individual; ARMINE AKCHEIAN, an individual; PETER BAIA T A, an individual; AGUSTIN (JOHN) LATOSQUIN, an individual; CRAIG FREIS, an individual; CARLA ORTIZ, an individual; MANUEL AMAYA, an individual; ANA JULIA AMAYA, an individual; TERRY STRAW, an individual; STACY STRAW, an individual; OSCAR BOBADILLA, an individual; JOSE ALVARENGA, an individual; JOSEPH MOORE, an individual; ADELA MOORE, an individual; GEORGE LUCAS, an individual; MARIA ODELL, an individual; ALEJANDRO BASURTO, an individual; CHOR CHUN NGAN, an individual; CARLOS CASTILLO, an individual; ISABEL ARREOLA, an individual; AMAR MALHI, an individual; KULWANT KAUR MALHI, an individual; JULIO SANTA CRUZ, an individual; DANIEL PERAZZO, an individual; DELJEAN STARKS, an individual; EDWARD GONZALES, an individual; BERNICE GONZALES, an individual; BARMWOOD COX, an individual; RUBEN GARCIA, an individual; AMBER KRAUS, an individual; GREG KRAUS, an individual; RAYMOND LUNA, an individual; PAUL RUSCONI, an individual; LARRY BLUFORD, an individual; MICHELLE HARBOUR, an individual; MARY DAVIDSON, an individual; KERALD MITCHELL, an individual; MERCY UMEOKAFOR, an individual; MARTIN LOZANO, an individual; DONALD MILLER, an individual; ALIS NAZIKYAN, an individual; EVA FLOWERS, an individual; CAL BELL, an individual; JAIME SEVILLA, an individual; WILMER YABAR, an individual; SALVADOR MARTINEZ, an individual; STEVEN THORNE, an individual; PETE FLORES, an individual; CYNTHIA FLORES, an individual; REYNALDO JAOJOCO, an individual; CORAZON JAOJOCO, an individual; PAT HENNEMANN, an individual; JOHN HENNEMANN, an individual; ROGER GOWRINATHAN, an individual; CARLOS HURTADO, an individual; NORMA NAVARRO, an individual; SCOTT STREISEL, an individual; TRACI JOHNSON, an individual; EMETERIO RODRIGUEZ, an individual; PEDRO PEREZ, an individual; GRISELDA PEREZ, an individual; HERMILO ROBLES GOMEZ, an individual; JOAQUIN REYES, an individual; MONICA GONZALEZ, an individual; MARCELINO ROMAN, an individual; VICTOR MUNOZ, an individual; INGRID MUNOZ, an individual; ALFREDO JIMENEZ, an individual; LARRY RIMER, an individual; TONY KEUSSEYAN, an individual; EILEEN KEUSSEYAN, an individual; EMMIT COLLIER, an individual; MARIA CUARA, an individual; ALAN HUNTER, an individual; RUDESINO FERNANDEZ, an individual; CORNELIO BOSQUES, an individual; EDDIE EBRAHIMI, an individual;

Page __1__ of __5__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRADFORD vs. BANK OF AMERICA, N.A. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

ROXANA MARROQUIN, an individual; PEDRO MARROQUIN, an individual; ROCIO LOPEZ, an individual; JUAN DE DIOS LANDAVERDE, an individual; REBECCA ARTMORE , an individual; MICHEAL ARTMORE, an individual; SHARON WILSON, an individual; STANLEY GRAHAM, an individual; ISIDRO DUARTE, an individual; JESUS JUAREZ, an individual; LILIA JUAREZ, an individual; HECTOR RODRIGUEZ, an individual; FRED LEY, an individual; BETTY LEY, an individual; LORENZO SELVA, an individual; RITA SELVA, an individual; MICHAEL DAVIDSON, an individual; KIM DAVIDSON, an individual; RAJAH NALLIAH, an individual; NOELINE SHANMUGAN, an individual; LINDA PAUL, an individual; DENNIS ROSS, an individual; TIFFANY WONG, an individual; LINDA K. HUNEKE, an individual; REFUGIO ALARCON, an individual; LEONARDO ALARCON, an individual; MARGARITA CONTRERAS, an individual; GEMMA JIMENA, an individual; GLADYS BOCANEGRA, an individual; JOSEPH CEDILLO, an individual; KEITH KIM, an individual; KENT VAAGEN, an individual; ARGEO GALLASTEGUI, an individual; ISABEL GALLASTEGUI, an individual; JOSE VELADO, an individual, MARIA VELADO, an individual; HECTOR NIETO, an individual; BRENT BON, an individual; MATTHEW HOFER, an individual; ANA LARA, an individual; JESUS GUEVARA, an individual; FERNANDO MORALES, an individual; ELIA HERNANDEZ, an individual; ARTURO CALDERON, an individual; JESUS GONZALEZ, an individual; BRADLEY SMITH, an individual; RANNAH SMITH, an individual; CHERYL WELCH, an individual; THOMAS POLITZ, an individual; DAVID RICKARD, an individual; GUSTAVO GONZALEZ, an individual; RODOLFO CAGAMPAN, an individual; REFUGIO DIAZ, an individual; ROSARIO DIAZ, as individual; RUBEN ESPINOZA, an individual; RENE ESPINOZA, an individual; LYNNE MARIE RASMUSSEN, an individual; RONALD KOLODZIEJ, an individual; MARJEANNE TENDLER, an individual; ARTHUR TENDLER, an individual; MICHELE VESPIER, an individual; ANALILIA WADE, an individual; LORRAINE JOHNSON, an individual; MEHRAN ABAZARY, an individual; SOHEILA FERDOWSI, an individual; JULIE ASPIRAS M.D., an individual; MARIA CIBRIAN, an individual; ERNIE ANZURES, an individual; SHERI TOURTELLOTTE-JOHNSON, an individual; MANUEL QUIROZ, an individual; SERGIO FAURRIETA, an individual; GARY BROOKSHIER, an individual; MARIA GOMEZ, an individual; CHARLES BATTLE, an individual; JON MARQUEZ, an individual; SHIRLEY MARQUEZ, an individual; LOLITA MANAOAT, an individual; BENITO GONZALEZ, an individual; CARLOS LEMUS, an individual; LINDA V. DEL ANGEL, an individual; CHARLIE HARRIS, an individual; SHELLEY CALDWELL, an individual; DEBRA DEMAGNUS, an individual; LAWRENCE BELL, an individual; YOLANDA TUMANENG, an individual; VIRGINIA WESTON, an individual; FRANCIS FUNIESTAS, an individual; MARISSA FUNIESTAS, an individual; GUILLERMO FLORES, an individual; KENNETH SKAIFE, an individual; BALDEV SINGH, an individual, DAVID MANAOAT, an individual; LEAH MANAOAT, an individual; ALFONSO BORJA, an individual; AVELINA BORJA., an individual; RICARDO FAJARDO, an individual; GRACE HONG, an individual; STEPHEN HARRIS, an individual; ROBERTA BURTON, an individual;

Page __2__ of __5__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-200(A)

| SHORT TITLE:<br>BRADFORD vs. BANK OF AMERICA, N.A. | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

OTHELLO ABATA, an individual; ERLINDA ABATA, an individual; YOUNG J. PARK, an individual; CHRISTOPHER FLORENDO, an individual; DELICIA FLORENDO, an individual; TEIRA DOOM, an individual; CIRILO GOMEZ, an individual; YOLANDA SMITH, an individual; LEVITA TAYLOR, an individual; WILLIAM TAYLOR, an individual; JANET HAGEN, an individual; JAMES HAGEN, an individual; LOLITA CUNANAN, an individual; JOHNNY VISTA, an individual; OLGA VISTA, an individual; ANDRES IBARRA, an individual; ANABELLA IBARRA, an individual; ESTELLA DOMINGUEZ, an individual; MARIA LAZARO, an individual; JESUS LAZARO, an individual; ALLEN WILSON, an individual; THOMAS LUKE, an individual; DEBORAH LUKE, an individual; JUAN MOYA, an individual; VERONICA MOYA, an individual; ROBERT RODEN, an individual; MANUEL BRITO, an individual; DAVE MAFFIE, an individual; LINDA HUBBARD, an individual; EDUARDO MUNOZ, EDDIE MUNOZ, an individual; ROLANDO MARTINEZ, an individual; RONALD RUIZ, SANDRA RUIZ, an individual; HOPERT MADISON, an individual; MARIA DE LA CRUZ, TERI O'ROURKE, an individual; SANDRA MORAN, an individual; JUAN MUNOZ, an individual; JAMES WALKER, an individual; WILLIAM COSTA, an individual; TONY CASTADINI, an individual; BARBARA HARADA, an individual; BARBARA HENRY, PAUL HENRY, an individual; DAWN MAHURIN, an individual; MARK MORGAN, RICH JOHNSON, an individual; MICHELLE JOHNSON, an individual; AURELIO RUIZ, an individual; YASMIN KABUYA, an individual; GRACE ZARAZOGA, an individual; CARLOS MEGALLONA, an individual; MARIO DIAZ, MAGDALENA DIAZ, an individual; CLIFTON KINGSTON, an individual; VICTORIA ARCADI, an individual; SCOTT COFFEY, STEPHEN JONES, an individual; CHARLES AHUMADA, an individual; JUAN SALCEDO, an individual; RODOLFO JIMENEZ, an individual; ROSA GARAICOA, an individual; CHRISTINE PETERSEN, an individual; EMILLE DECUIR, an individual; COYE DECUIR, an individual; KARL BURCH, an individual; AARON SEBAH, an individual; HANNELORE SEBAH, an individual; JOHN CHICA, an individual; ROSEMARIE GONZALEZ, an individual; DAWN CALLOWAY, an individual; CARLOS NAVA, an individual; GUADALUPE CERVANTES, an individual; JANEATTE GANTER, an individual; GREGORY GANTER, an individual; ALVARO PARADA, an individual; LINO CAMBALIZA, an individual; TERESA CAMBALIZA, an individual; CINDY STENBECK, an individual; KEN GALSTER, an individual; JEROME GRANT, an individual; AMPARO LIWANAG, an individual; TINA TRUONG, an individual; NOEL EZEKIEL, an individual; WANDA ROGERS, an individual; JUDITH CALDWELL, an individual; JAMES DIGIOVANNI, an individual; JUDITH PERKINS, an individual; ANNA CALLIRGOS, an individual; MARIO CALLIRGOS, an individual; GUSTAVO MIRANDA, an individual; JUSTIN SLEDGE, an individual; RICARDO GARDOCE, an individual; JOSEPHINE GARDOCE, an individual; SCOTT LEE, an individual; TERESA IRANNEJAD, an individual; MICHAEL MCDONALD, an individual; GARY SAGE, an individual; JUDY SAGE, an individual; JUAN PAN, an individual; LUISA VARGAS, an individual; SERGIO VARGAS, an individual; JESSE CHAPMAN, an individual;

Page ___3___ of ___5___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT A - PAGE 9

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRADFORD vs. BANK OF AMERICA, N.A | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

LONNY PACE, an individual; SAVIOUR AZZOPARDI, an individual; KATHRYN AZZOPARDI, an individual; BEATRIZ GARCIA, an individual; GILBERTO SANABRIA, an individual; PABLO JIMENEZ, an individual; BERTHA GARCIA, an individual; MARTIN LOZANO, an individual; ADRIAN AGUILAR, an individual; JOSE GUTIERREZ, an individual; WILLIAM DEBNAM, an individual; SONIA CANAS, an individual; VICTOR RIVERA, an individual; ARTURO GALLEGOS, an individual; and DENNIS ROSS

Page __4__ of __5__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRADFORD vs. BANK OF AMERICA, N.A. | |

#### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

BANK OF AMERICA CORPORATION, a Delaware corporation, authorized to do business in California; BANK OF AMERICA, N.A.; BANC OF AMERICA MORTGAGE SECURITIES, INC., not authorized to do business in California; RECONTRUST COMPANY, N.A., and DOES 1 through 100, inclusive

Page __5__ of __5__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT A - PAGE 11

COPY

1    Vito Torchia, Jr. (SBN 244687)
2    BROOKSTONE LAW, PC
     18831 Von Karman Ave., Suite 400
3    Irvine, California 92612
     Telephone: (949) 209-5046
4    Facsimile: (888) 547-4410
     E-mail: VTorchia@BrookstoneLaw.com
5
     Attorneys for Plaintiffs
6

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 08 2014

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                       COUNTY OF LOS ANGELES

9

10   STEVIE BRADFORD, an individual; JEFFERY      Case No.:    BC 5 5 6 8 2 0
     WHITE, an individual; LETICIA
11   MERCADO, an individual; REFUGIO
     MERCADO, an individual; GLORIA              COMPLAINT FOR:
12   FERREL, an individual; ROBERT FERREL, an
     individual; KAREN GILMORE, an              1. FOR CONSUMER RELIEF UNDER THE
13   individual; LARRY MOORE, an individual;       AUGUST 20, 2014, SETTLEMENT
     STEPHEN CHILDS, an individual; FRANCISCO      AGREEMENT BETWEEN THE U.S.
14   RAMIREZ, an individual; MARIA RAMIREZ, an     DEPARTMENT OF JUSTICE AND THE
     individual; MARIA PEREZ, an individual;       BANK OF AMERICA DEFENDANTS
15   WAYNE FONTZ, an
     Individual; LOURDES FONTZ, an individual;  2. UNLAWFUL, UNFAIR AND
16   JOHN LIPONI, an individual; DUNG HO, an        FRAUDULENT BUSINESS PRACTICES
     Individual; JOAN TUCKER, an individual;        ACT (Bus. & Prof. Code §17200)
17   HAROLD TUCKER, an individual;
     20 WALTER LUSK, an individual; JAMES       3. VIOLATION OF THE ROSENTHAL FAIR
18   WILLIAMS, an individual; HASSAN               DEBT COLLECTION PRACTICES ACT
     ABDALLAH, an individual; MARIA                (Civil Code §1788)
19   ABDALLAH, an individual; LUIS SOTO, an
     Individual; ARMINE AKCHEIAN, an           4. NEGLIGENCE
20   individual; PETER BAIA T A, an individual;
     AGUSTIN (JOHN) LATOSQUIN, an individual;  5. NEGLIGENT MISREPRESENTATION
21   CRAIG FREIS, an individual; CARLA ORTIZ, an
     individual; MANUEL AMAYA, an individual;  6. FRAUDULENT MISREPRESENTATION
22   ANA JULIA AMAYA, an individual; TERRY
     STRAW, an individual; STACY STRAW, an     7. BREACH OF THE IMPLIED COVENANT
23   individual; OSCAR BOBADILLA, an individual;    OF GOOD FAITH AND FAIR DEALING
     JOSE ALVARENGA, an individual; JOSEPH
24   MOORE, an individual; ADELA MOORE, an      8. DECLARATORY RELIEF
     individual; GEORGE LUCAS, an individual;
25   MARIA ODELL, an individual;
     ALEJANDRO BASURTO, an individual;             [JURY TRIAL DEMANDED]
26   CHOR CHUN NGAN, an individual;
     CARLOS CASTILLO, an individual;
27   ISABEL ARREOLA, an individual; AMAR
28

                                    - 1 -

MALHI, an individual; KULWANT KAUR MALHI, an individual; JULIO SANTA CRUZ, an individual; DANIEL PERAZZO, an individual; DELJEAN STARKS, an individual; EDWARD GONZALES, an individual; BERNICE GONZALES, an individual; BARMWOOD COX, an individual; RUBEN GARCIA, an individual; AMBER KRAUS, an individual; GREG KRAUS, an individual; RAYMOND LUNA, an individual; PAUL RUSCONI, an individual; LARRY BLUFORD, an individual; MICHELLE HARBOUR, an individual; MARY DAVIDSON, an individual; KERALD MITCHELL, an individual; MERCY UMEOKAFOR, an individual; MARTIN LOZANO, an individual; DONALD MILLER, an individual; ALIS NAZIKYAN, an individual; EVA FLOWERS, an individual; CAL BELL, an individual; JAIME SEVILLA, an individual; WILMER YABAR, an individual; SALVADOR MARTINEZ, an individual; STEVEN THORNE, an individual; PETE FLORES, an individual; CYNTHIA FLORES, an individual; REYNALDO JAOJOCO, an individual; CORAZON JAOJOCO, an individual; PAT HENNEMANN, an individual; JOHN HENNEMANN, an individual; ROGER GOWRINATHAN, an individual; CARLOS HURTADO, an individual; NORMA NAVARRO, an individual; SCOTT STREISEL, an individual; TRACI JOHNSON, an individual; EMETERIO RODRIGUEZ, an individual; PEDRO PEREZ, an individual; GRISELDA PEREZ, an individual; HERMILO ROBLES GOMEZ, an individual; JOAQUIN REYES, an individual; MONICA GONZALEZ, an individual; MARCELINO ROMAN, an individual; VICTOR MUNOZ, an individual; INGRID MUNOZ, an individual; ALFREDO JIMENEZ, an individual; LARRY RIMER, an Individual; TONY KEUSSEYAN, an individual; EILEEN KEUSSEYAN, an individual; EMMIT COLLIER, an individual; MARIA CUARA, an individual; ALAN

- 2 -

1 | HUNTER, an individual; RUDESINDO
FERNANDEZ, an individual; CORNELIO
2 | BOSQUES an individual; EDDIE
EBRAHIMI, an individual; ROXANA
3 | MARROQUIN, an individual; PEDRO
MARROQUIN, an individual; ROCIO
4 | LOPEZ, an individual; JUAN DE DIOS
LANDAVERDE, an individual; REBECCA
5 | ARTMORE , an individual; MICHEAL
ARTMORE, an individual; SHARON
6 | WILSON, an individual; STANLEY
GRAHAM, an individual; ISIDRO DUARTE,
7 | an individual; JESUS JUAREZ, an individual;
LILIA JUAREZ, an individual; HECTOR
8 | RODRIGUEZ, an individual; FRED LEY, an
Individual; BETTY LEY, an individual;
9 | LORENZO SELVA, an individual; RITA
SELVA, an individual; MICHAEL
10 | DAVIDSON, an individual; KIM
DAVIDSON, an individual; RAJAH
11 | NALLIAH, an individual; NOELINE
SHANMUGAN, an individual; LINDA
12 | PAUL, an individual; DENNIS ROSS, an
Individual; TIFFANY WONG, an individual;
13 | LINDA K. HUNEKE, an individual;
REFUGIO ALARCON, an individual;
14 | LEONARDO ALARCON, an individual;
MARGARITA CONTRERAS, an individual;
15 | GEMMA JIMENA, an individual; GLADYS
BOCANEGRA, an individual; JOSEPH
16 | CEDILLO, an individual; KEITH KIM, an
Individual; KENT VAAGEN, an individual;
17 | ARGEO GALLASTEGUI, an individual;
ISABEL GALLASTEGUI, an individual;
18 | JOSE VELADO, an individual, MARIA
VELADO, an individual; HECTOR NIETO,
19 | an individual; BRENT BON, an individual;
MATTHEW HOFER, an individual; ANA
20 | LARA, an individual; JESUS GUEVARA, an
Individual; FERNANDO MORALES, an
21 | individual; ELIA HERNANDEZ, an
individual; ARTURO CALDERON, an
22 | individual; JESUS GONZALEZ, an
individual; BRADLEY SMITH, an individual;
23 | RANNAH SMITH, an individual; CHERYL
WELCH, an individual; THOMAS POLITZ,
24 | an individual; DAVID RICKARD, an
individual; GUSTAVO GONZALEZ, an

- 3 -

individual; RODOLFO CAGAMPAN, an
individual; REFUGIO DIAZ, an individual;
ROSARIO DIAZ, as individual; RUBEN
ESPINOZA, an individual; RENE
ESPINOZA, an individual; LYNNE MARIE
RASMUSSEN, an individual; RONALD
KOLODZIEJ, an individual; MARJEANNE
TENDLER, an individual; ARTHUR
TENDLER, an individual; MICHELE
VESPIER, an individual; ANALILIA WADE,
an individual; LORRAINE JOHNSON, an
individual; MEHRAN ABAZARY, an
individual; SOHEILA FERDOWSI, an
individual; JULIE ASPIRAS M.D., an
individual; MARIA CIBRIAN, an individual;
ERNIE ANZURES, an individual; SHERI
TOURTELLOTTE-JOHNSON, an individual;
MANUEL QUIROZ, an individual; SERGIO
FAURRIETA, an individual; GARY
BROOKSHIER, an individual; MARIA
GOMEZ, an individual; CHARLES BATTLE,
an individual; JON MARQUEZ, an
individual; SHIRLEY MARQUEZ, an
individual; LOLITA MANAOAT, an
individual; BENITO GONZALEZ, an
individual; CARLOS LEMUS, an individual;
LINDA V. DEL ANGEL, an individual;
CHARLIE HARRIS, an individual ;
SHELLEY CALDWELL, an individual;
DEBRA DEMAGNUS, an individual;
LAWRENCE BELL, an individual;
YOLANDA TUMANENG, an individual;
VIRGINIA WESTON, an individual;
FRANCIS FUNIESTAS, an individual;
MARISSA FUNIESTAS, an individual;
GUILLERMO FLORES, an individual;
KENNETH SKAIFE, an individual;
BALDEV SINGH, an individual, DAVID
MANAOAT, an individual; LEAH
MANAOAT, an individual; ALFONSO
BORJA, an individual; AVELINA BORJA.,
an individual; RICARDO FAJARDO, an
individual; GRACE HONG, an individual;
STEPHEN HARRIS, an individual;
ROBERTA BURTON, an individual;
OTHELLO ABATA, an individual;
ERLINDA ABATA, an individual; YOUNG
J. PARK, an individual; CHRISTOPHER

- 4 -

| | |
|---|---|
| 1 | FLORENDO, an individual; DELICIA FLORENDO, an individual; TEIRA DOOM, |
| 2 | an individual; CIRILO GOMEZ, an individual; YOLANDA SMITH, an |
| 3 | individual; LEVITA TAYLOR, an individual; |
| 4 | WILLIAM TAYLOR, an individual; JANET HAGEN, an individual; JAMES HAGEN, an |
| 5 | Individual; LOLITA CUNANAN, an individual; JOHNNY VISTA, an individual; |
| 6 | OLGA VISTA, an individual; ANDRES |
| 7 | IBARRA, an individual; ANABELLA IBARRA, an individual; ESTELLA |
| 8 | DOMINGUEZ, an individual; MARIA LAZARO, an individual; JESUS LAZARO, |
| 9 | an individual; ALLEN WILSON, an |
| 10 | individual; THOMAS LUKE, an individual; DEBORAH LUKE, an individual; JUAN |
| 11 | MOYA, an individual; VERONICA MOYA, an individual, ROBERT RODEN, an |
| 12 | individual; MANUEL BRITO, an individual; |
| 13 | DAVE MAFFIE, an individual; LINDA HUBBARD, an individual; EDUARDO MUNOZ, |
| 14 | EDDIE MUNOZ, an individual; ROLANDO MARTINEZ, an individual; RONALD RUIZ, |
| 15 | SANDRA RUIZ, an individual; HOPERT |
| 16 | MADISON, an individual; MARIA DE LA CRUZ, TERI O'ROURKE, an individual; SANDRA |
| 17 | MORAN, an individual; JUAN MUNOZ, an individual; JAMES WALKER, an individual; |
| 18 | WILLIAM COSTA, an individual; TONY |
| 19 | CASTADINI, an individual; BARBARA HARADA, an individual; BARBARA HENRY, |
| 20 | PAUL HENRY, an individual; DAWN MAHURIN, an individual; MARK MORGAN, |
| 21 | RICH JOHNSON, an individual; MICHELLE |
| 22 | JOHNSON, an individual; AURELIO RUIZ, an individual; YASMIN KABUYA, an individual; |
| 23 | GRACE ZARAZOGA, an individual; CARLOS MEGALLONA, an individual; MARIO DIAZ, |
| 24 | MAGDALENA DIAZ, an individual; CLIFTON |
| 25 | KINGSTON, an individual; VICTORIA ARCADI, an individual; SCOTT COFFEY, |
| 26 | STEPHEN JONES, an individual; CHARLES AHUMADA, an individual; JUAN SALCEDO, an |
| 27 | individual; RODOLFO JIMENEZ, an individual; |
| 28 | ROSA GARAICOA, an individual; CHRISTINE PETERSEN, an individual; EMILLE DECUIR, an individual; COYE DECUIR, an individual; KARL BURCH, an individual; AARON SEBAH, |

- 5 -

EXHIBIT A - PAGE 16

1    an individual; HANNELORE SEBAGH, an
     individual; JOHN CHICA, an individual;
2    ROSEMARIE GONZALEZ, an individual;
     DAWN CALLOWAY, an individual; CARLOS
3    NAVA, an individual; GUADALUPE
     CERVANTES, an individual; JANEATTE
4    GANTER, an individual; GREGORY GANTER,
     an individual; ALVARO PARADA, an
5    individual; LINO CAMBALIZA, an individual;
     TERESA CAMBALIZA, an individual; CINDY
6    STENBECK, an individual; KEN GALSTER, an
     individual; JEROME GRANT, an individual;
7    AMPARO LIWANAG, an individual; TINA
8    TRUONG, an individual; NOEL EZEKIEL, an
     individual; WANDA ROGERS, an individual;
9    JUDITH CALDWELL, an individual; JAMES
10   DIGIOVANNI, an individual; JUDITH
     PERKINS, an individual; ANNA CALLIRGOS,
11   an individual; MARIO CALLIRGOS, an
12   individual; GUSTAVO MIRANDA, an
     individual; JUSTIN SLEDGE, an individual;
13   RICARDO GARDOCE, an individual;
14   JOSEPHINE GARDOCE, an individual; SCOTT
     LEE, an individual; TERESA IRANNEJAD, an
15   individual; MICHAEL MCDONALD, an
16   individual; GARY SAGE, an individual; JUDY
     SAGE, an individual; JUAN PAN, an individual;
17   LUISA VARGAS, an individual; SERGIO
18   VARGAS, an individual; JESSE CHAPMAN, an
     individual; LONNY PACE, an individual;
19   SAVIOUR AZZOPARDI, an individual;
20   KATHRYN AZZOPARDI, an individual;
     BEATRIZ GARCIA, an individual; GILBERTO
21   SANABRIA, an individual; PABLO JIMENEZ,
     an individual; BERTHA GARCIA, an individual;
22   MARTIN LOZANO, an individual; ADRIAN
23   AGUILAR, an individual; JOSE GUTIERREZ, an
     individual; WILLIAM DEBNAM, an individual;
24   SONIA CANAS, an individual; VICTOR
     RIVERA, an individual; ARTURO GALLEGOS,
25   an individual; and DENNIS ROSS

26            Plaintiffs,

27

28       vs.

- 6 -

| |
|---|
| BANK OF AMERICA CORPORATION, a Delaware corporation, authorized to do business in California; BANK OF AMERICA, N.A.; BANC OF AMERICA MORTGAGE SECURITIES, INC., not authorized to do business in California; RECONTRUST COMPANY, N.A., and DOES 1 through 100, inclusive<br><br>Defendants. |

1  
2  
3  
4  
5  
6  
7  
8  

9   Plaintiffs, and each of them, hereby demand a jury trial and allege as follows:

10                                   **PARTIES**

11                                   *Plaintiffs*

12  
13       1.   All Plaintiffs listed in the above caption are competent adults and individuals residing in the

14  State of California, who borrowed money from one or more of the Defendants or its subsidiaries or

15  affiliates or successors and assigns, secured by a deed of trust on his or her California real estate(s). At

16  all material times hereto, one or more of the Defendants have acted as Servicer or some other control or

17  capacity over processing the loan.

18       2.   Pursuant to California Code of Civil Procedure, Section 378, the Plaintiffs in this case have

19  joined together in this action because they assert a right to relief severally, arising out of a series of

20  transactions or occurrences and there are common questions of law or fact. This requirement has been

21  broadly construed under law. *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal. App. 4th

22  1093, 1113. CCP Section 378 is based on Rule 20(a) of the Federal Rules of Civil Procedure.  The Ninth

23  Circuit defines "transaction or occurrence" to mean "similarity in the factual background of a claim" –

24  noting only *similarity* between claims, nothing more is needed.  *See e.g. Bautista v. Los Angeles County*

25  (9th Cir. 2000) 216 F.3d 837, 842; *See also Union Paving Co. v. Downer Corp.* (9th Cir.1960) 276 F.2d

26  468, 470 [claims that have a "logical relationship" arise out of same transaction and occurrence].)  See

27  *Hysell v. Schwarzenegger* (E.D.Cal.2011) 2011 WL 2678829 at *14 ["The same transaction requirement

28  

- 7 -

in Rule 20 refers to similarity in the factual background of the claims; claims that arise out of a systematic pattern of events and have a very definite logical relationship arise out of the same transaction and occurrence"]. The allegations in this Complaint are that the harms alleged by Plaintiffs herein were the common result of Defendants practices and policies – that there was a connection between them –not unconnected incidents with no logical relationship. Thus, although each of the Plaintiffs had different loan transactions, different loan products, different loan brokers, and different properties located in different cities, each of the separate loan transactions, and each of the harms to Plaintiffs, were the direct result of a common intentional practice/scheme implemented by Defendants on a company-wide level to achieve just such a result. These are not unrelated wrongs. It is these policies and practices for which Plaintiffs bring this action.

3. All of the negligent and fraudulent misrepresentations of Defendants, and each of them, whether affirmative misrepresentations, or based on the omission to state material facts, were unknown to all Plaintiffs referenced herein at the time of misrepresentations. All Plaintiffs herein discovered these misrepresentations beginning no more than 3 years prior to the date of filing this action. A reasonable person would have been unable to reasonably discover said misrepresentations at any earlier date.

### *Defendants*

4. Plaintiffs are informed and believe, and based thereon allege that, Defendant BANK OF AMERICA CORPORATION, a Delaware corporation, authorized to do business in California, and doing business in the State of California and the County of Los Angeles.

5. Plaintiffs are informed and believe, and based thereon allege that, Defendant BANK OF AMERICA, N.A. is a National Association, doing business in the State of California and the County of Los Angeles.

6. Plaintiffs are informed and believe, and based thereon allege that, Defendant BANC OF

- 8 -

AMERICA MORTGAGE SECURITIES, INC., is not authorized to do business in California, however, is doing business in the State of California and the County of Los Angeles. The Defendants described in paragraphs 3 - 5 of this Complaint, are collectively referred to as "Bank of America".

7.    In February 2012, the Attorney General entered into the National Mortgage Settlement with five major banks: JPMorgan Chase, Ally Financial, Bank of America, Citibank, and Bank of America. The settlement provides as much as $25 billion in relief to distressed borrowers and direct payments to states and the federal government.  The settlement created new servicing standards that remain in place until 2015; provided cash payments to many homeowners who were wrongly foreclosed upon; provided loan modification relief, short sale opportunities, and other relief to many distressed homeowners; and, appointed a monitor to oversee the banks to make sure they complied with the settlement terms.

8.    Plaintiffs are informed and believe, and based thereon allege that, Defendant RECONTRUST COMPANY, N.A. ("ReconTrust"), is a National Association, doing business in the State of California and the County of Los Angeles. ReconTrust was, and is now, the vital foreclosing arm of Bank of America, involved with intentionally, negligently and maliciously foreclosing on Plaintiffs' properties, knowing they had no authority to do so, pursuant to, and in furtherance of their conspiracy with Bank of America, and one another.  Plaintiffs are informed and believe, and based thereon allege, that the Trustee Defendants were, and are now, separately responsible for robo-signing affidavits, executing assignments, and recording Notice of Defaults and Trustee Sale Notices which are defective and not in accordance with California law.  Plaintiffs allege that the Trustee Defendants' actions as co-conspirators in the fraud and other wrongs complained of herein, were done with actual malice and in bad faith – eviscerating any defense of qualified trustee immunity. See *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 341; *Latino v. Bank of America Bank, N.A.* (E.D. Cal., Oct. 27 2011) 2011 WL 4928880 at *5

9.     The true names and capacities of the Defendants listed herein as DOES 1 through 100 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Each of the DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby participated in all of the wrongdoing set forth herein. On information and belief, each such Defendant is responsible for the acts, events and concealment set forth herein and is sued for that reason. Upon learning the true names and capacities of the DOE Defendants, Plaintiffs may amend this Complaint accordingly.

10.    Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants. Any allegation about acts of any corporate or other business Defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents, brokers and/or representatives while they were acting within the actual or ostensible scope of their authority. The exact terms and conditions of the agency, representation, or employment relationships are presently unknown to Plaintiff, but when the information is ascertained, leave of court will be sought to insert appropriate allegations.

11.    At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent or the assignee or the substitute of other Defendants, and all of Defendants acted within the scope of their agency if acting as an agent, the assignee or the substitute of another. At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and

- 10 -

abetted the other Defendants in the unlawful conduct. At all relevant times, Defendants have engaged in conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to the present.

## FIRST CAUSE OF ACTION
### FOR CONSUMER RELIEF UNDER THE AUGUST 20, 2014, SETTLEMENT AGREEMENT BETWEEN THE U.S. DEPARTMENT OF JUSTICE AND THE BANK OF AMERICA DEFENDANTS

12.     Plaintiffs reallege and incorporate by reference each of the above paragraphs as though fully set forth herein.

13.     On August 20, 2014, a Settlement Agreement (the "DOJ-BOA Settlement Agreement") was entered into between the United States, acting through the United States Department of Justice ("Department of Justice"), along with the States of California, Delaware, Illinois, Maryland, and New York, and the Commonwealth of Kentucky, acting through their respective Attorneys General (collectively, "the States"), and Defendants Bank of America Corporation, Bank of America, N.A., and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America"). A true and correct copy of this DOJ-BOA Settlement Agreement is attached hereto as **Exhibit "A"**, and incorporated herein by this reference.

14. The DOJ-BOA Settlement Agreement, which requires Bank of America to pay or provide relief totaling $16.65 billion, is the largest civil settlement with a single entity in American history. The DOJ-BOA Settlement Agreement resolves federal and state claims against Bank of America and its former and current subsidiaries, including Countrywide Financial Corporation and Merrill Lynch. As part of this global resolution, DOJ-BOA Settlement Agreement terms require Bank of America to pay $7 billion in relief to struggling homeowners, borrowers and communities affected by Bank of America's conduct, as well as to provide funds that will help defray tax liability as a result of mortgage modification, forbearance or forgiveness. That relief will take various forms, including principal

- 11 -

reduction loan modifications that result in numerous homeowners no longer being underwater on their mortgages and finally having substantial equity in their homes. It will also include new loans to credit worthy borrowers struggling to get a loan, donations to assist communities in recovering from the financial crisis, and financing for affordable rental housing.

15. Attached as Annex 1 to the DOJ-BOA Settlement Agreement, is a **Statement of Facts** describing the wrongful conduct of Bank of America in connection with originating, underwriting, approving, funding and servicing home loans made to Consumers, a true and correct copy of which is attached hereto as **Exhibit "B"**, and incorporated herein by this reference. As the Statement of Facts describes, Merrill Lynch regularly told investors the loans it was securitizing were made to borrowers who were likely and able to repay their debts. Merrill Lynch made these representations even though it knew, based on the due diligence it had performed on samples of the loans, that a significant number of those loans had material underwriting and compliance defects - including as many as 55 percent in a single pool. In addition, Merrill Lynch rarely reviewed the unsampled loans to ensure that the defects observed in the samples were not present throughout the remainder of the pools. Merrill Lynch also disregarded its own due diligence and securitized loans that the due diligence vendors had identified as defective. This practice led one Merrill Lynch consultant to "wonder why we have due diligence performed" if Merrill Lynch was going to securitize the loans "regardless of issues."

16. Plaintiffs are informed and believe, and based thereon allege, that the wrongdoings committed by Bank of America against Consumers, and set forth in the Statement of Facts, are the same or similar wrongdoings committed by Merrill Lynch (and assumed by Bank of America on September 14, 2008, when Bank of America acquired Merrill Lynch), in connection with those Loans that were originated, underwritten, approved, funded and serviced by Bank of America to Plaintiffs.

17. Attached as Annex 2 to the DOJ-BOA Settlement Agreement, is a description of the money, as well as the other types and amounts of **Consumer Relief** available to borrowers,

- 12 -

homeowners and Consumers that borrowed home loans from Bank of America, a true and correct copy of which is attached hereto as **Exhibit "C"**, and incorporated herein by this reference

18.    Plaintiffs are informed and believe, and based thereon allege, that Plaintiffs are within the class or pool of Consumers, or are otherwise intended third-party beneficiaries, that are entitled to receive money, as well as the other specified types and amounts of Consumer Relief available to borrowers, homeowners and Consumers under the DOJ-BOA Settlement Agreement.

19.    Accordingly, Plaintiffs request a Judicial Decree, Order and Judgment that Plaintiffs are, in fact and under law, within the class or pool of Consumers, or are otherwise intended third-party beneficiaries, and, therefore, are entitled to receive money, as well as the other specified types and amounts of Consumer Relief available to borrowers, homeowners and Consumers under the DOJ-BOA Settlement Agreement.

### SECOND CAUSE OF ACTION
### UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES ACT
#### (Bus. & Prof. Code §17200)

20.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully herein.

21.    California Business & Professions Code Section 17200, et seq., prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice . . ." and conduct which is "likely to deceive" and is "fraudulent" within the meaning of Section 17200.

22.    As alleged above, and as set forth in the Statement of Facts, Defendants' past and ongoing acts and practices are likely to deceive, constituting a fraudulent business act or practice.  Specifically, Defendants have engaged, and continue to engage, in deceptive business practices with respect to mortgage loan servicing, assignments of notes and deeds of trust, foreclosure of residential properties and related matters by, among other things:

    (a) Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

- 13 -

EXHIBIT A - PAGE 24

(b) Executing and recording false and misleading documents;

(c) Executing and recording documents without the legal authority to do so;

(d) Failing to disclose the principal for which documents were being executed and recorded in violation of California Civil Code Section 1095;

(e) Demanding and accepting payments for debts that were non-existent;

(f) Acting as beneficiaries and trustees without the legal authority to do so;

(g) Failing to give proper notice of a trustee's sale and the postponement of the sale pursuant to California Civil Code Sections 2924g and 2924h;

(h) Failing to comply with California Civil Code Section 2923.5 and 2923.55;

(i) Failing to comply with the HAMP guidelines;

(j) Misrepresenting the foreclosure status of properties to borrowers; and

(k) Other deceptive business practices.

23.     Plaintiffs allege that by engaging in the above described acts and/or practices as alleged herein, Defendants have violated several California laws and regulations, and that such predicate acts are therefore per se violations of California Business and Professions Code Section 17200, et seq.

24.     Plaintiffs alleges that Defendants' misconduct, as alleged herein, gave, and have given, Defendants an unfair competitive advantage over their competitors. The scheme implemented by Defendants is designed to defraud California consumers. The foregoing acts and practices have caused substantial harm to California consumers, and have enriched the Defendants.

25.     Plaintiffs allege that as direct and proximate result of the aforementioned acts, Defendants have prospered and benefitted from Plaintiff by collecting mortgage payments and fees for foreclosure related services, and have been unjustly enriched from their acts of foreclosing on Plaintiffs' properties, when they had agreed not to do so and/or to do so in compliance with applicable laws.

26.     By reason of the foregoing, Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiffs and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to California Business & Professions Code Sections 17203 and 17204. Moreover, as a result of the aforementioned acts and conduct, Plaintiffs have lost money and property and suffered injury in fact, and other members of the public falling victim to Defendants' schemes are likely to be injured.

- 14 -

27.    The harm to Plaintiffs and to members of the general public outweighs the utility of Defendants' policy and practices. Consequently, Defendants' policy and practices constitute an unlawful business act or practice within the meaning of Business and Professions Code §17200. Further, the foregoing conduct threatens an incipient violation of a consumer law, or violates the policy or spirit of such law or otherwise significantly threatens or harms competition.

28.    Defendants' practices described above are likely to mislead the general public, and therefore, constitute a fraudulent business act of practice within the meaning of Business and Professions Code §17200.  The Defendants' unfair, unlawful, and fraudulent business practices and false and misleading advertising present a continuing threat to members of public in that other consumers will be defrauded into having their property improperly sold at foreclosure.  Plaintiffs and other members of the general public have no other adequate remedy of law.

29.    Plaintiffs are therefore entitled to compensatory damages, injunctive relief and attorneys' fees as available under California Business and Professions Code Sec. 17200, et. seq.  These acts and practices, as described in this Cause of Action, are unfair and violate Business and Professions Code § 17200, et. seq., because Defendants' policies and practices violate all the statutes previously listed as well as California Civil Code § 1709, and consequently, constitute and unlawful business act of practice within the meaning of Business and Professions Code § 17200, et. seq.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT
#### (Civil Code §1788)

30.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully herein.

31.    The Rosenthal Fair Debt Collection Practices Act, Civil Code, Section 1788.1, provides that:

> (a) The Legislature makes the following findings:
>   (1) The banking and credit system and grantors of credit to consumers are dependent upon the collection of just and owing debts.

- 15 -

*Unfair or deceptive collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers.*

*(2) There is need to ensure that debt collectors and debtors exercise their responsibilities to one another with fairness, honesty and due regard for the rights of the other.*

*(b) It is the purpose of this title to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts, as specified in this title.*

32. Plaintiffs are consumers, and the obligation between the parties is a debt owed pursuant to the subject Loan, Promissory Notes, and Deeds of Trust, constitutes consumer debt pursuant to the Rosenthal Fair Debt Collection Practices Act.

33.    Defendants Bank of America and ReconTrust violated the Rosenthal Fair Debt Collection Practices Act, Civil Code, Section 1788, et. seq., by performing, or failing to perform the following acts, or by collecting, or attempting to collect, the consumer debt Loan:

(a)    by making threats to borrowers that their nonpayment of the consumer debt Loan will result in sale of their property, when such sale was not permitted by law, in violation of Section 1788.10(e);

(b)    by causing a borrower's telephone to ring repeatedly or continuously to annoy the person called, in violation of Section 1788.11 (d);

(c)    by communicating, by telephone or in person, with the debtor with such frequency as to be unreasonable and to constitute an harassment to the debtor under the circumstances, in violation of Section 1788.11 (e);

(d)    by making a false representation that such collector person is an attorney or counselor at law, in violation of 1788.13 (b);

(e)    by collecting, or attempting to collect, the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt Loan, when such fees or charges are not permitted by law, the Loan documents or the Deed of Trust, in violation of Section 1788.14 (b); and,

(f)    by initiating communications, other than statements of account, with the debtor with regard to the consumer debt Loan, when the debt collector has been previously notified in writing by the debtor's attorney that the debtor is represented by such attorney with respect to the consumer debt and such notice includes the attorney's name and address and a request by such attorney that all communications regarding the consumer debt be addressed to such attorney, in violation of Section 1788.14 (c).

- 16 -

34.     As a proximate result of Defendants violations of the Rosenthal Fair Debt Collection Practices Act, Plaintiffs are entitled to actual and statutory damages, attorney's fees and costs, pursuant to Section 1788.30, and such other relief as the court determines is due.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE

35.     Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully herein.

36.     At all times relevant herein, Defendant Bank of America, acting as Plaintiffs' lender and/or servicer, had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited, disclosing who owned Plaintiffs' Loans to Plaintiffs, refraining from taking any action against Plaintiff that it did not have the legal authority to do, providing all relevant information regarding the Loan to Plaintiff, and in following Loan Modification guidelines.

37.     In performing the acts, or failing to perform the acts alleged above, and as set forth in the Statement of Facts, Defendant Bank of America breached its duty of care and skill to Plaintiffs in the servicing of Plaintiffs' loans by, among other things, failing to disclose to Plaintiff that it was foreclosing on Plaintiff's Subject Property while telling him the opposite, preparing and recording false documents, attempting to foreclose on Plaintiffs' properties without having the legal authority and/or proper documentation to do so, and in failing to follow Loan Modification guidelines.

38.     At all times relevant herein, ReconTrust acting as the alleged trustee under the Deeds of Trust, but without the legal authority to do so, had a duty to exercise reasonable care and skill to follow California law with regard to foreclosures, avoid any conflicts of interest in exercising its duties, and refrain from taking any action against Plaintiffs for which they did not have the legal authority.

- 17 -

39.    In taking the actions alleged above, and in failing to take the actions as alleged above, Defendants breached their duty of care and skill to Plaintiffs, by failing to properly train and supervise its agents and employees with regard to California law regarding following Loan Modification guidelines, the execution and recording of foreclosure documents; failing to follow California law with regard to foreclosures, including, but not limited to, acting as the trustee under the Deeds of Trust when they did not have the legal authority to do so; and taking actions against Plaintiffs that they did not have the legal authority to perform.

40.    As a direct and proximate result of the negligence and carelessness of Defendants as set forth above, Plaintiffs have suffered, and continue to suffer, general and special damages in an amount to be determined at trial, but not less than $50,000,000.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

41.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully herein.

42.    Given the loan lender / servicer - borrower relationship, and the trustee - borrower relationship which existed between Defendants and Plaintiffs, Defendants had a duty to make accurate statements to Plaintiff regarding the Loan Modification process and options to avoid foreclosure, and to comply with the various laws, regulations and guidelines regarding the foreclosure and Loan Modification process.

43.    As detailed above, and as set forth in the Statement of Facts, Defendants negligently made numerous inaccurate and misleading representations to Plaintiffs.

44.    In truth, such representations were false. At the time Defendants made the foregoing representations to Plaintiffs, such Defendants knew, or should have known, that such representations were untrue, false and misleading, and also that these representations were material representations.

45.    Given the loan lender / servicer - borrower relationship, and the trustee - borrower

- 18 -

1  relationship, Plaintiffs' reliance and trust was reasonably placed upon such misrepresentations.

2      46.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs

3  have been damaged in that they have not received a loan modification; they have wasted time in

4  attempting to process Loan Modification Applications, they have remained in the foreclosure process,

5  which is costing them excessive interest rate charges, late fees, penalties and other foreclosure costs;

6  and, Plaintiffs are now involved in this litigation, which is causing Plaintiffs to incur attorneys' fees to

7  protect their properties, all to Plaintiffs' damage and injury.

8

9      47.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs

10  have suffered money damages in an amount in excess of the minimum jurisdiction of this court, general

11  and special damages in an amount to be determined at trial, but not less than $50,000,000.

12

13              **SIXTH CAUSE OF ACTION**
           **FRAUDULENT MISREPRESENTATION**

14

15      48.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully

16  herein.

17      49.    Defendants had a duty to make accurate statements to Plaintiff regarding the Loan

18  Modification process and options to avoid foreclosure, and to comply with the various laws, regulations

19  and guidelines regarding the foreclosure and Loan Modification process.

20

21      50.    As detailed above, and as set forth in the Statement of Facts, Defendants intentionally

22  and willfully made numerous inaccurate and misleading representations to Plaintiffs.

23      51.    In truth, such representations were false. At the time Defendants made the foregoing

24  representations to Plaintiffs, such Defendants knew, or should have known, that such representations

25  were untrue, false and misleading, and also that these representations were material representations.

26

27      52.    Given the loan lender / servicer - borrower relationship, Plaintiffs' reliance and trust was

28  reasonably placed upon such misrepresentations.

      53.    As a direct and proximate result of Defendants' intentional and fraudulent

- 19 -

1    misrepresentations, Plaintiffs have been damaged in that they have not received a loan modification;

2    they have wasted time in attempting to process Loan Modification Applications, they have remained in

3    the foreclosure process, which is costing them excessive interest rate charges, late fees, penalties and

4    other foreclosure costs; and, Plaintiffs are now involved in this litigation, which is causing Plaintiffs to

5
6    incur attorneys' fees to protect their properties, all to Plaintiffs' damage and injury.

7          54.    As a direct and proximate result of Defendants' intentional and fraudulent

8    misrepresentations, Plaintiffs have suffered money damages in an amount in excess of the minimum

9    jurisdiction of this court, general and special damages in an amount to be determined at trial, but not

10   less than $50,000,000.
11
12         55.    Additionally, Defendants acted with malice, fraud and/or oppression and, thus, Plaintiffs

13   are entitled to an award of exemplary and punitive damages, according to proof.

14                              **SEVENTH CAUSE OF ACTION**
15   **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

16         56.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully

17   herein.

18         57.    The processing of Plaintiffs' Applications for a Loan Modification gave rise to an oral
19
20   agreement between Plaintiffs and Defendants, to wit: If Plaintiffs submitted a complete Application for

21   a Loan Modification, then Defendants would (a) properly underwrite such Application under all

22   available Loan Modification programs, (b) come to a decision on this Application before proceeding

23   with a foreclosure sale, and (c) that any Loan Modification denial, would be supported by a Net Present

24   Value analysis as required by the Dodd-Frank Act.
25
26         58.    The oral agreement between Plaintiffs and Defendants also gave rise to implied

27   covenants or duties which are contained in all contracts, namely, that the parties would act in good faith

28   and deal fairly with each other in performing their respective duties under the oral agreement, such that

     the parties could reasonably attain the mutual benefits of their bargain.

59.    Unfortunately, as alleged above, and as set forth in the Statement of Facts, Defendants negligently, intentionally and willfully made numerous inaccurate and misleading representations to Plaintiffs.

60.    In truth, such representations were false. At the time Defendants made the foregoing representations to Plaintiffs, such Defendants knew, or should have known, that such representations were untrue, false and misleading, and also that these representations were material representations.

61.    Plaintiffs have performed each and every obligation required to be performed by them under the oral agreement, except as excused by Defendants.

62.    As a direct and proximate result of Defendants' breach of the implied covenant or good faith and fair dealing, Plaintiffs have suffered general and special damages in an amount to be determined at trial, but not less than $50,000,000.

## EIGHTH CAUSE OF ACTION
## DECLARATORY RELIEF

63.    Plaintiffs reallege and incorporate by reference the above paragraphs as set forth fully herein.

64.    In light of Defendants' wrongful acts as set forth in the Statement of Facts, negligence, negligent and intentional misrepresentations, failure to properly follow the foreclosure laws, and failure to follow the guidelines regarding the Loan Modification process, actual controversies now exists concerning the interpretation and effectiveness of the Notice of Default, the Notice of Trustee's Sale, and the entire Trustee's foreclosure sale process.

65.    Therefore, Plaintiffs seek a declaratory judgment interpreting Plaintiffs' Loans, Promissory Notes, Deeds of Trust, and foreclosure documents against Defendants, declaring that Defendants have violated Plaintiffs' rights, title and interest with respect to the Loan and their properties, and that Defendants are not entitled, nor are the proper parties, to foreclose upon Plaintiffs' properties, whereas Defendants dispute this.

- 21 -

## PRAYER FOR RELIEF

Wherefore, Plaintiffs prays for judgment against Defendants and each of them, jointly and severally, as follows:

1.      For compensatory, special and general damages in an amount according to proof at trial, but not less than $50,000,000, against all Defendants;

2.      For an Order decreeing that Plaintiffs are, in fact and under law, within the class or pool of Consumers, or are otherwise intended third-party beneficiaries, that are entitled to receive money, and he other specified types and amounts of Consumer Relief available to borrowers, homeowners and Consumers under the DOJ-BOA Settlement Agreement, as well as civil penalties, restitution and attorneys' fee pursuant to all other applicable statutes;

3.      Pursuant to Code Civ. Proc., Section 527(c), Plaintiffs request that this court issue a Temporary Restraining Order following *ex parte* notice in order to preserve the *status quo* that prevents Defendants from proceeding with any foreclosure sale, and protecting Plaintiffs from suffering irreparable injury pending a hearing on Plaintiff application for a preliminary injunction. In addition, Plaintiffs request that this court issue a Preliminary Injunction to preserve the *status quo* until a court can make a final determination on the merits of the action;

4.      For the issuance of an Order canceling the Notice of Default and Notice of Trustee's Sale;

5.      For punitive damages in an amount to be determined by the Court against all Defendants;

6.      For costs of suit incurred herein;

7.      For interest on all damages at the maximum legal rate; and

//
//
//
//

- 22 -

8.  For such other and further relief as the Court may deem just and proper.

Dated:  September 4, 2014                Respectfully submitted,

                                        **BROOKSTONE LAW, PC**

                               By:      _____
                                        Vito Torchia, Jr.
                                        Attorneys for Plaintiffs

- 23 -

# EXHIBIT A

ANNEX 1

Bank of America Corporation

Statement of Facts

## BANK OF AMERICA - RMBS

In late 2007 and early 2008, Bank of America structured, offered and sold over $850 million in residential mortgage-backed security ("RMBS") certificates in a securitization trust known as the BOAMS 2008-A securitization to investors, including federally insured financial institutions. Bank of America marketed these RMBS as backed by Bank-originated, prime mortgages. Bank of America issued these RMBS certificates using a shelf registration statement and other offering documents filed with the U.S. Securities and Exchange Commission ("SEC") by a Bank of America affiliate, Banc of America Mortgage Securities, Inc. ("BOAMS").

In the BOAMS 2008-A offering documents, Bank of America represented that "each mortgage [backing the securitization] . . . is underwritten in accordance with guidelines established in Bank of America's Product and Policy Guides." It further represented that "[a] loan is considered to be underwritten in accordance with a given set of guidelines if, based on an overall qualitative evaluation, the loan is in substantial compliance with such underwriting guidelines." Bank of America also represented that it "permits [a loan applicant's debt-to-income ratio] to exceed guidelines when the applicant has documented compensating factors for exceeding ratio guidelines . . . ."

At the time Bank of America made these representations, its internal reporting showed that "wholesale" mortgages—that is, loans originated through third-party mortgage brokers—had decreased in performance and were experiencing an increase in underwriting exceptions. Additionally, a report that Bank of America prepared for qualified institutional buyers showed that wholesale loans from an industry lender, on average, experienced a higher Conditional Prepayment Rate ("CPR") than retail mortgages. These reports were received by Bank of America employees involved in the BOAMS 2008-A securitization prior to its marketing and sale. Bank of America did not disclose this information in the BOAMS 2008-A offering documents.

Bank of America also did not disclose in the BOAMS 2008-A offering documents the percentage of wholesale mortgage loans collateralizing the securitization. Over 70 percent of the mortgage loans collateralizing the BOAMS 2008-A securitization consisted of mortgages Bank of America originated through its wholesale channel. Approximately six weeks before the transaction closed, Bank of America disclosed preliminary data relating to the percentage of wholesale mortgage loans collateralizing the BOAMS 2008-A RMBS to certain investors but it did not disclose the percentage to all buyers of the BOAMS 2008-A offering.

The preliminary loan tapes containing the information about the wholesale loan percentage that Bank of America provided to certain investors were "ABS informational and computational material" because they were "factual information regarding the pool assets underlying the asset-backed securities, including origination . . . and other factual information concerning the parameters of the asset pool appropriate to the nature of the underlying assets, such as . . . the programs under which the loans were originated." Bank of America did not

1

publicly file the preliminary loan tapes containing this information with the SEC and only disclosed it to the aforementioned investors, who ultimately invested.

Bank of America did not have third-party, loan-level due diligence conducted on the specific mortgage loans collateralizing the BOAMS 2008-A securitization. This was contrary to its past practice. Third-party, loan level due diligence had been conducted on previous BOAMS securitizations that closed in March, April, and August 2007; these diligence reviews revealed that some of the mortgages reviewed did not conform to Bank of America underwriting standards. Third-party due diligence also had revealed data errors in the preliminary loan tapes that Bank of America had provided to investors. Bank of America did not disclose in the BOAMS 2008-A offering documents that third-party, loan-level due diligence was not conducted on the loans collateralizing BOAMS 2008-A.

## MERRILL LYNCH - RMBS

Throughout 2006 and 2007, Merrill Lynch issued approximately 72 RMBS consisting of thousands of subprime mortgage loans. Merrill Lynch acquired some of these loans from third-party originators in whole loan transactions. Merrill Lynch also securitized loans from two originators in which Merrill Lynch had an ownership interest: Ownit Mortgage Solutions, Inc. ("Ownit") and First Franklin Financial Corporation ("First Franklin").

Merrill Lynch made certain representations in the offering documents it filed with the SEC concerning the loans securitized in these RMBS. Merrill Lynch also submitted information about these RMBS to the ratings agencies. Prior to making these representations, Merrill Lynch received information as part of its due diligence process showing that, for certain loan pools, significant numbers of the loans it was considering for securitization did not conform to the representations made in the offering documents it filed with the SEC.

In particular, the offering documents for Merrill Lynch subprime RMBS regularly included representations that "[a]ll of the Mortgage Loans were originated generally in accordance with the [originator's] Underwriting Guidelines." The offering documents also regularly represented that exceptions were made to these guidelines on a "case-by-case basis" based on the presence of "compensating factors." (According to offering documents filed with the SEC, the underwriting guidelines were "primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.") The offering documents also represented that the loans securitized by Merrill Lynch conformed to applicable federal, state, and local laws.

Prior to making these representations, employees at Merrill Lynch's Whole Loan Trading Desk conducted due diligence on the loans to be purchased. This due diligence process typically included a review of the files for a sample of the loans from each pool. This review was conducted by a third-party vendor and overseen by Merrill Lynch. The sample would contain randomly selected loans, as well as loans selected using "adverse sampling" techniques designed to identify loans that had particular characteristics that Merrill Lynch believed warranted further review. This loan file review included an evaluation of the loans' compliance with the

2

originators' underwriting guidelines (the "credit review"), as well as an evaluation of whether the origination of the loans complied with federal, state, and local laws, rules, and regulations (the "compliance review").

The third-party vendors that performed the credit and compliance reviews assigned grades to each of the loans they reviewed. The vendor graded a loan an "Event Grade 1" loan, or EV1, if it determined that the loan was underwritten according to the originator's underwriting guidelines and in compliance with relevant rules and regulations. Loans that the vendor determined did not strictly comply with applicable underwriting guidelines, but that had sufficient compensating factors, were rated as an EV2. Vendors graded a loan an EV3 when the loan was not originated in compliance with applicable laws and regulations, the loan did not comply with applicable underwriting guidelines and lacked the sufficient offsetting compensating factors, or the loan file was missing a key piece of documentation.

The underwriting and compliance attributes considered by the vendors in grading loans as EV3 included, among other things, loans to borrowers who had recently declared bankruptcy in certain lending programs where bankrupt borrowers were not permitted; "high cost" loans that appeared to violate state lending laws; debt-to-income ratios that did not comply with applicable product guidelines; inadequate or missing documentation of income, assets, and rental or mortgage history for the relevant loan program; and stated incomes the vendors concluded were unreasonable.

Merrill Lynch's subprime due diligence manager received the vendors' reports and the results of the due diligence reviews throughout the whole loan acquisition process. The vendors' reports were also available to others in Merrill Lynch's RMBS business, including those on the trading desk and in the securitization group. These reports showed that some due diligence samples had an EV3 rate as high as 50% of the loans sampled. Merrill Lynch typically did not review the unsampled portion of the loan pools to determine whether they also included loans with material credit or compliance defects.

In addition, due diligence personnel and, in certain instances, traders on Merrill Lynch's Whole Loan Trading Desk, reevaluated certain loans graded EV3 by the vendor and, in certain circumstances, overruled the vendor's grade and "waived" particular loans into the purchased pool. Merrill Lynch's contemporaneous records did not in all cases document Merrill Lynch's reasons for directing the due diligence vendors to re-grade loans.

In an internal email that discussed due diligence on one particular pool of loans, a consultant in Merrill Lynch's due diligence department wrote: "[h]ow much time do you want me to spend looking at these [loans] if [the co-head of Merrill Lynch's RMBS business] is going to keep them regardless of issues? . . . Makes you wonder why we have due diligence performed other than making sure the loan closed."

In 2006 and 2007, Merrill Lynch's due diligence vendors provided Merrill Lynch with reports reflecting that the vendors graded certain of the sampled loans as EV3. For some pools, the reports showed that the vendors had graded more than 20 percent of the sampled loans as EV3. The following examples provide the approximate percentages of EV3 loans that were

3

present in the samples taken from particular pools and the approximate percentage of those EV3
loans that were waived in by Merrill Lynch for acquisition:

- Sampled loans from five pools of loans originated by ResMAE Mortgage Corporation
  fed into four securitizations issued by Merrill Lynch Mortgage Investors Trust in
  2006: MLMI 2006-RM1, MLMI 2006-RM2, MLMI 2006-RM3 and MLMI 2006-
  RM5. For one pool, the vendor graded 24% of the due diligence sample EV3, and
  Merrill Lynch waived into the purchase pool 16% of these loans. For a second pool,
  the vendor graded 32% of the due diligence sample EV3, and Merrill Lynch waived
  into the purchase pool 14% of these loans. For a third pool, the vendor graded 22% of
  the due diligence sample EV3, and Merrill Lynch waived into the purchase pool 27%
  of these loans. For a fourth pool, the vendor graded 57% of the due diligence sample
  EV3. Finally, for a fifth pool, the vendor graded 40% of the due diligence sample
  EV3, and Merrill Lynch waived into the purchase pool 50% of these loans.

- Sampled loans from two pools of loans originated by Mortgage Lenders Network
  USA, Inc. fed into MLMI 2006-MLN1, a securitization issued by Merrill Lynch
  Mortgage Investors Trust in 2006. Vendors graded 22% and 23% of the due
  diligence sample EV3 for these two pools. For the latter sample, Merrill Lynch
  waived into the purchase pool 22% of the loans that had received an EV3 rating.

- Sampled loans from two pools of loans originated by WMC Mortgage Corporation
  fed into two securitizations issued by Merrill Lynch Mortgage Investors Trust in
  2006: MLMI 2006-WMC1 and MLMI 2006-WMC2. For these two pools, the
  vendors graded 22% and 45% of the loans in the due diligence sample EV3. For the
  latter sample, Merrill Lynch waived into the purchase pool 26% of the loans that had
  received an EV3 rating.

- Sampled loans from a pool of loans originated by Accredited Home Lenders, Inc. fed
  into MLMI 2006-AHL1, a securitization issued by Merrill Lynch Mortgage Investors
  Trust in 2006. For this pool, vendors graded 55% of the due diligence sample EV3.
  Merrill Lynch waived into the purchase pool 31% of the loans that had received an
  EV3 rating.

Merrill Lynch securitized most of the EV3 loans it waived in and acquired in this fashion,
typically within a matter of months.

These due diligence results are consistent with a "trending report" prepared for client
marketing purposes by one of Merrill Lynch's due diligence vendors (later described by the
vendor to be a "beta" or test report) that tracked EV3 and waiver rates in the samples from the
Merrill Lynch loan pools that the vendor reviewed from the first quarter of 2006 through the
second quarter of 2007. During those six quarters, the vendor reported that it reviewed 55,529
loans for Merrill Lynch. The vendor reported that 12,888 of the loans reviewed, or 23%, received
an initial grade of EV3. The report notes that 4,099 loans, or 31.8% of the loans that received an
initial EV3 grade, were "waived" into the purchase pools by Merrill Lynch.

4

Through the due diligence process in 2005 and 2006, Merrill Lynch also learned that certain originators were loosening their underwriting guidelines, resulting in Merrill Lynch's identifying, for example, an increasing number of loans with unreasonable stated incomes. Merrill Lynch's due diligence manager brought this to the attention of Merrill Lynch's head of whole loan trading in a memorandum written in November 2005. Merrill Lynch, however, continued to acquire and securitize loans from some of these originators without substantially altering its disclosures to investors. A year later, in December 2006, Merrill Lynch's due diligence manager again brought the loosening of originator guidelines to the attention of the head of whole loan trading in another memorandum. Merrill Lynch still continued to acquire and securitize loans from some of those originators without substantially altering its disclosures to investors.

With its acquisition of originator First Franklin in December 2006, Merrill Lynch vertically integrated all significant aspects of its RMBS business, from origination through securitization. This integration gave Merrill Lynch greater visibility into First Franklin's loan origination practices. Following its acquisition of First Franklin, Merrill Lynch sometimes reviewed a smaller due diligence sample when securitizing First Franklin loans than it had when acquiring and securitizing loans from First Franklin prior to the acquisition. In an email, one Merrill Lynch employee stated that certain post-acquisition First Franklin loans were being securitized "without the equivalent of a whole loan due diligence" and as a result "valuation and other credit kickouts will not occur" to the same extent as prior to the First Franklin acquisition. Moreover, for a period of time in 2007, Merrill Lynch gave its wholly owned subsidiary First Franklin the authority in certain circumstances to make the final decision about what First Franklin loans should be waived in and securitized. For example, according to a May 2007 report, the due diligence vendor graded 7% of the loans in one sample of First Franklin loans EV3 and 58% of those loans were waived into the purchase pool. Most of these loans were ultimately securitized by Merrill Lynch.

The offering documents for Merrill Lynch subprime RMBS also made representations concerning the value of the properties that secured the mortgage loans it securitized. In particular, the offering documents made representations to investors concerning the loan to value ("LTV") and combined loan to value ("CLTV") ratios of the securitized loans. Originators generally made their LTV and CLTV determinations by comparing the appraised value of the property at the time of origination or the purchase price of the property (whichever was lower) to the amount of the loan or loans secured by the property.

Merrill Lynch hired third-party valuation firms to test the reasonableness of the appraised values of mortgaged properties. These checks were performed through a variety of methods that generated valuation estimates, including (i) "automated valuation models," or "AVMs," (ii) desk reviews of the appraisals by licensed appraisers, and (iii) broker price opinions. After reviewing the relevant data, the valuation firm would provide its results to Merrill Lynch. Merrill Lynch had an internal "tolerance" of 10 to 15%. As a result of this practice, Merrill Lynch accepted certain loans for purchase and securitization where the reported appraised value at the time of origination was as much as 10 to 15% higher than the valuation firm's estimated value of the property. In addition, some of the RMBS issued by Merrill Lynch potentially contained loans

5

with an LTV in excess of 100%, based on valuations obtained from AVMs. The offering documents did not disclose facts about Merrill Lynch's "tolerance" levels.

The conduct described above with respect to Merrill Lynch all occurred prior to Bank of America's acquisition of Merrill Lynch in January 2009.

## COUNTRYWIDE - RMBS

Between 2005 and 2007, Countrywide Financial Corporation ("CFC") was the parent corporation of Countrywide Home Loans ("CHL"), Countrywide Bank, FSB ("CB"), and Countrywide Securities Corporation ("CSC"). CHL originated and acquired residential mortgage loans. CB was a federally chartered savings bank, the deposits of which were federally insured. CSC was a registered broker-dealer that was engaged in underwriting RMBS, which were often backed by "pools" of loans originated by CHL. CFC, CHL, CB, and CSC are referred to herein collectively as "Countrywide."

As discussed below, from 2005 to 2007, Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. At the same time, employees of Countrywide received information indicating that there was an increased risk of poor performance for certain mortgage programs and products that were being included in RMBS. Despite having access to this information, Countrywide's RMBS offering documents generally did not disclose the extent to which underlying loans were originated as exceptions to its Loan Program Guides. Nor did Countrywide disclose in its RMBS offering documents the results of certain reviews and internal reports related to loan performance.

### I.    Countrywide Business Model

Between 2005 and 2007, Countrywide was a diversified financial services company engaged in mortgage lending, banking, mortgage loan servicing, mortgage warehouse lending, securities, and insurance. At this time, Countrywide was among the largest originators of residential mortgage loans in the United States. Countrywide's SEC filings show that it originated $229 billion in residential mortgage loans in 2005, $243 billion in 2006, and $205 billion in 2007.

Countrywide's business model was to serve as an intermediary between borrowers seeking residential mortgages and investors seeking to purchase loans in the secondary market. As disclosed in Countrywide's Form 10-K for 2005, most of the mortgage loans Countrywide produced were sold into the secondary mortgage market, primarily in the form of RMBS. From 2005 to 2007, Countrywide sponsored and sold approximately $332 billion of prime, Alt-A, second lien, home equity line of credit, and subprime RMBS backed by loans originated by, among others, CHL.

Countrywide employed, among others, a corporate strategy sometimes referred to as the "Supermarket Strategy." The Supermarket Strategy was developed to create a one-stop shopping experience for borrowers. In addition to offering its own products, Countrywide strove to offer to

6

borrowers every kind of mortgage product that was available from legitimate competing lenders. A component of the Supermarket Strategy, which has sometimes been referred to as the "matching strategy," was a process by which Countrywide would learn about and evaluate loan product offerings from its competitors and expand its product offering to match or exceed its competitors' product offerings.

## II.    Countrywide Loan Origination Process

CHL originated and acquired residential mortgage loans through a variety of channels, including its own retail branches, mortgage brokers, and a network of third-party correspondent lenders. Countrywide's retail branches were referred to as the Consumer Markets Division ("CMD") and the Full Spectrum Lending Division ("FSL"). Countrywide provided its CMD and FSL branch underwriters with sets of lending guidelines, including Loan Program Guides, that listed borrower and loan characteristics, including credit scores and debt-to-income ("DTI") and LTV ratios, that branch underwriters were to consider when underwriting a potential loan. Branch underwriters had authority to approve loans that fit within the parameters outlined in the Loan Program Guides.

When branch underwriters received loan applications that did not meet the program parameters in the Loan Program Guides (e.g., credit score, LTV, loan amount), the branch underwriters were authorized to refer the applications to more experienced underwriters at the relevant divisional "Structured Loan Desk" ("SLD") for consideration of an "exception." Underwriters at the SLD were authorized to approve requests to make an "exception" to the Loan Program Guides if the proposed loan and borrower complied with the characteristics described in another set of guidelines, referred to as so-called "Shadow Guidelines," and the loan contained compensating factors supporting the exception request. The Shadow Guidelines generally permitted loans to be made to borrowers with lower credit scores and allowed for higher LTV ratios than the Loan Program Guides. If the SLD underwriter did not believe that an exception was appropriate as presented, the SLD underwriter either could deny the exception request or could propose a counter-offer to the branch underwriter. A counter-offer was a rejection of the exception request accompanied by a proposal that the loan could be originated under a different set of terms from those originally proposed by the branch underwriter. For example, a counter-offer might propose a different loan product or program or request that the borrower increase the size of a down payment. Countrywide's policies indicated that after an exception approval or counter-offer was delivered to the branch underwriter, the branch underwriter would then be responsible for deciding whether to approve the loan.

If a loan application did not meet the credit standards of the Shadow Guidelines, Structured Loan Desk underwriters were authorized to submit a request to Countrywide's Secondary Marketing Structured Loan Desk ("SMSLD"), which would then determine whether the requested loan, if originated, could be priced and sold in the secondary market. If a loan could be priced and sold, SMSLD would provide a price for the loan and ultimately it would be returned to the branch underwriter.

7

### III.    RMBS Securitization Process

Countrywide sold the majority of the loans that it originated. Many such loans were sold in the form of RMBS underwritten by CSC. The CHL loans that CSC underwrote in these securitizations were sourced in a variety of ways, including through third-party correspondent lenders. Countrywide structured and securitized these CHL or third-party mortgage loans under its own shelf registrations, such as Countrywide Alternative Loan Trust.

#### Due Diligence

When Countrywide securitized loans into RMBS, it would typically engage a third-party due diligence provider to perform due diligence on a sample of the loans. During this process, third-party due diligence providers generally reviewed a sample of the loans to be securitized against underwriting guidelines provided by Countrywide. In certain instances, Countrywide provided the due diligence providers with what were known as "Seller Loan Program Guides," which were guidelines based on the characteristics of loans that Countrywide had been able to make and sell in the past. Seller Loan Program Guides reflected the credit attributes of the loans that Countrywide had previously made and sold, and as a result they frequently listed lower credit scores or higher DTI and LTV ratios than the applicable Loan Program Guides or the applicable Shadow Guidelines. For example, certain of the Seller Loan Program Guides stated that they allowed DTIs of up to 55% for certain loans. The due diligence providers would then report the results of their review of the loans that were contained in the selected samples, including whether they complied with the underwriting guidelines provided by Countrywide and/or whether exceptions to those guidelines were supported by compensating factors.

#### Offering Document Representations and Disclosures

Countrywide prepared and filed with the SEC certain documents in connection with offering RMBS. Those documents included Prospectuses and Prospectus Supplements (together, "Offering Documents"), as well as Pooling and Servicing Agreements that memorialized agreements among Countrywide entities that offered or serviced the RMBS and the trustee for the RMBS once they were issued. Portions of the Pooling and Servicing Agreements were described and/or incorporated by reference in the Offering Documents.

In certain of the Offering Documents that were provided to investors in RMBS, Countrywide represented that it maintained an underwriting system that was intended to evaluate residential borrowers' credit standing and repayment ability. Although the Offering Documents were not uniform, Countrywide typically represented in them that it originated loans substantially in accordance with its credit, appraisal and underwriting standards. For example, Countrywide typically represented that it applied its underwriting standards "to evaluate the borrower's credit standing and repayment ability" and that "a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and to meet the borrower's monthly obligations on the proposed mortgage loan." For certain RMBS, Countrywide also generally stated that "exceptions" to CHL's "underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."

8

In certain of the Offering Documents, Countrywide stated that it originated loans under "Standard Underwriting Guidelines" and "Expanded Underwriting Guidelines." Countrywide stated that certain Standard Underwriting Guidelines generally permitted DTI ratios based on monthly housing expenses up to 33% and, when based on total debt, up to 38%.

Certain Offering Documents disclosed that under Countrywide's Standard Underwriting Guidelines, loans could be originated pursuant to the "Full," "Alt," "Reduced," "CLUES Plus," and "Streamlined" documentation programs, and that under certain of these programs, "some underwriting documentation concerning income, employment and asset verification is waived," that "information relating to a prospective borrower's income and employment is not verified," and that therefore DTI for those loans was calculated "based on the information provided by the borrower in the mortgage loan application."

Certain Offering Documents also disclosed that under Countrywide's Expanded Underwriting Guidelines, loans could be originated under additional documentation programs, namely "Stated Income/Stated Assets," "No Income/No Assets," and "No Ratio." Under the "Stated Income/Stated Asset" program, borrowers stated their incomes on a loan application without providing supporting documentation that could then be verified. The Offering Documents disclosed that in connection with the Stated Income/Stated Assets program, the loan application was reviewed to determine whether the income as stated by the borrower was reasonable for the borrower's stated employment. The description of the Expanded Underwriting Guidelines also stated that they generally permitted DTI ratios up to 36% on the basis of housing debt and up to 40% on the basis of total debt.

Countrywide entities made representations to securitization trustees in Pooling and Servicing Agreements. For example, CHL typically represented that each CHL mortgage loan supporting the subject RMBS was underwritten in all material respects in accordance with CHL's underwriting guidelines. In certain Pooling and Servicing Agreements, CHL also represented that the mortgage loan pools backing the subject RMBS were "selected from among the . . . portfolios of the Sellers at the Closing Date as to which the representations and warranties [set forth in the Pooling & Servicing Agreement] can be made" and were not "selected in a manner intended to adversely affect the interests of the Certificateholders." CHL also represented in certain Pooling and Servicing Agreements that, to the best of its knowledge, "there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration" as to any mortgage loan serving as collateral for the RMBS.

## IV.    Countrywide Expanded Its Loan Offerings Based on Salability

In the early to mid-2000s, mortgage originators across the mortgage lending industry began to offer more types of mortgage products. In furtherance of its goal to obtain a 30% market share and its "Supermarket Strategy," Countrywide began to offer products that featured more permissive lending criteria. Examples of these more permissive lending criteria included loans with higher combined-loan-to-value ratios or with lower credit scores. Countrywide also began to offer products that required less documentation from borrowers or offered flexible payment options. Examples of these mortgage products included "Stated Income" loans and Pay-Option Adjustable Rate Mortgages ("ARMs"). Stated Income loans did not require borrowers to

9

substantiate their claimed incomes with tax forms or other documentary proof. Pay-Option ARMs featured variable interest rates and flexible repayment options, including the ability to pay only the interest due for a certain period of time.

In a memo sent in October 2004, CFC's then Chief Credit Officer wrote: "my impression since arriving here is that the Company's standard for products and Guidelines has been: 'If we can price it, then we will offer it.'" In a May 13, 2007 internal memorandum, the same executive wrote:

> A core principal [*sic*] underlying product guidelines is salability. The only exception to this principle is specific 'Bank only' programs where loans are originated or purchased for the Bank portfolio.

Similarly, in an email dated June 7, 2007, CFC's Chief Investment Officer wrote to CFC's President, "[W]hen credit was easily salable, SLD was a way to take advantage of the 'salability' and do loans outside guidelines and not let our views of risk get in the way."

*Increase in Exception Loans*

Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. A June 28, 2005, a Countrywide Financial Corporate Credit Risk Committee presentation noted that approximately 15% of nonconforming loans[1] that Countrywide was originating through CMD were exception loans.

On July 28, 2005, a Countrywide executive sent an email informing the SLD that it could begin to expand the programs for which it could approve "exception" loans to programs other than the 30 year fixed and 5/1 ARM loan products. He wrote:

> [T]o the widest extent possible, we are going to start allowing exceptions on all requests, regardless of program, for all loans less than $3 million, effective immediately.
>
> \* \* \* \*
>
> The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. We will assume securitization in all cases.

By June 7, 2006, less than a year later, an internal Countrywide email indicated that during May 2006, for prime loans, exceptions constituted by dollar amount approximately 30% of fundings for certain fixed loans, 40% for Pay-Option ARMs, and 50% for expanded criteria hybrid loans.

---

[1]  Loans that did not meet requirements for sale to Fannie Mae or Freddie Mac.

10

Extreme Alt-A Program

In late 2006, Countrywide, after analyzing the mortgage products offered by certain of its competitors, implemented an expansion of its underwriting guidelines used by SLD underwriters, internally referred to as "Extreme Alt-A." The Extreme Alt-A initiative resulted in underwriting guidelines that, among other things, permitted higher LTV ratios and allowed for lower FICO scores from prospective borrowers. Extreme Alt-A loans were originated with the intent that they would be sold and that no credit risk would be retained by Countrywide. Some loans with Extreme Alt-A characteristics were sold in RMBS securitizations.

In connection with approving the Extreme Alt-A guideline expansion, Countrywide conducted various stress tests to model the loans' expected performance. Under certain adverse economic assumptions, Countrywide's models predicted that certain bands of Extreme Alt-A loans could perform more like subprime loans than like Alt-A loans.

In or around late March 2006, the Extreme Alt-A program was presented to Countrywide's Responsible Conduct Committee ("RCC") for consideration. The presentation included Model Foreclosure Frequency Estimates which projected that, under stressed economic conditions, certain bands of the loans originated under Extreme Alt-A guidelines could exceed a 21.62% foreclosure frequency. The model described in the presentation predicted that a number of categories of loans within the Extreme Alt-A program could experience default percentages into the high 30's or low 40's, and even a few in the 50's. The presentation indicated that "poor performance should be expected."

On April 5, 2006, a Countrywide executive sent an email regarding the Extreme Alt-A program that read, "[b]ecause this is a 'hazardous product' (direct quote from [another Countrywide executive]), ... [that Countrywide executive] wants to see a detailed implementation plan which addresses the process for originating and selling these loans such that we are not left with credit risk." Countrywide began offering the Extreme Alt-A program in 2006 and began originating and selling loans under its expanded underwriting guidelines. As with most exception loans, the Extreme Alt-A guidelines called for Extreme Alt-A loans to be processed at the SLD level, but the Extreme Alt-A guidelines did not require SLD underwriters to identify compensating factors in connection with underwriting the loans.

V.    Countrywide Received Information Concerning Risks and Quality of Its Mortgage Loans

During the period from August 2005 to 2007, Countrywide received information regarding the performance and characteristics of loans that it originated under various products and programs and securitized into RMBS. That information suggested that certain products had the potential to perform poorly, particularly in a challenging economic environment.

Exception Loan Performance

Using its SLD and SMSLD processes, Countrywide originated a substantial number of loans as exceptions to its Loan Program Guides. Internal reporting indicated that certain categories of exception loans performed poorly compared to loans originated within the parameters set out in Loan Program Guides. For example, a June 28, 2005 CFC Credit Risk

11

Committee report indicated that certain exception loans greater than $650,000 were "performing 2.8x worse overall" than non-exception loans.

### Pay-Option ARM Loans

Countrywide began issuing Pay-Option ARM loans around 2000, and by 2004 they were a large part of Countrywide's loan originations. In some instances, Pay-Option ARM borrowers were able to make payments that were less than the interest that accrued on the principal balance each month. The difference between the amount of interest that accrued on the loan and that lower payment is called "negative amortization" and was added to the principal balance of the loan. If the loan's principal balance reached a certain amount, frequently 110% or 115% of the original loan amount, the loan payment "reset" to the amount necessary to amortize the principal balance. This "reset" could result in substantially higher payments for borrowers, resulting in a form of what became known in the industry as "payment shock."

Starting in mid-2005, Countrywide received information indicating, among other things, that a majority of Pay-Option ARM borrowers were opting to make the minimum payment on their loans. In response to certain information, CFC and CB decided to limit the types of Pay-Option ARM loans that CB held for investment. On August 1, 2005, CFC's Chairman sent an email to CHL's President and head of loan production and CB's President stating:

> I am becoming increasingly concerned about the environment surrounding the borrowers who are utilizing the pay option loan and the price level of real estate in general but particularly relative to condos and specifically condos being purchased by speculators (non owner occupants). I have been in contact with developers who have told me that they are anticipating a collapse in the condo market very shortly simply related to the fact that in Dade County alone 70% of the condos being sold are being purchased by speculators. The situation being reported in Broward County, Las Vegas as well as other so called "hot" areas of the Country.
>
> We must therefore re-think what assets [we] should be putting in the bank. For example you should never put a non-owner occupied pay option Arm on the balance sheet. I know you have already done this but it is unacceptable. Secondly only 660 fico's and above, owner occupied should be accepted and only on a limited basis. The focus should be on 700 and above (owner occupied) for this product. The simple reason is that when the loan resets in five years there will be enormous payment shock and the borrower is not sufficiently sophisticated to truly understand the consequences then the bank will be dealing with foreclosure in potentially a deflated real estate market. This would be both a financial and reputational catastrophe.

On August 2, 2005, CHL's president responded to this email, writing that this approach had "securitization implications":

12

> We need to analyze what remains if the bank is only cherry picking
> and what remains to be securitized/sold is overly concentrated with
> higher risk loans. The concern and issue gets magnified as we put a
> bigger percentage of our pay option production into the Bank
> because the remaining production then increasingly looks like an
> adversely selected pool.

On August 2, 2005, CFC's Chairman responded to this email:

> I absolutely understand your position however there is a price no
> matter what we do. The difference being that by placing less
> attractive loans in the secondary market we will know exactly the
> economic price we will pay when the sales settle.

In accordance with the direction of CFC's Chairman, CB later limited the Pay-Option ARM
loans that it held for its own investment to loans with relatively higher credit characteristics.

Beginning in October 2005, Countrywide tracked its Pay-Option ARM portfolio through
monthly "Flash Reports." Countrywide's analysis showed that the percentage of borrowers who
chose to make the minimum mortgage payment each month was trending higher than predicted
and, thus, certain loans were at risk of "resetting" earlier than anticipated. This "resetting," which
was an inherent risk of the Pay-Option ARM product, could result in higher payments and, thus,
could cause "payment shock" for borrowers.

On February 3, 2006, an article in Inside Mortgage Finance Publications reported on a
study that Countrywide presented at the American Securitization Forum Conference. The article
reported that a Countrywide executive had stated that "Pay Option Arms were found to be the
riskiest product on the market."

On April 3, 2006, CFC's Chairman sent to CHL's President and head of loan origination
an email observing that there was:

> important data that could portend serious problems with [Pay-
> Option ARMs]. Since over 70% have opted to make the lower
> payments it appears that it is just a matter of time that we will be
> faced with a substantial amount of resets and therefore much
> higher delinquencies. We must limit [CB's retained investment in]
> this product to high ficos otherwise we could face both financial
> and regulatory consequences.

On May 18, 2006, CFC's Chairman sent to CFC's CFO, CHL's President, and others an
email in which he warned: "As for pay options the Bank faces potential unexpected losses
because higher rates will cause these loans to reset much earlier than anticipated and as [a] result
caus[e] mortgagors to default due to the substantial increase in their payments."

On June 7, 2006, a Countrywide executive sent an email, observing that "exceptions"
constituted 40% of prime Pay-Option ARM loans by dollar amount.

13

On September 13, 2006, CFC's Chairman spoke at a Countrywide Fixed Income Investor Forum and disclosed that, with respect to Pay-Option ARMs, "in the first year 78% of the borrowers employ the lower payment."

On September 26, 2006, CFC's Chairman sent an internal email in which he described Pay-Option ARM loans as "the lightening [*sic*] rod of 'exotic loans'" and then described his concern with how the product would perform in stressed market conditions:

> The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced value and slowing home sales . . . It [sic] therefore I [sic] believe the timing is right for us to sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently on their port[folio].

Throughout 2006 and 2007, Countrywide continued to originate Pay-Option ARMs, including as exceptions to its Loan Program Guides, and to securitize these Pay-Option ARMs into RMBS. As disclosed in Offering Documents, in certain RMBS backed by Pay-Option ARMs, as many as 90% of the loans that backed the certificates were originated under reduced documentation programs.

### Stated Income Loans

Countrywide also received information indicating that some borrowers who applied for loans in which they stated their incomes without providing verification may have been overstating their incomes on their loan applications. In a May 26, 2006, CB Credit Risk Committee Report, CB presented the results of a review of the tax returns of a sample of borrowers who had filled out IRS Form 4506-Ts in connection with their mortgage applications. A form 4506-T allows a mortgage lender to request a borrower's previous year's income tax return from the IRS. The audit described in the CB Credit Risk Committee Report compared the income a borrower provided in connection with a mortgage application to the income reported on the borrower's income tax return in the prior tax year. The presentation, assuming that borrowers correctly reported (and did not understate) their income on their tax returns, suggested:

> that approximately 40% of the Bank's reduced documentation loans in the portfolio could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more.

The study further suggested that, among the group of borrowers who may have overstated their income by more than 10%, 68% had a variance of greater than 50%, 25% had a variance between 25% and 50%, and 7% had a variance between 10% and 25%. For Pay-Option ARM loans, the overwhelming majority of which were stated income loans, the study indicated that 72% of the Pay-Option ARM loans that showed greater than 10% variance showed greater than 50% variance.

In a June 2, 2006, email drafted in response to this presentation, CFC's Chief Risk Officer wrote:

14

> These results are basically identical to what I've seen other times
> (both here and other places) this type of analysis has been done.
> You will observe similar results for other types of consumer loans
> (e.g., credit cards, installment loans) where income is not
> documented. While I'm no fan of reduced doc, we should also
> keep in mind:
>
> 1) Any income growth since the last tax return won't be reflected
> in this type of analysis ....
>
> 2) Borrowers are not underwriters. Some of what we would not
> count as income (e.g., support from relatives) would be considered
> by most borrowers. Most borrowers are not going to knowingly
> take on an obligation they don't believe they can afford.
>
> 3) Many (most?) borrowers seek to report as little income as
> possible on their tax return.
>
> 4) Unlike many loan programs, the reduced doc is not
> differentially priced for most PayOption loans. So we may not
> have as much adverse selection here as other programs.
>
> We need to be careful painting all of this as a "misrep." Although
> that is obviously the case in some (perhaps many) instances, it
> won't be the case in all cases.

If a borrower overstated his or her income, it would affect the accuracy of DTI
calculations, and also could affect an underwriter's ability to evaluate a borrower's repayment
ability.

## VI.    Disclosures in Offering Documents Did Not Reflect Certain Information That Countrywide Received

Although Countrywide originated an increasing number of mortgage loans as exceptions
to its Loan Program Guides from 2005 to 2007, Countrywide generally did not disclose in its
RMBS Offering Documents the scope of the exceptions to its Loan program Guides. Throughout
this time period, Countrywide received information on risks associated with certain mortgage
products and programs. Countrywide did not disclose in its RMBS Offering Documents the
results of certain reviews and internal reports that analyzed this information.

Countrywide's Offering Documents did not include a description of its Supermarket
Strategy, whereby Countrywide sought to achieve more market share and growth by creating a
one-stop shopping experience for borrowers by offering a complete suite of mortgage products
that were available in the industry from legitimate competing lenders.

Countrywide did not disclose in its Offering Documents that according to the June 28,
2005 CFC Credit Risk Committee report, non-conforming loans greater than $650,000 that were
originated since 2004 via the retail branch network or mortgage brokers through the exception

15

process were "performing 2.8x worse" than loans originated without exceptions. Nor did
Countrywide's Offering Documents identify the percentage of loans backing an offering that
were originated as exceptions to Countrywide's Loan Program Guides.

The Offering Documents also did not disclose certain information concerning specific
mortgage products that served as collateral for certain of Countrywide's RMBS offerings. For
example, the Offering Documents did not disclose historical information on the percentage of
Pay-Option ARM borrowers who chose to make the minimum payments. Although Countrywide
disclosed in certain of its SEC filings (i) the attributes of Pay-Option ARMs that were held by
CB and (ii) the increasing volume and dollar amount of loans that were experiencing negative
amortization, the Offering Documents did not disclose that certain Pay-Option ARM loans
included as collateral were loans that CB had elected not to hold for its own investment portfolio
because they had risk characteristics that CFC management had identified as inappropriate for
CB.

With respect to stated income loans, Countrywide did not describe in its Offering
Documents the results of the tax return study described in the May 26, 2006 CB Credit Risk
Committee Report. Nor did the Offering Documents describe the impact that an overstatement of
income could have had on DTI calculations.

Although the Offering Documents included detailed loan-level statistics about the pool of
loans serving as collateral for the RMBS, the Offering Documents were not revised to describe
the Extreme Alt-A program. In particular, the Offering Documents did not disclose that under the
Phase 1 (roll-out) of the Extreme Alt-A program Countrywide originated CMD and Wholesale
Lending Division loans whose characteristics fell outside of the Loan Program Guides, and that
documents drafted in connection with implementing the program indicated that in Phase 1 "loans
[would] be treated as exceptions and routed to SLD for guideline and price determination"
without requiring compensating factors as a basis for approval. The Offering Documents also did
not disclose whether Extreme Alt-A loans were included in the collateral for a given RMBS. Nor
did the Offering Documents describe the default rates predicted by the model used to generate
the March 2006 RCC presentation on Extreme Alt-A performance.

## VII.   Bank of America's Acquisition of Countrywide

On July 1, 2008, after the events described herein, Countrywide was acquired by Bank of
America Corporation.

## FHA UNDERWRITING

Bank of America is a mortgage lender that participates in a federal program sponsored by
the Department of Housing and Urban Development ("HUD") called the "Direct Endorsement
Program." Subject to the requirements of the program, Bank of America is authorized to
"originate" - i.e., make - and to underwrite mortgage loans to first-time and low-income home
buyers and to low-income home owners refinancing mortgages, that are insured by the Federal
Housing Administration ("FHA"), an agency within HUD. In exchange for having the authority
to originate and underwrite FHA-insured loans, Bank of America is obligated to determine

16

whether prospective borrowers meet minimal credit-worthiness criteria and to certify to HUD that borrowers who received loans met the criteria. In the event that an FHA-insured loan originated by Bank of America goes into default, the FHA guarantees payment of the outstanding portion of the mortgage principal, accrued interest, and costs owed by the borrower.

During the period May 1, 2009 through March 31, 2012, Bank of America underwrote and insured for FHA insurance loans to borrowers who did not qualify for loans under the criteria set by HUD. In certain cases, Bank of America, inter alia, did not properly verify borrowers' income, did not adequately verify the source of gift funds borrowers used to make the statutory minimum down payment, and approved borrowers that may have lacked the ability to make monthly mortgage payments.

Many of Bank of America's borrowers have defaulted on their mortgage loans and have either lost or are in the process of losing their homes to foreclosure. As a result of Bank of America's conduct, HUD-FHA insured loans that were not eligible for FHA mortgage insurance and that HUD-FHA would not otherwise have insured. HUD consequently incurred hundreds of millions of dollars of losses when it paid insurance claims on those Bank of America-endorsed loans.

## I.    FHA MORTGAGE INSURANCE AND
## THE DIRECT ENDORSEMENT PROGRAM

The National Housing Act of 1934 authorizes the FHA to insure home mortgages for first-time and low-income home buyers. 12 U.S.C. § 1709. The FHA only insures mortgage loans issued by approved mortgage lenders or "mortgagees" to qualified borrowers.

Under the Direct Endorsement Program, approved mortgage lenders ("Direct Endorsers") determine whether loan applicants are eligible for FHA mortgage insurance. See 24 C.F.R. §203.5(a). A Direct Endorser must submit a mortgage insurance application for each borrower to HUD, with documentation of the borrower's income, assets and credit-worthiness, and of the Direct Endorser's review and analysis of the loan.

HUD authorizes some Direct Endorsers to endorse mortgage loans for FHA mortgage insurance on an expedited basis, after the company's own pre-endorsement review of the file. This endorsement occurs without a required pre-endorsement review of the mortgage insurance application file by HUD. This is known as the Lender Insurance Program. Under this program, Direct Endorsers are still required to comply with all HUD regulations concerning the origination of FHA-insured mortgages. Additionally, there is no reduction in the documents required, and the mortgage lender is required to retain all loan origination documents. Further, Direct Endorsers are required to submit the full mortgage loan file to HUD upon HUD's request. During the relevant time period, Bank of America participated in the Lender Insurance program.

Bank of America originated mortgages nationally through its direct lending branch. Direct lending branches of FHA-approved mortgage lenders contact consumers and originate mortgages through the internet, or through a call center.

17

A.    Underwriting and Eligibility Requirements for FHA Mortgage Insurance

In determining whether a loan applicant qualifies for an FHA-insured mortgage loan, a Direct Endorser must comply with HUD underwriting requirements which establish the minimum standard of due diligence in underwriting mortgage loans. 24 C.F.R. § 203.5(c). Among other things, a Direct Endorser is required by law to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the [Direct Endorser] would be entirely dependent on the property as security to protect its investment." Id. Put another way, a Direct Endorser may not underwrite an FHA-insured mortgage loan less carefully than it would if the mortgage loan was not insured by the FHA.

1.    Income, Credit History and Ability to Make Mortgage Payments

Specifically, HUD requires a Direct Endorser to be responsible for evaluating a borrower's credit characteristics, including past credit history and demonstrated willingness to pay debts. Additionally, a Direct Endorser must assess the adequacy of a borrower's income, including the adequacy and stability of income to meet periodic mortgage payments and any other recurring debt payments and the adequacy of a borrower's available assets to cover the statutory minimum down payment. 24 C.F.R. § 203.5(d).

For each FHA-insured loan, a Direct Endorser must establish that the borrower has the ability and willingness to repay the loan. A Direct Endorser's determination must be predicated on sound underwriting principles consistent with HUD's requirements and must be supported by requisite documentation. See HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance, One to Four Family Properties, May 10, 2009 ("Credit Analysis Handbook"),. A Direct Endorser must therefore pay specific attention to a borrower's rent or mortgage payment history, and any collection actions, judgments, foreclosures or bankruptcies. Id.

HUD requires a Direct Endorser to submit documentation that the borrower has the ability to responsibly manage his or her financial affairs. See Credit Analysis Handbook,. For example, if a borrower has gone through a bankruptcy, the Direct Endorser must document that the borrower's current situation indicates that the events that led to the bankruptcy are not likely to recur.

HUD regulations further require that a Direct Endorser calculate a borrower's verifiable income and determine the likelihood that the income will continue through at least the first three years of the mortgage. See Credit Analysis Handbook. In particular, a Direct Endorser must review:

       a.    salaries, wages, and other regular payments such as social security or retirement benefits;

       b.    alimony, child support or maintenance income; and

       c.    net rental income from property owned by the borrower.

18

A Direct Endorser may include rental income from properties owned by borrowers in its analysis, if the lender can document that the rental income is stable through a lease, an agreement to lease, or a rental over the past twenty-four months free of unexplained gaps.

A Direct Endorser must further verify and document a borrower's minimum required cash investment in the property by obtaining a Verification of Deposit form from the borrower's bank to verify its current bank deposits, along with the most recent bank statement. See Credit Analysis Handbook,. A Direct Endorser must also list a borrower's recurring obligations, including installment loans, charge accounts, and real estate loans, and consider their impact on the borrower's ability to pay the mortgage. Id.

### 2.    Debt, Qualifying Ratios and Overall Merit of Loan Application

Additionally, a Direct Endorser must compute two "Qualifying Ratios" to determine whether the borrower can reasonably be expected to meet the expenses involved in home ownership, and otherwise provide for the borrower's family:

a.    Mortgage Payment to Effective Income: the mortgage payment, including payments into an escrow account for taxes, insurance and any other assessments, should not exceed 31% of a borrower's effective income. See Credit Analysis Handbook; Mortgagee-Letter 2005-16, April 13, 2005.

b.    Total Fixed Payment to Effective Income: the borrower's mortgage payments and all other recurring payment obligations should not exceed 43% of effective income. See Credit Analysis Handbook; Mortgagee-Letter 2005-16, April 13, 2005.

Where a borrower exceeds either Qualifying Ratio, a Direct Endorser must determine whether there are "Compensating Factors" that justify the making of the loan. See Credit Analysis Handbook. Compensating Factors include whether:

a.    Housing Expense Payments: The borrower has successfully demonstrated the ability to pay housing expenses greater than or equal to the proposed monthly housing expenses for the new mortgage over the past 12-24 months;

b.    Down Payment: The borrower makes a large down payment of 10 percent or higher toward the purchase of the property;

c.    Accumulated Savings: The borrower has demonstrated:
• an ability to accumulate savings, and
• a conservative attitude toward using credit;

d.    Previous Credit History: A borrower's previous credit history shows that he/she has the ability to devote a greater portion of income to housing expenses;

19

e.    Compensation or Income Not Reflected in Effective Income: The borrower receives documented compensation or income that is not reflected in effective income, but directly affects his/her ability to pay the mortgage. This type of income includes food stamps, and similar public benefits;

f.    Minimal Housing Expense Increase: There is only a minimal increase in the borrower's housing expense;

g.    Substantial Cash Reserves: The borrower has substantial documented cash reserves (at least three month's worth) after closing. The lender must judge if the substantial cash reserve asset is liquid or readily convertible to cash, and can be done so absent retirement or job termination, when determining if the asset can be included as cash reserves, or cash to close. Funds and/or "assets" that are not to be considered as cash reserves include equity in other properties, and proceeds from a cash-out refinance.

Lenders may use a portion of a borrower's retirement account, subject to the conditions stated below. To account for withdrawal penalties and taxes, only 60% of the vested amount of the account may be used. The lender must document the existence of the account with the most recent depository or brokerage account statement. In addition, evidence must be provided that the retirement account allows for withdrawals for conditions other than in connection with the borrower's employment termination, retirement, or death. If withdrawals can only be made under these circumstances, the retirement account may not be included as cash reserves. If any of these funds are also to be used for loan settlement, that amount must be subtracted from the amount included as cash reserves. Similarly, any gift funds that remain in the borrower's account following loan closing, subject to proper documentation, may be considered as cash;

h.    Substantial Non-Taxable Income: The borrower has substantial non-taxable income;

i.    Potential for Increased Earnings: The borrower has a potential for increased earnings, as indicated by job training or education in his/her profession; and

j.    Primary Wage-Earner Relocation: The home is being purchased because the primary wage-earner is relocating, and the secondary wage-earner

• has an established employment history

• is expected to return to work, and

• has reasonable prospects for securing employment in a similar occupation in the new area

20

HUD further requires that a Direct Endorser judge the overall merit of a borrower's loan application. Simply establishing that a loan transaction meets minimal standards does not necessarily constitute prudent underwriting. See Credit Analysis Handbook. A Direct Endorser must therefore analyze the probability that a borrower will repay the mortgage obligation. Id. .

A Direct Endorser must document each loan submitted for mortgage insurance. See Credit Analysis Handbook. A Direct Endorser must ask questions that will elicit a complete picture of the borrower's financial situation.

When a borrower's credit history reveals delinquent accounts, the Direct Endorser must document its analysis of whether the late payments were based on a disregard for, or inability to pay or manage debts. See Credit Analysis Handbook

### 3.   Supporting Documents Must Come From Disinterested Parties

A Direct Endorser may receive Verification of Employment forms from a borrower's employer by fax, if the borrower's employer is clearly identified as the source of the fax. The lender is accountable for ascertaining the authenticity of employment verification documents, by examining information in its header and footer. See Credit Analysis Handbook.

Mortgage lenders may not accept or use documents relating to the employment, income or credit of borrowers that are handled or transmitted from or through interested third parties, including real estate agents, or by using their equipment. See Credit Analysis Handbook

### B.   Specific Due Diligence Required of Direct Endorsement Lenders

HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans. The purposes of due diligence include (a) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, see 24 C.F.R. § 203.5(d), and (b) examining a property offered as security for the loan to determine if it provides sufficient collateral, see 24 C.F.R. § 203.5(e)(3). Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.

HUD has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders. These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties, to evaluate a borrower's credit. The rules set forth in HUD 4155.1 exist to ensure that a Direct Endorsement Letter sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

21

To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for any gaps in employment; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

With respect to appraising the mortgaged property (i.e., collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD 4150.2, Valuation Analysis for Home Mortgage Insurance. The rules set forth in HUD 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

### C.    Direct Endorser Certifications To HUD

#### 1.    Annual Certifications

As a condition for maintaining its participation in the Direct Endorsement Program, a Direct Endorser, by its President or Vice-President, must certify to HUD annually that the Direct Endorser conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval. See Title II Yearly Verification Report, Home Office. The officer must further certify that the Direct Endorser is responsible for all its employees' actions. Id.

The Direct Endorsement Lender must make the following annual certification, in sum and substance:

> I know or am in the position to know, whether the operations of the above named mortgage conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA approval, and that the above named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

The annual certification requires compliance with the basic eligibility requirements for Direct Endorsement Lenders, which includes compliance with HUD rules concerning lender's quality control.

22

2.    Loan Application Certifications

For each mortgage loan insured by FHA under the Direct Endorsement Program, a Direct Endorser and its Underwriter must make a number of certifications required by HUD. See Direct Endorsement Approval for a HUD/FHA Insured Mortgage form; HUD Handbook 4000.4 Rev-1, Single Family Direct Endorsement Program, 9/2/88 ("Direct Endorsement Handbook").

Specifically, a Direct Endorser and/or the Direct Endorsement Underwriter must make a series of certifications in the HUD 1003 Addendum, also known as the HUD/VA Addendum to Uniform Residential Loan Application and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, including:

a.    The loan terms furnished in the Uniform Residential Loan Application and the Addendum are true, accurate and complete.

b.    The information contained in the Uniform Residential Loan Application and the Addendum was obtained directly from the borrower by an employee of the undersigned lender or its duly authorized agent and is true to the best of the lender's knowledge and belief.

c.    The verification of employment was requested and received by the lender or its duly authorized agent without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.

d.    The verification of deposit was requested and received by the lender or its duly authorized agent without passing through the hands of any third persons and are true to the best of the lender's knowledge and belief.

e.    The proposed loan to the borrower meets the income and credit requirements of the governing law in the lender's judgment.

f.    That the statements made in its application for insurance and the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

g.    That complete disbursement of the loan has been made to the borrower, or to his/her creditors for his/her account and with his/her consent.

h.    No charge has been made to or paid by the borrower except as permitted under HUD regulations.

i.    The Lender has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with the transaction except as permitted under HUD regulations and administrative instructions.

23

j.    The Lender's officer has personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents.

k.    All certifications required for the mortgage by the Direct Endorsement Handbook.

D.    **Submission To HUD**

A Direct Endorser must submit a mortgage insurance application for each borrower to HUD, together with documentation of the borrower's assets and credit-worthiness, and documentation of the Direct Endorser's review and analysis of the loan, including:

a.    The Uniform Residential Loan Application and Addendum signed and dated by all borrowers and the Direct Endorser. See Credit Analysis Handbook;

b.    Mortgage Credit Analysis Worksheet where the Direct Endorser must truthfully and accurately break out and review the borrower's available assets and income, versus the expected costs of both the mortgage and other fixed payments owed by the borrower. The Direct Endorser further must truthfully apply HUD-mandated ratios and ratings of the borrower's credit as well as their current and future ability to pay their debts;

c.    Credit Report for all borrowers;

d.    Verification of employment;

e.    Verification of available funds from borrower's bank, and the borrower's most recent bank statements;

f.    Verification of Rent or Payment History of Present/Previous Mortgages; and

g.    Settlement Statement (also known as the "HUD-1").

Direct Endorsers also electronically submit information for mortgage insurance applications to HUD, including the borrower's name and social security number, the property address, the appraiser's name, and the borrower's Qualifying Ratios.

After HUD receives a Direct Endorser's mortgage insurance application, HUD will issue a mortgage insurance certificate for the mortgage if several criteria are met, including that the application contains all the required documentation and that the Direct Endorser and its Underwriter have made their certifications. 24 C.F.R. § 203.255(c)(1)-(7). As noted above, at all times relevant to this action Bank of America participated in the Lender Insurance program, which permitted it to endorse mortgage loans for FHA mortgage insurance.

HUD monitors Direct Endorsers' compliance with HUD regulations. HUD tracks the delinquency and default rates (delinquencies of greater than ninety days) of borrowers from each approved branch office of a Direct Endorsement mortgage lender for the first two years of each

24

loan, to detect whether the mortgage lenders may be violating HUD standards in originating insured mortgage loans.

HUD's primary means to monitor compliance with its underwriting regulations is through the Neighborhood Watch system. HUD monitors compliance with its underwriting regulations by mortgagees, like Bank of America, through its Neighborhood Watch system ("Neighborhood Watch"). Neighborhood Watch is a tool which identifies lenders, loan types, and locations by zip code that have a high incidence of single family insured mortgages going into default (90 days delinquent) within the first two years after loan origination ("Early Default Loans").

The system is designed to highlight exceptions, so that potential problems are readily identifiable. Neighborhood Watch is designed as an Early Warning System and is intended, _inter alia_, to aid HUD/FHA staff in monitoring lenders and our programs.

E.     Automated Underwriting Systems

A Direct Endorsement Lender may use an FHA-approved automated underwriting system to review loan applications. The automated underwriting system processes information entered by the Direct Endorsement Lender and rates loans as either an "accept"/"approve" or a "refer"/"caution."

In cases where a Direct Endorsement Lender uses an FHA-approved automated underwriting system, and the system rates a loan as an "accept" or "approve", the Direct Endorsement Lender must make the following certification:

> This mortgage was rated an "accept" or "approve" by a FHA-approved automated underwriting system. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that a Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

In cases where a Direct Endorsement Lender uses an FHA-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or in cases where a Direct Endorsement lender does not use an FHA-approved automated underwriting system, the underwriter must make the following certification:

> This mortgage was rated as a "refer" or "caution" by a FHA-approved automated underwriting system, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is

25

eligible for HUD mortgage insurance under the Direct
Endorsement program and I hereby make all certifications required
by this mortgage as set forth in HUD Handbook 4000.4.

The certifications in HUD Handbook 4000.4, incorporated by reference in the
certifications above, include the certification that the mortgage complies with HUD underwriting
requirements contained in all outstanding HUD Handbooks and Mortgagee Letters.

Bank of America used an automated underwriting system referred to as the Countrywide
Loan Underwriting Expert System ("CLUES"). Bank of America used CLUES to underwrite
loans for FHA-insurance. CLUES interfaced with FHA's Technology Open to Approved
Lenders ("TOTAL"), an automated tool that evaluates many of the new loans insured by the
FHA. Lenders certify they are in compliance with requirements applicable to the use of TOTAL,
including that they "not disassemble, decompile, reverse engineer, derive or otherwise reproduce
any part of the source code or algorithm in TOTAL."

Absent a truthful mortgage eligibility certification, a Direct Endorsement Lender may not
endorse a mortgage for FHA insurance.

## II.    BANK OF AMERICA'S NON-COMPLIANCE RELATED TO FHA-INSURED LOANS

As of December 31, 2013, Bank of America had submitted for payment claims for loans
that were originated by the Bank of America and insured by the FHA on or after May 1, 2009, or
for which the terms and conditions of the mortgage loan were approved by an FHA direct
endorsement underwriter on or after May 1, 2009. Review of Bank of America's early default
loans indicates that for many loans, Bank of America did not always meet FHA requirements.
The deficiencies include non-compliance with the applicable regulations. Bank of America
engaged in the following types of conduct: (a) it did not establish income stability; (b) it did not
verify income; (c) it inaccurately evaluated borrower's previous mortgage or rental payment
history; (d) it did not account for a major derogatory on a borrower's credit; (e) it did not verify
and document earnest money; (f) it did not verify and document checking and savings account
information; (g) it did not document gift fund monies and verify wire transfers of same; (h) it did
not document and verify the borrower's investment in the property; (i) it under-reported
borrower liabilities; (j) it did not always present adequate compensating factors when the
borrower exceeded HUD-established income-to-debt ratios; and (k) it sometimes incorrectly
calculated income for purposes of such ratios.

Review of samples of FHA loans originated by Bank of America showed unacceptable
rates of material underwriting defects.

For example, in one instance, Bank of America refinanced a Countrywide-held non-FHA
loan into a government-backed FHA loan. The loan, which was in the amount of $156,491 for a
24-year-old mobile home, contained numerous unresolved income discrepancies. The borrower
was also delinquent on his initial loan at the time of closing. In addition, the borrower was
improperly permitted to roll $12,623 of credit card and auto debt into the new FHA loan. The
borrower made only two payments before defaulting on the new FHA loan.

26

In another example, Bank of America allowed a borrower to roll $65,356 of credit card debt into a new, larger refinanced loan insured by the FHA. Bank of America also failed to verify the borrower's employment and omitted the borrower's debts from the credit analysis. The original mortgage was $140,000 but Bank of America refinanced the loan for $207,824 in a declining market. With respect to another loan, Bank of America endorsed a loan for FHA insurance even though the borrower lived with a relative rent-free and, thus, had no history of paying rent or other housing expense. Bank of America also did not verify the borrower's income, and the borrower was on a leave of absence from employment eight days prior to closing. Despite the requirement that the borrower show two months' complete bank statements, the borrower's bank account was opened a mere twelve days prior to closing. The borrower made only four payments before defaulting on the $314,204 FHA loan.

When using the CLUES system, Bank of America sometimes changed an applicant's financial information and then re-submitted the loan multiple times in an effort to get a CLUES "accept". For example, in at least one instance, Bank of America's underwriter attempted to get a CLUES accept rating more than forty times and in other cases underwriters regularly changed the relevant data and re-submitted the loans through CLUES more than twenty times. In a case note, one underwriter characterized what she was doing as trying to "trick" the CLUES system into giving an "accept" rating.

## COUNTRYWIDE AND BANK OF AMERICA - ORIGINATIONS SOLD TO GSEs

From at least 2004 through 2008, Countrywide Home Loans, Inc. and Countrywide Bank, FSB (collectively, "Countrywide") originated residential mortgage loans and sold certain of those loans to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "government-sponsored enterprises" or "GSEs"). After acquiring Countrywide in 2008, Bank of America, N.A. ("Bank of America") continued to originate residential mortgage loans and sell certain of those loans to the GSEs.

In selling residential mortgage loans to the GSEs, Countrywide and Bank of America made representations and warranties to the GSEs that the loans complied in all respects with the standards outlined in the Single Family Selling Guide (the "Fannie Guide"), Single-Family Seller/Servicer Guide (the "Freddie Guide"), and the applicable purchase contracts, including in the case of Fannie Mae, the Strategic Alliance Agreements entered into between Fannie Mae and Countrywide, which collectively set forth underwriting, documentation, quality control, and self-reporting requirements.

Countrywide and Bank of America made representations and warranties to Fannie Mae concerning each residential mortgage loan that they originated and sold to Fannie Mae, including but not limited to, the following:

a. The mortgage conformed to all the applicable requirements in the Fannie Guide and the purchase contracts;

b. The mortgage was an "acceptable investment";

27

c. All required loan data was true, correct, and complete;

d. Automated underwriting conditions were met for loans processed through an automated underwriting system; and

e. No fraud or material misrepresentation was committed by any party, including the borrower.

Countrywide and Bank of America made similar representations and warranties to Freddie Mac concerning each residential mortgage loan they originated and sold to Freddie Mac, including, but not limited to, the following:

a. The terms, conditions, and requirements stated in the Freddie Guide and purchase contracts were fully satisfied;

b. All warranties and representations of Countrywide and Bank of America were true and correct;

c. The loan was "investment quality"; and

d. Countrywide and Bank of America had not misstated or omitted any material fact about the mortgage.

Countrywide and Bank of America were also generally required to self-report to Fannie Mae and Freddie Mac any loans they identified as defective and/or otherwise ineligible for sale to the GSEs.

A significant percentage of the loans that Countrywide sold to the GSEs during 2004 to 2008 were originated by Countrywide's prime retail division, known as the Consumer Markets Division ("CMD"). During this time, Countrywide was aware that many of the residential mortgage loans originated through CMD were defective and/or otherwise ineligible for sale to the GSEs. After acquiring Countrywide Bank in 2008, Bank of America continued to originate mortgage loans for sale to the GSEs through its retail lending channel that were defective and/or otherwise ineligible for sale to the GSEs.

Thus, Countrywide and Bank of America sold residential mortgage loans that they originated to the GSEs with representations and warranties that the loans conformed to the Fannie Guide, Freddie Guide and/or applicable purchase contracts; that the loans were acceptable investments or investment quality; that all required loan data was true, correct, and complete; that automated underwriting conditions had been met; that no material misrepresentations were committed in connection with the loans; and that they had not misstated or omitted any material fact about the loans; when, in fact, many of those representations or warranties were not accurate, as many of the loans were defective and/or otherwise ineligible for sale to the GSEs.

Countrywide and Bank of America also did not self-report to the GSEs mortgage loans originated through CMD and Bank of America's retail lending channel that were internally identified as defective and/or otherwise ineligible for sale to the GSEs.

28

## COUNTRYWIDE AND BANK OF AMERICA – "PIGGYBACK LOANS"

From at least 2006 through 2013, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, First Franklin Financial Corp., and Bank of America, N.A. (collectively, "Bank of America") originated residential mortgage loans and sold certain of them to Fannie Mae and Freddie Mac. Among the loans that were originated were "Piggyback Loans," *i.e.*, multiple residential mortgage loans made to the same borrower at the same time on the same property and which are subject to the same or similar representations and warranties. Given the nature of the representations and warranties made with respect to each loan, if one of the two Piggyback Loans is found to be defective or otherwise subject to repurchase, the other frequently will be as well.

Bank of America sold first lien loans from piggyback transactions to Fannie Mae and Freddie Mac and sold such first and second lien loans to RMBS trusts. In selling residential mortgage loans to the GSEs, representations and warranties were made to the GSEs that the loans complied in all respects with the standards outlined in the GSE selling guides and sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements. Specifically, loans sold to Fannie Mae are sold with the representations and warranties contained in its Single Family Selling Guide (the "Fannie Guide") and the applicable purchase contracts, including in the case of Countrywide the Strategic Alliance Agreements entered into between Fannie Mae and Countrywide. Loans sold to Freddie Mac are sold with the representations and warranties contained in its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts.

Bank of America made representations and warranties to Fannie Mae concerning each residential mortgage loan that they originated and sold to Fannie Mae, including but not limited to, the following:

a.  The mortgage conformed to all the applicable requirements in the Fannie Guide and the purchase contracts;

b.  The mortgage was an "acceptable investment";

c.  All required loan data was true, correct, and complete;

d.  Automated underwriting conditions were met for loans processed through an automated underwriting system; and

e.  No fraud or material misrepresentation was committed by any party, including the borrower.

Bank of America likewise made representations and warranties to Freddie Mac concerning each residential mortgage loan sold to Freddie Mac, including but not limited to, the following:

a.  The terms, conditions, and requirements stated in the Freddie Guide and purchase contracts were fully satisfied;

29

b.    All warranties and representations of the seller were true and correct;

c.    The loan was "investment quality;" and

d.    Bank of America had not misstated or omitted any material fact about the mortgage.

Bank of America was also generally required to self-report to Fannie Mae and Freddie Mac any loans it identified as defective and/or otherwise ineligible for sale to the GSEs. When purchasing or providing reimbursement for a second lien mortgage that violated its representations and warranties, Bank of America did not regularly review the corresponding first lien mortgage loan that had been sold to Fannie Mae and Freddie Mac to determine whether it was required to self-report that loan, and typically did not self-report the related first lien mortgage loan.

30

# EXHIBIT B

This Settlement Agreement ("Agreement") is entered into between the United States acting through the United States Department of Justice ("Department of Justice"), along with the States of California, Delaware, Illinois, Maryland, and New York, and the Commonwealth of Kentucky, acting through their respective Attorneys General (collectively, "the States"), and Bank of America Corporation, Bank of America, N.A., and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America"). The United States, the States, and Bank of America are collectively referred to herein as "the Parties."

## RECITALS

A.     The United States Attorney's Offices for the District of New Jersey, the Western District of North Carolina, the Northern District of Georgia, and the Central District of California conducted investigations of the packaging, origination, marketing, sale, structuring, arrangement, and issuance of residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") by Bank of America; Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Countrywide Securities Corporation, as well as their current and former subsidiaries and affiliates (collectively, "Countrywide"); Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch Mortgage Lending, Inc., and Merrill Lynch Mortgage Investors, Inc., as well as their current and former subsidiaries and affiliates (collectively, "Merrill Lynch"); and First Franklin Financial Corporation, as well as its current and former subsidiaries and affiliates ("First Franklin"). Based on these investigations, the United States believes that there are potential legal claims by the United States against Bank of America, Countrywide, Merrill Lynch and First Franklin for violations of federal law. Furthermore, based on its investigation, the United States Attorney's Office for the Western District of North Carolina filed a civil action,

*United States v. Bank of America Corp., et al.*, No. 13-cv-446-MOC (W.D.N.C.), against Bank
of America seeking a civil monetary penalty pursuant to the Financial Institutions Reform,
Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a.

B.     The States, based on their independent investigations of the same conduct, believe
that there are potential legal claims by California, Delaware, Illinois, Maryland, Kentucky, and
New York against Bank of America, Countrywide, Merrill Lynch, and First Franklin for state
law violations in connection with the packaging, origination, marketing, sale, structuring,
arrangement, and issuance of RMBS and CDOs.

C.     The United States Attorney's Office for the Southern District of New York has
conducted investigations of Countrywide and Bank of America's origination and sale of
defective residential mortgage loans to the Federal National Mortgage Association ("Fannie
Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively,
"government-sponsored enterprises" or "GSEs"), including investigating allegations asserted by:

i.     Relator, who filed a complaint on or about June 21, 2011, under the *qui tam*
provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, against Bank of
America, three of its subsidiaries (Countrywide Financial Corporation, Landsafe
Appraisal Services, Inc. and U.S. Trust), and another defendant, asserting *inter
alia*, that, from 2004 to 2011, Bank of America and its subsidiaries originated
residential mortgage loans using inflated appraisals and fraudulently sold those
loans to the GSEs with misrepresentations as to the loans' quality;

ii.    Relator, who filed a complaint on or about June 4, 2014, under the *qui tam*
provisions of the False Claims Act against Countrywide and Bank of America,
alleging, *inter alia*, that, from 2009 to 2014, these entities fraudulently sold

2

defective residential mortgage loans originated by Countrywide's Consumer

Markets Division and later Bank of America to the GSEs with misrepresentations

as to the loans' quality; and

iii.    Relator, who filed a complaint on or about January 14, 2014, under the *qui tam*

provisions of the False Claims Act against Defendants Countrywide, Bank of

America, Merrill Lynch, and First Franklin, alleging, *inter alia*, that, from 2008 to

2013, those entities breached representations and warranties by failing to report

thousands of defective loans to the GSEs.

Based on these investigations, the United States believes that there are potential legal claims by

the United States against Bank of America for violations of federal law.

D.    The United States Attorney's Office for the Western District of North Carolina

has also conducted an investigation of Bank of America and Countrywide submitting false

claims to the Federal Housing Administration ("FHA"), an agency within the United States

Department of Housing and Urban Development, including investigating allegations asserted by

Mortgage Now, Inc., which filed a complaint on or about June 7, 2012, under the *qui tam*

provisions of the False Claims Act against Bank of America alleging *inter alia*, that Bank of

America and Countrywide submitted claims to FHA for reimbursement of amounts Bank of

America and Countrywide already had recovered from third-party correspondent lenders. As

part of this investigation, the United States Attorney's Office for the Western District of North

Carolina examined whether Bank of America settled repurchase claims with Freddie Mac and

Fannie Mae concerning residential mortgages for which Bank of America or Countrywide

received compensation from third party correspondent lenders that Bank of America did not

disclose to Freddie Mac and Fannie Mae.

3

EXHIBIT A - PAGE 69

E.      The United States Attorney's Office for the Eastern District of New York has

conducted an investigation of Bank of America's origination of loans insured by the FHA from

May 1, 2009 through March 31, 2012.

F.      The United States Department of Housing and Urban Development has conducted

an investigation of Bank of America's performance as Master Subservicer under Contract

Number C-OPC-23289 with the Government National Mortgage Association ("Ginnie Mae").

G.      Bank of America, Countrywide, Merrill Lynch, and/or certain affiliates thereof

have resolved claims filed by the Federal Deposit Insurance Corporation ("FDIC") as Receiver

for 1st Pacific Bank of California, the FDIC as Receiver for Affinity Bank, the FDIC as Receiver

for CF Bancorp, the FDIC as Receiver for Citizens National Bank, the FDIC as Receiver for

Colonial Bank, the FDIC as Receiver for Eurobank, the FDIC as Receiver for First Banking

Center, the FDIC as Receiver for First Dupage Bank, the FDIC as Receiver for Franklin Bank,

S.S.B., the FDIC as Receiver for Guaranty Bank, the FDIC as Receiver for Horizon Bank, the

FDIC as Receiver for Imperial Capital Bank, the FDIC as Receiver for Independent Bankers

Bank, the FDIC as Receiver for Los Padres Bank, the FDIC as Receiver for Palos Bank & Trust

Co., the FDIC as Receiver for Prosperan Bank, the FDIC as Receiver for SCB Bank, the FDIC as

Receiver for Security Savings Bank, the FDIC as Receiver for ShoreBank, the FDIC as Receiver

for Statewide Bank, the FDIC as Receiver for Strategic Capital Bank, the FDIC as Receiver for

United Western Bank, F.S.B., the FDIC as Receiver for USA Bank, the FDIC as Receiver for

Venture Bank, and the FDIC as Receiver for Warren Bank (the FDIC in its capacity as receiver

for each of the Failed Banks referred to as "FDIC-R"), and claims filed by Bank of America,

N.A. The terms of the resolution of those claims are memorialized in a separate agreement,

attached hereto as Exhibit A.

4

H.    Bank of America and Merrill Lynch have reached an agreement in principle to resolve claims by the United States Securities and Exchange Commission ("SEC"). The terms of the resolution of those claims are reflected in separate documents, attached hereto as Exhibit B.

I.    Bank of America acknowledges the facts set out in the Statement of Facts set forth in Annex 1, attached hereto and hereby incorporated.

J.    In consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.    **Payment.** Bank of America shall pay a total amount of $9,650,000,000.00 to resolve pending and potential legal claims in connection with the Covered Conduct, as defined below (the "Settlement Amount"), of which $5,020,000,000.00 shall be paid as a civil monetary penalty. As set out in Paragraph 1(A)(i), $5,000,000,000.00 of the Settlement Amount will be paid as a penalty recovered pursuant to FIRREA, 12 U.S.C. § 1833a. The remainder will be paid as set out in Paragraphs 1(A)(ii) to 1(A)(ix) and Paragraphs 1(B) to 1(G) and the Total Tax Relief Payment Amount as set out in Paragraph 2. As set out in the settlement documents attached hereto as Exhibit B, $20,000,000.00 of the Settlement Amount will be paid as a penalty in connection with the claims referenced in Recital Paragraph H.

A.    Within sixty (60) days of receiving written payment processing instructions from the Department of Justice, Office of the Associate Attorney General, Bank of America shall pay $8,216,840,000.00 of the Settlement Amount by electronic funds transfer to the Department of Justice.

5

i. $5,000,000,000.00, and no other amount, is a civil monetary penalty recovered pursuant to FIRREA, 12 U.S.C. § 1833a. It will be deposited in the General Fund of the United States Treasury.

ii. $350,000,000.00, and no other amount, is in settlement of the claims of the United States identified in Recital Paragraph C and *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America.

iii. $350,000,000.00, and no other amount, is in settlement of the claims of the United States identified in Recital Paragraph C and *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America.

iv. $50,000,000.00, and no other amount, is in settlement of the claims of the United States identified in Recital Paragraph D and *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America.

v. $300,000,000.00, and no other amount, is in settlement of the claims of the United States identified in Recital Paragraph C and *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America.

vi. $800,000,000.00, and no other amount, is in settlement of Bank of America's submission of claims through December 31, 2013 for FHA loans originated by Bank of America or Countrywide on or after May 1, 2009. Any amount that FHA receives will be deposited into the Federal Housing Administration's Capital Reserve Account.

vii. $200,000,000.00, and no other amount, is in settlement of potential contractual claims related to Bank of America's and Countrywide's performance as Master Subservicer under Contract Number C-OPC-23289

6

with Ginnie Mae. Any amount that Ginnie Mae receives will be deposited

into the Government National Mortgage Association's Financing Account.

viii. $1,031,000,000.00, is paid by Bank of America in settlement of the claims of

the FDIC identified in Recital Paragraph G, pursuant to the settlement

agreement attached hereto as Exhibit A, the terms of which are not altered or

affected by this Agreement.

ix. $135,840,000.00, and no other amount, is paid by Bank of America in

settlement of the claims of the SEC identified in Recital Paragraph H,

pursuant to the settlement documents attached hereto as Exhibit B, the terms

of which are not altered or affected by this Agreement.

B.      $300,000,000.00, and no other amount, will be paid by Bank of America to the

State of California pursuant to Paragraph 8, below, and the terms of written payment instructions

from the State of California, Office of the Attorney General. Payment shall be made by

electronic funds transfer within sixty (60) days of receiving written payment processing

instructions from the State of California, Office of the Attorney General.

C.      $45,000,000.00, and no other amount, will be paid by Bank of America to the

State of Delaware pursuant to Paragraph 9, below, and the terms of written payment instructions

from the State of Delaware, Office of the Attorney General. Payment shall be made by

electronic funds transfer within sixty (60) days of receiving written payment processing

instructions from the State of Delaware, Office of the Attorney General.

D.      $200,000,000.00, and no other amount, will be paid by Bank of America to the

State of Illinois pursuant to Paragraph 10, below, and the terms of written payment instructions

from the State of Illinois, Office of the Attorney General. Payment shall be made by electronic

7

funds transfer within sixty (60) days of receiving written payment processing instructions from the State of Illinois, Office of the Attorney General.

      E.    $23,000,000.00, and no other amount, will be paid by Bank of America to the Commonwealth of Kentucky pursuant to Paragraph 11, below, and the terms of written payment instructions from the Commonwealth of Kentucky, Office of the Attorney General. Payment shall be made by electronic funds transfer within sixty (60) days of receiving written payment processing instructions from the Commonwealth of Kentucky, Office of the Attorney General.

      F.    $75,000,000.00, and no other amount, will be paid by Bank of America to the State of Maryland pursuant to Paragraph 12, below, and the terms of written payment instructions from the State of Maryland, Office of the Attorney General. Payment shall be made by electronic funds transfer within sixty (60) days of receiving written payment processing instructions from the State of Maryland, Office of the Attorney General.

      G.    $300,000,000.00, and no other amount, will be paid by Bank of America to the State of New York pursuant to Paragraph 13, below, and the terms of written payment instructions from the State of New York, Office of the Attorney General. Payment shall be made by electronic funds transfer within sixty (60) days of receiving written payment processing instructions from the State of New York, Office of the Attorney General.

2.    <u>Consumer Relief.</u> In addition, Bank of America shall provide $7,000,000,000.00 worth of consumer relief as set forth in Annex 2, attached hereto and hereby incorporated as a term of this Agreement, to remediate harms resulting from the alleged unlawful conduct of Bank of America. The value of consumer relief provided shall be calculated and enforced pursuant to the terms of Annex 2. An independent monitor will determine whether Bank of America has satisfied the obligations contained in Annex 2 (such monitor to be Eric Green), and Bank of

8

America will provide the Monitor with all documentation the Monitor needs to do so, excluding all privileged information. All costs associated with said Monitor shall be borne solely by Bank of America; notwithstanding the fact that Bank of America bears the costs associated with the Monitor, the Monitor shall be fully independent of Bank of America. Bank of America will refrain from retaining the Monitor to represent Bank of America in any capacity prior to two years after the date upon which Bank of America satisfies the Consumer Relief obligations set forth in Annex 2. Bank of America will also refrain from engaging the Monitor as a mediator in any matter to which Bank of America is a party until Bank of America satisfies the Consumer Relief obligations set forth in Annex 2. Bank of America shall also pay $490,160,000.00 (such amount to be referred to as the "Total Tax Relief Payment Amount") of the Settlement Amount, in addition to the $7,000,000,000.00 worth of consumer relief, for the payment of consumer tax liability as a result of consumer relief as set forth in Annex 3, attached hereto and incorporated as a term of this Agreement. Such $490,160,000.00 will be deposited into an escrow account (such account to be referred to as the "Tax Relief Payment Account") that is a Qualified Settlement Fund in accordance with Treasury Regulation 1.468B-1(a), and all aspects of the payments therefrom shall be handled by the Monitor provided for herein and shall not be the responsibility of Bank of America.

3.     <u>Covered Conduct.</u> "Covered Conduct" as used herein is defined as:

    A.     The creation, origination, pooling, structuring, arranging, formation, packaging, marketing, underwriting, sale, or issuance prior to January 1, 2009 by the Released Entities (as defined further below) of the RMBS and CDOs identified in Annex 4, attached hereto and hereby incorporated. Covered Conduct includes representations, disclosures, or non-disclosures to RMBS investors about, or made in connection with, the underlying residential mortgage loans,

9

where the representation, disclosure, or non-disclosure involves information about or obtained during the process of originating, acquiring, securitizing, underwriting, or servicing residential mortgage loans in the RMBS identified in Annex 4. Covered Conduct also includes representations, disclosures, or non-disclosures made in connection with the activities set forth above about the CDOs identified in Annex 4, attached hereto and hereby incorporated. Covered Conduct as set forth in this Paragraph 3(A) does not include: (i) representations or non-disclosures made in connection with the trading of RMBS or CDOs, except to the extent that the representations, disclosures, or non-disclosures are in the offering materials for the underlying RMBS or CDOs listed in Annex 4, attached hereto and hereby incorporated; (ii) any conduct where Bank of America, Countrywide, Merrill Lynch, and First Franklin acted only in the role of trustee; or (iii) the servicing of residential mortgage loans, except representations or non-disclosures to investors in the RMBS listed in Annex 4 about servicing, or information obtained in the course of servicing, such loans.

     B.    Covered Conduct includes the administration of RMBS and CDOs identified in Annex 4, attached hereto and hereby incorporated, as of the Execution Date, to the extent such administration relates to any actions or inactions with respect to representation and warranties or the cure, substitution, or repurchase (or failure to do or seek any of the same) of residential mortgage loans. Covered Conduct includes representations, disclosures, or non-disclosures to trustees made in connection with the activities set forth above about the residential mortgage loans included in the RMBS identified in Annex 4, attached hereto and hereby incorporated.

     C.    The underwriting and origination of residential mortgage loans by Bank of America and Countrywide that were sold by Bank of America and Countrywide prior to December 31, 2013 to the GSEs, including the appraisal of properties in connection with the

origination of such residential mortgage loans, and representations by Bank of America and
Countrywide made prior to December 31, 2013 to the GSEs regarding the underwriting,
origination, and quality control with respect to those residential mortgage loans.

D.    The repurchase, investigation, and reporting obligations of Bank of America,
Countrywide, and First Franklin from January 1, 2006 to December 31, 2013, under the
representations and warranties contained in the GSE Seller/Servicer Guide with respect to
concurrent residential mortgage loans.

E.    The origination, including the appraisal of properties in connection with the
origination of such residential mortgage loans, underwriting, quality control, and endorsement of
single-family residential mortgage loans by Bank of America and Countrywide, as set forth more
fully in Annex 1, originated on or after May 1, 2009, on which claims were submitted on or
before December 31, 2013 to the FHA.

F.    All claims as alleged in the following actions relating to the Covered Conduct
described in Paragraphs 3(A)-3(E), *supra*:

    i.    *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America

    ii.    *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of
    America;

    iii.    *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of
    America; and

    iv.    *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of
    America, relating to the submission of claims by Bank of America or
    Countrywide on or before December 31, 2013 to FHA for residential
    mortgages that: (i) Bank of America or Countrywide acquired from third

11

party correspondent lenders and (ii) Bank of America or Countrywide received any form of compensation from third party correspondent lenders that was not disclosed to FHA. Covered Conduct relating to this matter also includes Bank of America settling repurchase claims with Freddie Mac and Fannie Mae concerning residential mortgages for which Bank of America or Countrywide received compensation from third party correspondent lenders in connection with actual or anticipated losses on those mortgages that Bank of America did not disclose to Freddie Mac and Fannie Mae. Notwithstanding anything to the contrary, all conduct described in this Paragraph 3(F)(iv) shall be deemed Covered Conduct under this Agreement.

G.    Bank of America's and Countrywide's performance as Master Subservicer under Contract Number C-OPC-23289, with Ginnie Mae for the period March 1, 2009 through August 31, 2014.

H.    The underwriting and origination of residential mortgage loans, including the appraisal of properties in connection with the origination of such residential mortgage loans, by Bank of America, Countrywide, Merrill Lynch, and First Franklin that were securitized by non-governmental entities in private label securitizations prior to January 1, 2009.

4.    **Cooperation.** Until the date upon which all investigations and any prosecution arising out of the Covered Conduct are concluded by the Department of Justice, whether or not they are concluded within the term of this Agreement, Bank of America shall, subject to applicable laws or regulations: (a) cooperate fully with the Department of Justice (including the Federal Bureau of Investigation) and any other law enforcement agency designated by the Department of Justice

12

regarding matters arising out of the Covered Conduct; (b) assist the Department of Justice in any

investigation or prosecution arising out of the Covered Conduct by providing logistical and

technical support for any meeting, interview, grand jury proceeding, or any trial or other court

proceeding; (c) use its best efforts to secure the attendance and truthful statements or testimony

of any officer, director, agent, or employee of any of the entities released in Paragraph 5 at any

meeting or interview or before the grand jury or at any trial or other court proceeding regarding

matters arising out of the Covered Conduct; and (d) provide the Department of Justice, upon

request, all non-privileged information, documents, records, or other tangible evidence regarding

matters arising out of the Covered Conduct about which the Department or any designated law

enforcement agency inquires.

5.    <u>Releases by the United States.</u>  Subject to the exceptions in Paragraph 15 ("Excluded

Claims"), and conditioned upon Bank of America's full payment of the Settlement Amount and

Bank of America's agreement, by executing this Agreement, to satisfy the terms in Paragraph 2

("Consumer Relief") and Paragraph 4 ("Cooperation"), the United States fully and finally

releases Bank of America, Countrywide, Merrill Lynch, and First Franklin, ("Released Entities")

and each of their respective successors and assigns:

a.  For the Covered Conduct contained in Paragraphs 3(A), 3(B), 3(C), 3(D), 3(E), and

3(F) from any civil claims the United States has for the Covered Conduct arising

under FIRREA, 12 U.S.C. § 1833a; the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801, *et seq.*; the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.*; the Injunctions

Against Fraud Act, 18 U.S.C. § 1345; common law theories of negligence, gross

negligence, indemnification, payment by mistake, unjust enrichment, money had and

13

received, breach of fiduciary duty, breach of contract, misrepresentation, deceit,

fraud, and aiding and abetting any of the foregoing; or that the Civil Division of the

Department of Justice has actual and present authority to assert and compromise

pursuant to 28 C.F.R. § 0.45.

b.  For the Covered Conduct contained in Paragraph 3(H) from any civil claims the

United States has for the Covered Conduct arising under FIRREA, 12 U.S.C.

§ 1833a.

6.    **Releases by the FHA.**  Subject to the exceptions in Paragraph 15 ("Excluded Claims"),

and conditioned upon Bank of America's full payment of the Settlement Amount relating to the

submission of claims to the FHA ($800,000,000.00) and Bank of America's agreement, by

executing this Agreement, to satisfy the terms in Paragraph 2 ("Consumer Relief") and

Paragraph 4 ("Cooperation"), the United States Department of Housing and Urban Development,

acting on behalf of FHA, fully and finally releases the Released Entities and their successors and

assigns from any monetary administrative claim the FHA has for the Covered Conduct described

in Paragraphs 3(E) and 3(F), *supra*.

7.    **Releases by the Ginnie Mae.**  Subject to the exceptions in Paragraph 15 ("Excluded

Claims"), and conditioned upon: (i) Bank of America's full payment of the Settlement Amount

relating to Ginnie Mae ($200,000,000.00) and (ii) Bank of America's agreement, by executing

this Agreement, to satisfy the terms in Paragraph 2 ("Consumer Relief") and Paragraph 4

("Cooperation), the United States Department of Housing and Urban Development, acting on

behalf of Ginnie Mae, fully and finally releases the Released Entities and their successors and

assigns from any civil or administrative monetary claim Ginnie Mae has against Bank of

14

America for the Covered Conduct contained in Paragraph 3(G) under the common-law theory of breach of contract.

8.      **Releases by the California Attorney General.**  Subject to the exceptions in Paragraph 15 (Excluded Claims), and conditioned upon Bank of America's full payment of the Settlement Amount (of which $300,000,000.00 will be paid to the Office of the California Attorney General, in accordance with written payment instructions from the California Attorney General, to remediate harms to the State, pursuant to California Government Code §§ 12650-12656 and 12658, allegedly resulting from unlawful conduct of the Released Entities), the California Attorney General fully and finally releases the Released Entities from any civil or administrative claim for the Covered Conduct contained in Paragraph 3(A) only that the California Attorney General has authority to bring, including but not limited to:  California Corporate Securities Law of 1968, Cal. Corporations Code § 25000 *et seq.,* California Government Code §§ 12658 and 12660 and California Government Code §§ 12650-12656, common law theories of negligence, payment by mistake, unjust enrichment, money had and received, breach of fiduciary duty, breach of contract, misrepresentation, deceit, fraud and aiding and abetting any of the foregoing.  The California Attorney General executes this release in her official capacity and releases only claims that the California Attorney General has the authority to release for the Covered Conduct contained in Paragraph 3(A).  The California Attorney General agrees that no portion of the funds in this paragraph is received as a civil penalty or fine, including, but not limited to any civil penalty or fine imposed under California Government Code § 12651.  The California Attorney General and Bank of America acknowledge that they have been advised by their attorneys of the contents and effect of Section 1542 of the California

15

EXHIBIT A - PAGE 81

Civil Code ("Section 1542") and hereby expressly waive with respect to this Agreement any and all provisions, rights, and benefits conferred by Section 1542.

9.    **Releases by the State of Delaware.**  Subject to the exceptions in Paragraph 15 (Excluded Claims), and conditioned solely upon Bank of America's full payment of the Settlement Amount (of which $45,000,000.00 will be paid to the State of Delaware, in accordance with written payment instructions from the State of Delaware, Office of the Attorney General, to remediate harms to the State allegedly resulting from unlawful conduct of the Released Entities), the Delaware Department of Justice fully and finally releases the Released Entities from any civil or administrative claim for the Covered Conduct contained in Paragraph 3(A) only that it has authority to bring, including but not limited to:  6 Del. C. Chapter 12 (the Delaware False Claims and Reporting Act), 6 Del. C. §§ 2511 *et seq.* (the Delaware Consumer Fraud Act), 6 Del. C. Chapter 73 (the Delaware Securities Act), and common law theories of negligence, payment by mistake, unjust enrichment, money had and received, breach of fiduciary duty, breach of contract, misrepresentation, deceit, fraud and aiding and abetting any of the foregoing.  The payment to the State of Delaware shall be used, to the maximum extent possible, for purposes of providing restitution and remediating harms to the State and its communities allegedly resulting from unlawful conduct of the Released Entities, including efforts to address the mortgage and foreclosure crisis, financial fraud and deception, and housing-related issues.  The State of Delaware agrees that no portion of the funds in this paragraph is received as a civil penalty or fine, including, but not limited to any civil penalty or fine imposed under 6 Del. C. § 1201 or § 2522.

10.    **Releases by the State of Illinois.**  Subject to the exceptions in Paragraph 15 (Excluded Claims), and conditioned solely upon Bank of America's full payment of the Settlement Amount

16

(of which $200,000,000.00 will be paid to the State of Illinois, Office of the Attorney General, in accordance with the written payment instructions from the State of Illinois, Office of the Attorney General, to remediate harms to the State allegedly resulting from unlawful conduct of the Released Entities), the Illinois Attorney General of the State of Illinois fully and finally releases the Released Entities from any civil or administrative claim for the Covered Conduct contained in Paragraph 3(A) only that it has authority to bring or compromise, including but not limited to: Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/1 *et seq.*, and common law theories of negligence, gross negligence, payment by mistake, unjust enrichment, money had and received, breach of fiduciary duty, breach of contract, misrepresentation, deceit, fraud and aiding and abetting any of the foregoing. The State of Illinois agrees that no portion of the funds in this paragraph is received as a civil penalty or fine.

11.    **Releases of the Commonwealth of Kentucky.** Subject to the exceptions in Paragraph 15 (Excluded Claims), and conditioned solely upon Bank of America's full payment of the Settlement Amount (of which $23,000,000.00 will be paid to the Commonwealth of Kentucky, in accordance with written payment instructions from the Commonwealth of Kentucky, Office of the Attorney General, to remediate harms to the State allegedly resulting from allegedly unlawful conduct of the Released Entities), the Attorney General of the Commonwealth of Kentucky fully and finally releases the Released Entities from any civil or administrative claim for the Covered Conduct contained in Paragraph 3(A) only that it has the authority to bring or compromise, including but not limited to under: KRS 292.310-292.480 (Kentucky Securities Act), 367.110-367.300 (Kentucky Consumer Protection Act), and common law theories of negligence, gross negligence, recklessness, willful misconduct, payment by mistake, unjust enrichment, money had and received, breach of fiduciary duty, breach of

17

contract, misrepresentation, deceit, fraud, gross negligence, recklessness, willful misconduct, and aiding and abetting or conspiracy regarding any of the foregoing, as well as claims of unfair, abusive, or deceptive practices. The Commonwealth of Kentucky agrees that no portion of the funds in this paragraph is received as a civil penalty or fine.

12.    **Releases of the State of Maryland.**  Subject to the exceptions in Paragraph 15 (Excluded Claims), and conditioned solely upon Bank of America's full payment of the Settlement Amount (of which $75,000,000.00 will be paid to the State of Maryland, in accordance with written payment instructions from the State of Maryland, Office of the Attorney General, to remediate harms to the State allegedly resulting from unlawful conduct of the Released Entities), the Attorney General of the State of Maryland ("Maryland Attorney General") fully and finally releases the Released Entities from any civil or administrative claim for the Covered Conduct contained in Paragraph 3(A) only that the Maryland Attorney General has authority to bring, including but not limited to: Maryland Securities Act, Md. Code Ann., Corps. & Assn's, §§ 11-101 *et seq.*, Maryland Consumer Protection Act, Com. Law §§ 13-101 *et seq.*, statutes and regulations in the nature of the False Claims Act or similar Laws, and common law theories of negligence, gross negligence, recklessness, willful misconduct, payment by mistake, unjust enrichment, money had and received, breach of fiduciary duty, breach of contract, misrepresentation, deceit, fraud, indemnification, contribution, restitution, rescission, and aiding and abetting or conspiracy claims regarding any of the foregoing, as well as claims of unfair, abusive, or deceptive practices, but excluding any liability arising under the tax provisions of the Maryland Code and any claims that may arise in any non-enforcement legal action related to any Maryland governmental entity in its capacity as an investor. The Maryland Attorney General executes this release in his official capacity and releases only claims that the Maryland Attorney

18

General has the authority to release for the Covered Conduct. The payment to the State of

Maryland shall be made to the Maryland Attorney General, which shall hold the monies and

distribute them as directed by the Maryland Attorney General for restitution to certain investors,

including state and local governmental entities, and for costs incurred in connection with

restitution, with any remaining funds to be credited to the Mortgage Loan Servicing Practices

Settlement Fund to be used in accordance with Maryland law. The State of Maryland agrees that

no portion of the funds in this paragraph is received as a civil penalty or fine.

13.    <u>Releases by the State of New York.</u>  Subject to the exceptions in Paragraph 15

(Excluded Claims), and conditioned solely upon Bank of America's full payment of the

Settlement Amount (of which $300,000,000.00 will be paid to the State of New York, in

accordance with written payment instructions from the State of New York, Office of the

Attorney General, to remediate harms to the State allegedly resulting from unlawful conduct of

the Released Entities), the State of New York, by Eric T. Schneiderman, Attorney General of the

State of New York, fully and finally releases the Released Entities from any civil or

administrative claim for the Covered Conduct contained in Paragraph 3(A) only that it has

authority to bring, including but not limited to any such claim under: New York General

Business Law Article 23A, New York Executive Law § 63(12), and common law theories of

negligence, payment by mistake, unjust enrichment, money had and received, breach of fiduciary

duty, breach of contract, misrepresentation, deceit, fraud and aiding and abetting any of the

foregoing. The payment to the State of New York shall be used, to the maximum extent

possible, for purposes of redeveloping and revitalizing housing and home ownership and

rebuilding communities in the State, and for programs intended to avoid preventable

foreclosures, to ameliorate the effects of the foreclosure crisis, to provide funding for housing

19

counselors and legal assistance, housing remediation and anti-blight projects, to enhance housing code compliance efforts aimed at addressing blight and disinvestment, and to enhance efforts to remediate the effects of financial fraud or unfair or deceptive acts or practices. The State of New York agrees that no portion of the funds in this paragraph is received as a civil penalty or fine.

14.    **Releases by the FDIC and the SEC.** The release of claims by the FDIC and the SEC are contained in separate settlement documents with Bank of America, attached as Exhibits A and B. Any release of claims by the FDIC and the SEC are governed solely by those separate settlement documents.

15.    **Excluded Claims.** Notwithstanding the releases in Paragraphs 5-14 of this Agreement, or any other term(s) of this Agreement, the following claims are specifically reserved and not released by this Agreement:

      a.      Any criminal liability;

      b.      Any liability of any individual;

      c.      Any liability of any person or entity other than the Released Entities and their successors and assigns;

      d.      Any liability arising under Title 26 of the United States Code (the Internal Revenue Code);

      e.      Any liability arising under Title XI of the Kentucky Revised Statutes.

      f.      Any liability to or claims of the FDIC (in its capacity as a corporation, receiver, or conservator) and the SEC, except as expressly set forth in the separate agreements with those entities;

20

g.     Any claim related to compliance with the National Mortgage Settlement ("NMS"), or to compliance with the related agreements reached between the settling banks and individual states;

h.     Any liability to, or claims brought by, the Federal Reserve Board and its member institutions, and/or by the United States Department of the Treasury;

i.     Any liability to, or claims brought by, the Department of Veterans Affairs relating to whole loans insured, guaranteed, or purchased by the Department of Veterans Affairs;

j.     Any liability to, or claims brought by, Fannie Mae or Freddie Mac relating to whole loans insured, guaranteed, or purchased by Fannie Mae or Freddie Mac;

k.     Any administrative liability, including the suspension and debarment rights of any federal agency, except to the extent expressly released in Paragraphs 6 and 7;

l.     Any liability based upon obligations created by this Settlement Agreement;

m.     Any liability for the claims or conduct alleged in the following *qui tam* actions, and no setoff related to amounts paid under this Agreement shall be applied to any recovery in connection with any of these actions:

   (i)     *United States ex rel. O'Donnell* v. *Bank of America Corp. et al.*, No. 12-cv-1422 (S.D.N.Y.);

   (ii)     *United States ex rel. Adams, et al. v. Aurora Loan Servs. LLC et al.*, No. 11-cv-00535 (D. Nev.) & 14-15031 (9th Cir.);

   (iii)     *United States, et al. ex rel. Szymoniak v. American Home Mortgage Servicing, Inc., et al.*, No. 10-cv-01465-JFA (D.S.C.), *and United States ex*

21

*rel. Szymoniak v. ACE Securities Corp., et al.*, No. 13-cv-464-JFA

(D.S.C.), to the extent any claims survive dismissal;

(iv)  *United States ex rel. Fisher v. Bank of America, N.A.*, No. 13-cv-01913-TPG (S.D.N.Y.);

(v)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(vi)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(vii)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(viii)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(ix)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(x)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America;

(xi)  *In re* [CONFIDENTIAL];

(xii)  *United States ex rel. Armendariz v. Wiles, et al.*, No. 14-cv-00551 (D.D.C.); and

(xiii)  *United States ex rel. [Sealed] v. [Sealed]*, as disclosed to Bank of America, to the extent it alleges any false or fraudulent statements, claims, and/or certifications to United States Department of Housing and Urban Development and/or the GSEs in connection with the reimbursement of costs or expenses incurred in connection with foreclosure-related proceedings anywhere in the United States (including foreclosure proceedings or other proceedings, such as bankruptcy or eviction proceedings, involving claims or issues relating to foreclosure), any failure to comply with, or any false or fraudulent statements, claims, and/or certifications to United States Department of Housing and Urban

22

Development and/or the GSEs concerning compliance with, quality control and/or monitoring requirements applicable to such costs or expenses.

n.    Any dispute, claim, or defense which may arise between any Relator and Bank of America in the matters identified in Paragraph 3(F) regarding attorneys' fees, expenses and costs of the Relator under 31 U.S.C. § 3730(d).

o.    Any liability arising under: the Fair Housing Act; the Equal Credit Opportunity Act; the Home Mortgage Disclosure Act; or any other statute or law that prohibits discrimination because of race, color, national origin, gender, disability, or any other protected status.

p.    Any claims related to the alleged manipulation of the London Interbank Offered Rate or other currency benchmarks.

16.    <u>Releases by Bank of America.</u>  Bank of America and any current or former affiliated entity and any of its respective successors and assigns fully and finally releases the United States and the States, and their officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Bank of America has asserted, could have asserted, or may assert in the future against the United States and the States, and their officers, agents, employees, and servants, related to the Covered Conduct to the extent released hereunder and the investigation and civil prosecution to date thereof.

17.    <u>Waiver of Potential FDIC Indemnification Claims by Bank of America.</u>  Bank of America hereby irrevocably waives any right that it otherwise might have to seek (and in any event agrees that it shall not seek) any form of indemnification, reimbursement or contribution from the FDIC in any capacity, including the FDIC in its Corporate Capacity or the FDIC in its

23

Receiver Capacity for any payment that is a portion of the Settlement Amount set forth in Paragraph 1 of this Agreement or of the Consumer Relief set forth in Paragraph 2 of this Agreement, including payments to the United States, the States, and the SEC made pursuant to Paragraphs 1 and 2 of this Agreement.

18.     **Waiver of Potential Defenses by Bank of America.** Bank of America and any current or former affiliated entity (to the extent that Bank of America retains liability for the Covered Conduct associated with such affiliated entity) and any of their respective successors and assigns waive and shall not assert any defenses Bank of America may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

19.     **Unallowable Costs Defined.** All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Bank of America, and its present or former officers, directors, employees, shareholders, and agents in connection with:

  a.     the matters covered by this Agreement;

  b.     the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

  c.     Bank of America's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

  d.     the negotiation and performance of this Agreement; and

24

e.     the payment Bank of America makes to the United States pursuant to this

Agreement, are unallowable costs for government contracting purposes

(hereinafter referred to as "Unallowable Costs").

20.    **Future Treatment of Unallowable Costs.**  Unallowable Costs will be separately

determined and accounted for by Bank of America, and Bank of America shall not charge such

Unallowable Costs directly or indirectly to any contract with the United States.

21.    **Miscellaneous.**

a.     This Agreement is intended to be for the benefit of the Parties only and does not

create any third-party rights.

b.     This Agreement is governed by the laws of the United States.  The Parties agree

that the exclusive jurisdiction and venue for any dispute relating to this

Agreement is the United States District Court for the District of New Jersey.

c.     The Parties acknowledge that this Agreement is made without any trial or

adjudication or finding of any issue of fact or law, and is not a final order of any

court or governmental authority.

d.     Each Party shall bear its own legal and other costs incurred in connection with

this matter, including the preparation and performance of this Agreement.

e.     Each party and signatory to this Agreement represents that it freely and

voluntarily enters into this Agreement without any degree of duress or

compulsion.

f.     Nothing in this Agreement in any way alters the terms of the NMS, or Bank of

America's obligations under the NMS.

25

g.      Nothing in this Agreement constitutes an agreement by the United States

concerning the characterization of the Settlement Amount for the purposes of the

Internal Revenue laws, Title 26 of the United States Code.

h.      For the purposes of construing the Agreement, this Agreement shall be deemed to

have been drafted by all Parties and shall not, therefore, be construed against any

Party for that reason in any dispute.

i.      This Agreement, including all Annexes and Exhibits attached hereto, shall not

apply to, or be used in, *United States ex rel. O'Donnell v. Bank of America Corp.,

et al.*, No. 12-cv-1422 (S.D.N.Y.).

j.      This Agreement constitutes the complete agreement between the Parties.  This

Agreement may not be amended except by written consent of the Parties.

k.      The undersigned counsel represent and warrant that they are fully authorized to

execute this Agreement on behalf of the persons and entities indicated below.

l.      This Agreement may be executed in counterparts, each of which constitutes an

original and all of which constitute one and the same Agreement.

m.      This Agreement is binding on Bank of America's successors, transferees, heirs,

and assigns.

n.      All parties consent to the disclosure to the public of this Agreement by Bank of

America, the United States, the States, the FDIC, and the SEC whose separate

settlement agreements are referenced herein and attached as exhibits to this

Agreement.

26

o.   This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date of this Agreement").  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

27

For the United States:


TONY WEST
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Phone: (202) 514-9500


Dated:  8.20.2014

For the Department of Housing and Urban Development

Carol J. Galante
Assistant Secretary for Housing FHA
  Commissioner
U.S. Department of Housing and Urban Development
451 7th Street, SW
Washington, DC 20410
Tel: 202-708-2601
Fax: 202-708-2580

For the Department of Housing and Urban Development

Theodore W. Tozer
President
Government National Mortgage Association
U.S. Department of Housing and Urban Development
451 7th Street, SW
Washington, DC 20410
Tel: 202-708-0926
Fax: 202-485-0206

BANK OF AMERICA CORPORATION

By: JANA J. LITSEY

Title: DEPUTY GENERAL COUNSEL

Date: 8/20/2014


BANK OF AMERICA, N.A.

By: JANA J. LITSEY

Title: DEPUTY GENERAL COUNSEL

Date: 8/20/2014

*[Signature Page to Settlement Agreement]*

EXHIBIT A - PAGE 96

BANC OF AMERICA MORTGAGE SECURITIES, INC.

By: Cheryl Glory

Title: President and CEO

Date: 8/20/2014

*[Signature Page to Settlement Agreement]*

For the California Department of Justice:


KAMALA D. HARRIS
California Attorney General
California Department of Justice
455 Golden Gate, Suite ~~1200~~ 11000
San Francisco, CA 94102
Phone: (415) 703-5500


Dated: August 20, 2014

For the State of Delaware:

JOSEPH R. BIDEN, III
Attorney General for the State of Delaware
Delaware Department of Justice
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801
Phone: (302) 577-8338

Dated: 8/18/14

For the State of Illinois:

_Lisa Madigan_ (signature)

LISA MADIGAN
Attorney General State of Illinois
500 South Second Street
Springfield, IL 62706
Phone: (217) 782-1090

Dated: August 18, 2014

For the Commonwealth of Kentucky:

JACK CONWAY
Attorney General of Kentucky
State Capitol, Suite 118
700 Capital Avenue
Frankfort, KY 40601
Phone: (502) 696-5643

Dated: 8-18-2014

For the State of Maryland:


Melanie Senter Lubin
Securities Commissioner
Office of the Attorney General of Maryland, Securities Division
200 St. Paul Place
Baltimore, Maryland  21202

Dated: _August 18 2014_


Douglas F. Gansler
Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, Maryland  21202

Dated: _August 18, 2014_

For the State of New York:

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
120 Broadway
New York, NY 10271
Phone: (212) 416-8000

Dated: 8/19/14

# EXHIBIT C

## Consumer Relief

**Eligibility:** The Consumer Relief eligibility criteria shall reflect only the terms set forth below and the following principles and conditions: (1) Consumer Relief will not be implemented through any policy that violates the Fair Housing Act or the Equal Credit Opportunity Act; (2) Consumer Relief will not be conditioned on a waiver or release by a borrower, provided that waivers and releases shall be permitted in the case of a contested claim where the borrower would not otherwise have received as favorable terms or consideration; and (3) Eligible modifications may be made under the Making Home Affordable Program (including the Home Affordable Modification Program and the Housing Finance Agency Hardest Hit Fund) and any proprietary or other modification program. Nothing herein shall preclude the implementation of pilot programs in particular geographic areas that do not violate the Fair Housing Act, the Equal Opportunity Credit Act, or any other federal or state civil rights law.

Menu[1]

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| I. Modification – Forgiveness/Forbearance[3,4] | | |
| A. First Lien – Principal Forgiveness[5,6] | $1.00 Forgiveness = $1.00 Credit | Menu Item 1.A Minimum = $2.15 Billion Credit |

[1]  Start date of crediting is July 1, 2014 (based on first payment date for completed modifications and other actions under this Menu). Consumer Relief to be completed no later than August 31, 2018. No Credit will be provided for a modification if payments are required unless the borrower makes the first three scheduled payments under the modification (including trial period payments). With respect to earned forgiveness principal reduction modifications, Credit can be immediate, *provided* the borrower makes the required payments (to include any trial payments) and the earned forgiveness period is a maximum of 3 years. If a borrower receives more than one form of Consumer Relief, Credit shall be provided for each form of relief, *provided* that the forms of relief must be segregated for purposes of determining Credit. The Credits for principal forgiveness modifications shall be net of any state or federal funds paid to Bank of America, such netting calculated on a basis consistent with the National Mortgage Servicing Settlement Consent Judgment entered into the U.S. District Court for the District of Columbia ("National Mortgage Settlement"). Credit can be earned for all forms of relief in the 50 states, the District of Columbia, and the U.S. territories.

[2]  Credit will be provided for any Consumer Relief completed by any subservicer pursuant to this Annex 2 and for loans sold to other servicers (including sales of servicing rights) where a modification is completed by the deadline set forth in footnote 1 for Bank of America to complete its Consumer Relief obligations, and *provided* that the agreement providing for such sale of servicing allows for the tracking and reporting of such subsequent Consumer Relief to the satisfaction of the Monitor. With respect to loans held in securitizations, Consumer Relief shall be credited in accordance with this Annex 2 from July 1, 2014 for all eligible modifications described in this "Menu," *provided* that all principal forgiveness modifications performed on loans in securitizations shall be eligible only where Bank of America has confirmed that: (1) the modification is permitted under the operative documents for the securitization; or (2) Bank of America has permission from the relevant investors and/or trustees to provide the principal reduction under the operative documents for the securitization or another agreement with trustees/investors. In addition, Credit will be provided for Consumer Relief completed pursuant to this Annex 2 with respect to loans serviced by Bank of America as well as loans owned by Bank of America with servicing rights owned by others ("SBO") unless otherwise limited under the Menu.

[3]  For Menu Item 1.A, eligibility is limited to non-performing loans and loans in imminent default (as defined by Bank of America in its written policies with respect to its implementation of the Home Affordable Modification Program). With respect to all other categories, Credit is available for Consumer Relief provided to all borrowers unless otherwise limited under the Menu.

[4]  With respect to Credits achieved under Menu Items 1.A, 1.B, and 1.C, modifications must be for loans with an unpaid principal balance prior to capitalization at or below the local GSE conforming loan limit cap as of July 1, 2014.

[5]  With respect to any principal forgiveness modification performed on Bank of America held-for-investment loans (including SBO) pursuant to Menu Item 1.A, the non-adjustable post-modification interest rate on the remaining first lien unpaid principal balance shall be no greater than 2% and the post-modification LTV must be equal to or less than 75% LTV. With respect to any principal forgiveness modification performed on loans serviced by Bank of America (excluding loans in subservicing) pursuant to Menu Item 1.A, the post-modification LTV must be reduced to equal to or less than 100% or principal must be reduced in order to achieve a post-modification debt-to-income ratio of 25%. As used in this Menu, "LTV" shall refer to loan-to-value ratio. Subject to any applicable investor or contractual requirements, the property value used to calculate the LTV under this Menu shall be based upon a property valuation meeting the standards acceptable under the Making Home Affordable programs received within three months of the transaction.

[6]  With respect to any borrower who is eligible for the Home Affordable Modification Program or any of its component programs ("HAMP") and, with the written consent of the borrower (it being understood that, so long as the borrower states he or she consents to be evaluated for a principal modification consistent with that of Menu Item 1.A of this Annex 2 in lieu of HAMP and such statement is reflected by Bank of America in its servicing system or mortgage file, such written consent will be obtained only from borrowers who enter into a final modification agreement), Bank of America may, in lieu of any evaluation of such borrower under HAMP, evaluate such borrower for a principal modification under Menu Item 1.A of this Annex 2, should Bank of America obtain the appropriate HAMP Waiver from the Department of the Treasury ("Treasury"). Such waiver will not be contained within this Settlement Agreement.

-2-

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| | $1.00 Forgiveness on FHA-insured Loans[7] or VA-guaranteed Loans[8] = $1.75 Credit | |
| | 150% Enhanced Early Incentive Credit[9] 115% Early Incentive Credit[10] | |
| | 115% Credit for incremental LTV reduction between 90% and 100% 120% Credit for incremental LTV reduction between 76% and 90% | |
| | If post-modification LTV equal to or less than 75%, 125% Credit for entire amount of principal forgiven. | |
| | 115% Credit for incremental relief in Hardest Hit Areas ("HHA") beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA[11] | |
| | $1.00 Forgiveness on loans serviced by Bank of America but owned by other | |

---

[7]  Credit at the $1.75 level may not be earned for any indemnified loan or for any loan listed on the schedule attached hereto as Exhibit 1. No Credit may be given for Title I or HECM loans. With respect to FHA-insured loans, Credit may only be earned where the following conditions are met: the loan is a Bank of America held for investment loan, the pre-modification LTV is equal to or greater than 90%, Bank of America is not compensated for the actions taken (i.e., where no loss mitigation claim is filed with the Federal Housing Administration ("FHA")), and where Bank of America receives no loss mitigation incentives from FHA in connection with these actions.

[8]  With respect to VA-guaranteed loans, Credit can only be earned where the following conditions are met: the loan is a Bank of America held-for-investment loan; principal reductions are completed in accordance with 38 C.F.R. § 36.4311; and Bank of America executes an indemnification agreement as set forth in Exhibit 2. Subject to the foregoing conditions, the Department of Veterans Affairs ("VA") grants prior approval, pursuant to 38 C.F.R. § 36.4315, for modification of the VA-guaranteed loans that meet these conditions. To earn Credit under this Menu Item, modifications of VA-guaranteed loans must be reported to VA in accordance with 38 C.F.R. § 36.4317. Bank of America only agrees to execute an indemnification agreement with respect to loans for which a modification has been completed. Bank of America agrees to provide notice to VA within 30 days of any solicitation concerning a VA-guaranteed loan. That notice will include the VA Loan Number, Servicer Loan Number, Borrower Name and Property Address for each loan.

[9]  Enhanced Early Incentive Credit applies to all Consumer Relief activity under Menu Item 1.A completed by May 31, 2015 (based upon the first payment date, excluding trial payments, for modifications requiring a payment), provided that no Enhanced Early Incentive Credit will be provided for a modification if payments are required unless the borrower makes the first three scheduled payments under the modification (including trial period payments). Enhanced Early Incentive Credit and other Credits are cumulative (e.g., $1.00 of principal forgiveness as part of a modification resulting in an LTV of 75% completed prior to May 31, 2015 would receive $1.875 Credit), except that no Early Incentive Credit applies to consumer relief activity receiving Enhanced Early Incentive Credit.

[10]  Early Incentive Credit applies to all Consumer Relief activity offered or completed by August 31, 2015. Early Incentive Credit and other Credits are cumulative (e.g., $1.00 of principal forgiveness as part of a modification resulting in an LTV of 75% completed prior to August 31, 2015 in a Participating State (as described below under "State-Specific Consumer Relief") where Bank of America has already met its state-specific minimum in an amount beyond that state-specific minimum would receive $1.653125 Credit).

[11]  Hardest Hit Areas or "HHA" are defined as the hardest hit census tracts in the "Distressed Census Tracts only.csv" file provided by the Department of Justice to Bank of America on August 11, 2014.

-3-

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| | investors = $0.50 Credit | |
| | $1.00 Investor incentive payments (when paid) consistent with those paid in HAMP (if applicable) = $1.00 Credit[12] | |
| B. Principal Forgiveness of Forbearance | $1.00 Forgiveness = $1.00 Credit | |
| | 115% Early Incentive Credit 115% Credit for incremental LTV reduction below 100% 115% Credit for incremental relief in HHA beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA | |
| | $1.00 Forgiveness on loans serviced by Bank of America but owned by other investors = $0.50 Credit | |
| | $1.00 Investor incentive payments (when paid) consistent with those paid in HAMP for principal reduction of first liens (if applicable) = $1.00 Credit | |
| | Credit limited to principal reduction that reduces LTV to equal to or less than 100% LTV | |
| C. First Lien – Forbearance (Payment Forgiveness) | $Forgiveness = Pre Mod Rate x Forborne UPB x Avg Life[13] | |
| | 115% Early Incentive Credit 115% Credit for incremental relief in HHA beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA | |
| | $1.00 Forgiveness on loans serviced by Bank of America but owned by other investors = $0.50 Credit | |
| | $1.00 Investor incentive payments (when paid) consistent with those paid in HAMP (if applicable) = $1.00 Credit | |
| D. Second Lien Extinguishments[14,15] | Performing (90 days or less past due on the related Second Lien)[16]: | Menu Items 1.D + 1.E Cap = $2.5 Billion Credit |

---

[12]  With respect to investor incentive payments under Menu Item 1, Bank of America can apply for servicer and investor incentive payments under HAMP, but Credit cannot be earned for these incentives.

[13]  Based on an average life of 8 years.

[14]  Bank of America may not earn Credit under Menu Items 1.D and 1.E for extinguishment of a second lien, junior lien, or unsecured mortgage debt where Bank of America owns or services the first lien and Bank of America initiates or

-4-

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| | $1.00 Forgiveness = $1.00 Credit | |
| | | Menu Items 1.D + 1.E + 3.A Cap = $3.0 Billion Credit |
| | 115% Early Incentive Credit 115% Credit for incremental relief in HHA beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA | |
| | $1.00 Forgiveness on loans serviced by Bank of America but owned by other investors = $0.50 Credit | |
| | $1.00 Investor incentive payments (when paid) consistent with those paid in HAMP (if applicable) = $1.00 Credit | |
| | Seriously Delinquent & Non-Performing (> 90 days past due on the related Second Lien): $1.00 Forgiveness = $0.40 Credit | |
| | 115% Early Incentive Credit 115% Credit for incremental relief in HHA beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA | |
| | $1.00 Investor incentive payments (when paid) consistent with those paid in HAMP (if applicable) = $1.00 Credit | |
| E.  Junior Liens (Liens less than Second Lien position) Outstanding Unsecured Mortgage Debt Principal Forgiveness/ Extinguishment | $1.00 Forgiveness = $0.40 Credit 115% Early Incentive Credit 115% Credit for incremental relief in HHA beyond the minimum of deriving 50% of Menu Item 1 Credit from HHA | |

prosecutes a foreclosure with respect to the first lien within 6 months of the extinguishment of the second lien. Bank of America may not earn Credit under Menu Items 1.D and 1.E for debt that has become unenforceable by operation of state law (e.g., California Code of Civil Procedure sections 580b and 580d).. To the extent that any form of relief under Menu Items 1.D or 1.E is offered on an opt-out basis, the opt-out period must be at least 90 days in length.

[15]    Eligibility under Menu Items 1.D and 1.E is limited to borrowers with second lien UPBs at or below $208,500 nationwide with the exception of Alaska, Guam, Hawaii and Virgin Islands, where eligibility is limited to borrowers with second lien UPBs at or below $312,750. Credit can only be earned under Menu Items 1.D and 1.E for extinguishment of second liens, junior liens, or unsecured mortgage debt.

[16]    As used in this Menu, delinquency will be determined using either the MBA or OTS definition of delinquency depending upon the method reflected in Bank of America's applicable system of record. "MBA" refers to the Mortgage Bankers Association definition of delinquency. "OTS" refers to the Office of Thrift Supervision definition of delinquency.

-5-

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| | | With respect to Menu Item 1, 50% of the Credit must be from HHA. |
| **2. Low to Moderate Income and Other Lending** | | |
| A. Low to Moderate Income and Other Lending | $10,000 Credit for purchase money loans to credit worthy borrowers: (1) in HHA; (2) who lost a primary residence to foreclosure or short sale; or (3) who are first time LMI homebuyers[17]<br><br>115% Early Incentive Credit | |
| **3. Community Reinvestment and Neighborhood Stabilization** | | |
| A. Forgiveness of principal associated with a property where foreclosure is not pursued and liens are released[18] | $1.00 Forgiveness = $1.00 Credit | Menu Item 3.A Cap = $2.5 Billion Credit<br><br>Menu Items 1.D + 1.E + 3.A Cap = $3 Billion Credit |
| B. Cash costs paid for demolition and property remediation of abandoned and uninhabitable residential properties as part of a comprehensive local strategy to stabilize neighborhoods | $1.00 Payment = $1.00 Credit<br><br>$1.00 Reasonable Remediation Costs = $1.00 Credit | |
| C. Mortgages or REO properties donated to accepting municipalities, land banks, or non-profits or to servicemembers with disabilities or relatives of deceased servicemembers | $1.00 Property Value[19] = $1.00 Credit<br>$1.00 Reasonable Rehabilitation Costs = $1.00 Credit | |

---

[17] Any LMI loan must be made to borrowers with income at or below 100% of the area median income ("AMI") and originated after July 1, 2014. AMI shall be as calculated in accordance with the parameters used by the U.S. Department of Housing and Urban Development ("HUD").

[18] Credit can only be earned for extinguishment on occupied properties. To the extent that any relief provided under Menu Item 3.A is offered on an opt-out basis, the opt-out period must be at least 90 days in length.

[19] Subject to any applicable investor or contractual requirements, any property value used to calculate Credits for this provision shall have a property valuation meeting the standards acceptable under the Making Home Affordable programs received within three months of the transaction.

| Menu Item[2] | Credit Towards Settlement | Minimum/Cap |
|---|---|---|
| D. Donations to non-profits to facilitate reduction, rehabilitation, or maintenance of abandoned and uninhabitable residential properties donated under Menu Item 3C | D. $1.00 Payment = $2.00 Credit | |
| E. Donations to capitalize certified Community Development Financial Institutions ("CDFIs")[20], land banks subject to state or local regulation, or community development funds administered by non-profits or local governments | $1.00 Payment = $2.00 Credit | Menu Item 3.E Minimum = $50 Million Payment |
| F. Donations to state-based Interest on Lawyers' Trust Account (IOLTA) organizations (or other statewide bar-association affiliated intermediaries) that provide funds to legal aid organizations, to be used for foreclosure prevention legal assistance and community redevelopment legal assistance[21] | $1.00 Payment = $2.00 Credit | Menu Item 3.F Minimum = $30 Million Payment |
| G. Donations to HUD-approved housing counseling agencies to provide foreclosure prevention assistance and other housing counseling activities[22] | $1.00 Payment = $2.00 Credit | Menu Item 3.G Minimum = $20 Million Payment |
| | 115% Early Incentive Credit for Menu Items 3.A-G | |

---

[20]   The list of Community Development Institutions certified by the CDFI Fund of the U.S. Treasury is available on the Treasury Department website at http://www.cdfifund.gov/what_we_do/programs_id.asp?programID=9.

[21]   For purposes of Menu Item 3.F, to the extent practicable, "state-based" IOLTA organizations includes those in the 50 states, the District of Columbia, and all U.S. territories or possessions. A minimum amount of $200,000 will be provided to the IOLTA or other eligible organization in each jurisdiction, with all remaining donation funds under this Menu Item 3.F to be distributed pro rata among all jurisdictions based on poverty population data, in the manner employed for funding distribution by the Legal Services Corporation based on data collected by the U.S. Census Bureau.

[22]   The list of HUD-approved housing counseling agencies is available on the HUD website at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

| | | |
|---|---|---|
| 4. **Affordable Rental Housing** | For Critical Need Family Housing[23] developments: $1.00 Loss[24] = $3.75 Credit | |
| | For other developments: $1.00 Loss = $3.25 Credit | Menu Item 4 Minimum = $100 Million Loss |
| | 115% Early Incentive Credit | With respect to Menu Item 4, at least 50% of units generating Credit must be in Critical Family Need Housing developments. Each year, at least 40% of all units generating credit in Critical Need Family Housing developments must have 2 or more bedrooms. Each year, at least 10% of all units generating Credit in Critical Need Family Housing developments must have 3 or more bedrooms. |
| | Credits for Critical Need Family Housing developments and for other developments will be given for developments that are equivalent to affordable housing developed through LIHTC. For example, developments eligible for Credits (i) must have at least 20% of the residential units affordable up to 50% AMI or at least 40% of the units affordable up to 60% AMI, (ii) must have a Land Use Restriction Agreement for at least 30 years, and (iii) must agree to accept Housing Choice vouchers. Other features also must be equivalent to affordable housing developed through LIHTC. | |
| | | To earn Credit, developments must meet the same affirmative marketing standards as are set forth in 24 C.F.R. § 200.620. |
| | | **Total Credit Minimum (Menu Items 1+2+3+4) =** |
| | | **$7 Billion Credit** |

---

[23]   "Critical Need Family Housing" is defined as affordable low-income rental housing developments selected by Bank of America that (i) are located within Small Area DDAs or State-Defined High Opportunity/Low Poverty Areas, and (ii) none of the units have age restrictions for any of the occupants. For these purposes, "Small Area DDAs" are Small Area Difficult Development Areas defined by HUD as set forth in 78 Fed. Reg. 69,113 (Nov. 18, 2013), and "State-Defined High Opportunity/Low Poverty Areas" refers to "high opportunity" or "low poverty" areas as defined in State Qualified Allocation Plans (for those states that use such designations). The list of Small Area DDAs for 2014 for purposes of this agreement shall be the list of Hypothetical Small Area DDAs for 2014 that was transmitted to Bank of America by the Department of Justice on August 8, 2014. The list of Small Area DDAs for subsequent years will be available on HUD's website.

[24]   Loss is measured as the difference between the fair value and par value, as reflected on the books and records of Bank of America, on the origination date of the subordinated loan made to facilitate the construction, rehabilitation, or preservation of affordable low-income rental housing. Credit will only be given up to $100,000 per affordable housing unit. Origination date is defined as the date the commitment to lend is issued. For crediting purposes, origination date is the determinative date for crediting as described above. If Bank of America's Loss is substantially reversed due to circumstances such as cancellation of the project during the term of this Annex 2, Bank of America's Credit shall be calculated on the actual Loss incurred. The Credit shall be reduced to $3.25 for $1.00 Loss if the location of the project is moved outside a Small Area DDA or State-Defined High Opportunity/Poverty Area.

State-Specific Consumer Relief

Minimum Credit, which can be derived from any Menu Item (1-4 above), must be earned in the following Participating States and denominations (which shall be known as the "Participating State Minimum Amounts"): $500 million for California[25], $500 million for New York[26], $100 million for Illinois, and $150 million for Delaware, Maryland, and Kentucky combined.

115% Additional Credit (which shall be known as "Participating State Additional Credit") for Credit Amounts in Menu Items 1, 2, and 3.A-C in excess of the Participating State Minimum Amounts for each Participating State.

Required Outreach

Bank of America agrees to hold eight events each year until Bank of America has achieved the Total Credit Minimum. These events will be carried out on a rotational basis to provide geographically dispersed borrower access, with priority given to the Hardest Hit Areas and Participating States. In preparation for each event, Bank of America will conduct targeted borrower outreach through personalized invitational letters, emails and/or outbound phone calls with eligible customers. The multi-lingual event team will conduct this outreach in English and Spanish, and, on a best efforts basis, other languages to encourage customers to make appointments in advance. As part of this preparation, Bank of America will notify the State Attorneys General, State Housing Finance Authorities, and local not-for-profits of the schedule of events to build further awareness and encourage increased participation. Specialists in both loss mitigation and refinancing programs will be on-site at each event to provide a setting where a customer can be guided across the full range of consumer relief alternatives. In addition, specialists in new mortgage origination will be available to assist any borrowers in Hardest Hit Areas, borrowers who lost homes to foreclosure or short sales, and first time low-to-moderate income homebuyers who may be interested in purchasing a new home. Multilingual translation and interpretation services for Spanish and, on a best efforts basis, other languages will be offered and available to customers requesting such support. In addition to Bank of America-sponsored events, Bank of America will continue to provide a qualified staff of agents to participate in and support additional events annually across the nation sponsored by national intermediaries and local not-for-profits throughout the term of the agreement, as invited. Finally, within 90 days of execution of this Settlement Agreement, Bank of America will prepare a short, plain-language document (translated into Spanish, Chinese, Tagalog, Vietnamese, and Korean), available online, that can be distributed by third parties to explain to customers the forms of relief available under this agreement. Bank of America shall translate this document into other languages as appropriate on a best efforts basis.

The Monitor will evaluate and certify Bank of America's compliance with the Required Outreach set forth above using a methodology similar to the methodology employed to determine Bank of America's compliance with the remainder of this Annex 2.

---

[25]   Within California, the following minimums also apply (which shall be referred to as the "California-Specific Minimum Amount"): Menu Items 1.A + 1.B Credit Minimum = $380 Million. Participating State Additional Credit can only be earned in California once the California-Specific Minimum Amount has been achieved.

[26]   Within New York, the following minimums also apply (which shall be referred to as the "New York-Specific Minimum Amounts"): Menu Item 1.A Credit Minimum = $60 Million; Menu Item 3.C Credit Minimum = $20 Million (provided that to be creditable for purposes of this Menu 3.C Credit Minimum, any donation must be accompanied by a donation under Menu Item 3.D); Menu Item 3.E Payment Minimum = $8.1 Million; Menu Item 3.F Payment Minimum = payment as determined by the methodology set forth in footnote 19 of this Annex 2; Menu Item 3.G Payment Minimum = $8.1 Million; and Menu Item 4 Loss Minimum = $35.7 Million. Participating State Additional Credit can only be earned in New York once the New York-Specific Minimum Amount has been achieved.

**Additional Parameters**

Bank of America shall not be responsible for any tax consequences to borrowers of the Consumer Relief described in the Menu beyond that described in Annex 3, but Bank of America is required to clearly disclose to borrowers the tax consequences of any relief offered or provided, and recommend that borrowers seek appropriate counsel as needed.

**Credit Minimums, Reporting Requirements, and Liquidated Damages**

Bank of America shall endeavor to satisfy the Consumer Relief obligations set forth in this Annex 2 by August 31, 2017, but shall have until August 31, 2018 to complete all Consumer Relief obligations set forth in this Annex 2. An independent Monitor acceptable to the parties and paid for by Bank of America shall be appointed to publicly: 1) report progress towards completion of Consumer Relief, including reporting on overall progress on a quarterly basis commencing no later than 180 days after the date of this Agreement; 2) report on Credits earned as promptly as practicable following the date the Monitor has confirmed the methodology for validation of Credits under this Menu (including a description of the distribution of Credits at the census block level); 3) ultimately determine and certify Bank of America's compliance with the terms of this Annex 2; and 4) report on the Tax Relief Payments under Annex 3. If the Monitor determines that a shortfall in that obligation remains as of August 31, 2018, Bank of America shall make a compensatory payment in cash in an amount equal to the shortfall (the "Liquidated Damages"), 25% of which shall be to Neighborworks America, to provide housing counselling, neighborhood stabilization, foreclosure prevention or similar programs, and 75% of which shall be to state-based Interest on Lawyers' Trust Account (IOLTA) organizations (or other statewide bar-association affiliated intermediaries) that provide funds to legal aid organizations, to be used for foreclosure prevention legal assistance and community redevelopment legal assistance.[27] The payment of Liquidated Damages shall be the sole remedy for any failure to complete the Consumer Relief. The calculations regarding the Credit Minimums shall be performed by the Monitor and the Monitor shall determine at the end of the period whether there are Liquidated Damages and, if so, the amount due.

In the event that Bank of America is unable to satisfy the Credit Minimums set forth in this Menu despite using its best efforts (as confirmed by the Monitor) to solicit every eligible borrower, barring any legal limitations on its ability to contact a given borrower, for the applicable consumer relief program, Bank of America may apply any Credits earned in excess of any of the Credit Minimums or any Credit earned in any Menu Item as to which neither a Credit Minimum nor a Credit Cap applies to offset any deficiency in respect of any of the other Menu Items to which a Credit Minimum applies.

The Monitor shall provide Bank of America with flexibility on the evidencing requirements for loans not serviced by Bank of America where the standard evidence is unavailable and Bank of America is able to provide alternative evidence that enables the Monitor to satisfactorily carry out his duties under this Annex 2. For example, the Monitor may (but is not required to) determine that balance forgiveness may be evidenced by transaction screenshots, before and after statements and/or 1099C statements.

For Menu Items 1, 2, 3.A, 3.B, and 3.C, Bank of America is required to report data to the Monitor at the census block level. For Menu Items 1.A, 1.B, 1.D, 1.E, and 3.A, Bank of America is required to provide the Monitor with a copy of the Internal Revenue Service ("IRS") Form 1099C issued to each individual for each item of relief provided.

Credit will not be given for any item of relief provided pursuant to this Menu where the Monitor determines that Bank of America has failed to satisfactorily report data (including census block level data) for that relief as required in this Annex 2. In the event that the Monitor determines that Bank of America has failed to perform the outreach required in this Annex 2, Bank of America shall make a Liquidated Damages payment in the amount of $100 million.

---

[27]     For purposes of the Liquidated Damages, to the extent practicable, 75% of the Liquidated Damages will be distributed pro rata among all jurisdictions based on poverty population data, in the manner employed for funding distribution by the Legal Services Corporation based on data collected by the U.S. Census Bureau.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE (NON-CLASS ACTION)

Case Number _____ BC 556820

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below . There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Daniel Buckley | 1 | 534 | Hon. Malcolm H. Mackey | 55 | 515 |
| Hon. Barbara A. Meiers | 12 | 636 | Hon. Michael Johnson | 56 | 514 |
| Hon. Terry A. Green | 14 | 300 | Hon Rolf M. Treu | 58 | 516 |
| Hon. Richard Fruin | 15 | 307 | Hon. Michael L. Stern | 62 | 600 |
| Hon. Rita Miller | 16 | 306 | Hon. Mark Mooney | 68 | 617 |
| Hon. Richard E. Rico | 17 | 309 | Hon. William F. Fahey | 69 | 621 |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. Soussan G. Bruguera | 71 | 729 |
| Hon. Robert L. Hess | 24 | 314 | Hon. Ruth Ann Kwan | 72 | 731 |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. Rafael Ongkeko | 73 | 733 |
| Hon. Barbara Scheper | 30 | 400 | Hon. Teresa Sanchez-Gordon | 74 | 735 |
| Hon. Mary H. Strobel | 32 | 406 | | | |
| Hon. Michael P. Linfield | 34 | 408 | | | |
| Hon. Gregory Alarcon | 36 | 410 | **Hon. Emilie H. Elias** | **324** | **CCW** |
| Hon. Maureen Duffy-Lewis | 38 | 412 | | | |
| Hon. Michelle R. Rosenblatt | 40 | 414 | | | |
| Hon. Holly E. Kendig | 42 | 416 | | | |
| Hon. Mel Red Recana | 45 | 529 | | | |
| Hon. Frederick C. Shaller | 46 | 500 | | | |
| Hon. Debre Katz Weintraub | 47 | 507 | | | |
| Hon. Elizabeth Allen White | 48 | 506 | | | |
| Hon. Deirdre Hill | 49 | 509 | | | |
| Hon. John L. Segal | 50 | 508 | | | |
| Hon. Mitchell L. Beckloff | 51 | 511 | **\*Provisionally Complex Non-Class Action Cases** | | |
| Hon. Susan Bryant-Deason | 52 | 510 | Assignment is Pending Complex Determination | 324 | CCW |
| Hon. Steven J. Kleifield | 53 | 513 | | | |
| Hon. Ernest M. Hiroshige | 54 | 512 | | | |

**\*Complex**

All non-class action cases designated as provisionally complex are forwarded to the Supervising Judge of the Complex Litigation Program located in the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005), for complex/non-complex determination pursuant to Local Rule 3.3(k). This procedure is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on SEP 0 0 2014 By _____ SHERRI R. CARTER, Executive Officer/Clerk _____, Deputy Clerk

NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE

EXHIBIT A - PAGE 115



COPY

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Vito Torchia, Jr. #244687
Brookstone Law, PC
18831 Von Karman Ave., Suite 400
Irvine, CA  92612
TELEPHONE NO.: 800-946-9655       FAX NO.: 866-257-6172
ATTORNEY FOR *(Name):* Plaintiffs

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA  90012
BRANCH NAME: Stanley Mosk Courthouse

**CASE NAME:**
BRADFORD v BANK OF AMERICA, N.A.

**FOR COURT USE ONLY**

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 08 2014

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | **CASE NUMBER:** |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded $25,000 or less) | ☐ Counter ☐ Joinder <br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | BC 556820 <br> JUDGE: <br> DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☑ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

**2.** This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☐ Large number of separately represented parties
b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. ☐ Substantial amount of documentary evidence
d. ☐ Large number of witnesses
e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. ☐ Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
**4.** Number of causes of action *(specify):* 8 For Consumer Relief under Aug 20, 2014 Settlement Agreement
**5.** This case ☐ is ☑ is not a class action suit.
**6.** If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*

Date: September 2, 2014

Vito Torchia, Jr.
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

EXHIBIT A - PAGE 116

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

EXHIBIT A - PAGE 117

COPY

| SHORT TITLE: BRADFORD v. BANK OF AMERICA, N.A. | CASE NUMBER BC 5 5 6 8 2 0 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 10   ☐ HOURS/ ☑ DAYS

Item II. Indicate the correct district and courthouse location (4 steps – if you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check <u>one</u> Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

EXHIBIT A - PAGE 118

| SHORT TITLE: BRADFORD v. BANK OF AMERICA, N.A. | CASE NUMBER | |
|---|---|---|

| A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | | |
| Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | | |
| Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | | |
| Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | | |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2. |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ A6032  Quiet Title | 2., 6. |
| | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 8. |
| **Unlawful Detainer** | | |
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer- Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 2 of 4

EXHIBIT A - PAGE 119

| SHORT TITLE: BRADFORD v. BANK OF AMERICA, N.A. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☑ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 3 of 4

EXHIBIT A - PAGE 120

| SHORT TITLE: BRADFORD v. BANK OF AMERICA, N.A. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☑1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☑8. ☐9. ☐10. | ADDRESS:<br>9009 San Pedro Street, Los Angeles, CA 90003<br><br>Multiple other addresses |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90003 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: September 3, 2014

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

EXHIBIT A - PAGE 121

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| STEVIE BRADFORD, an individual, et al. | BANK OF AMERICA CORPORATION, et al. |

| (b) County of Residence of First Listed Plaintiff  Los Angeles | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. | Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |
|---|---|
| Vito Torchia, Jr. BROOKSTONE LAW, PC 183831 Von Karman Ave., Suite 400 Irvine, CA 92612 (949) 209-5046 | Nafiz Cekirge BRYAN CAVE LLP 120 Broadway, Suite 300 Santa Monica, CA 90401-2386 (310) 576-2100 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1. Original Proceeding

☒ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ 50,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☒ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | CV14  07188 |
|---|---|---|

CV-71 (06/14)   CIVIL COVER SHEET   Page 1 of 3

SM01DOCS\1053683.1

**COPY**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? [X] Yes [ ] No <br> If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | [X] Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? <br><br> [ ] Yes [X] No <br><br> If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | [ ] NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | [ ] NO. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? <br><br> [ ] Yes [X] No <br><br> If "no, " skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? <br><br> *check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | [ ] NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br><br> *check one of the boxes to the right* ➡ | [ ] YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | [ ] NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | [ ] | [ ] | [ ] |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | [ ] | [ ] | [ ] |

| **D.1.** Is there at least one answer in Column A? <br><br> [ ] Yes [X] No <br><br> If "yes," your case will initially be assigned to the SOUTHERN DIVISION. <br> Enter "Southern" in response to Question E, below, and continue from there. <br> If "no," go to question D2 to the right. ➡ | **D.2.** Is there at least one answer in Column B? <br><br> [ ] Yes [X] No <br><br> If "yes," your case will initially be assigned to the EASTERN DIVISION. <br> Enter "Eastern" in response to Question E, below. <br> If "no," your case will be assigned to the WESTERN DIVISION. <br> Enter "Western" in response to Question E, below. ⬇ |
|---|---|

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | Western |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | [ ] Yes [X] No |

SM01DOCS\1053683.1

American LegalNet, Inc. <br> www.FormsWorkFlow.com

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any cases previously filed **in this court?**   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are related when they:** (1) arise from the same or a closely related transaction, happening, or event; (2) call for determination of the same or substantially related or similar questions of law and fact; or (3) for other reasons would entail substantial duplication of labor if heard by different judges. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _Nafiz Cekirge_   DATE: September 15, 2014

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com